

Federal Communications Commission
Washington, D.C. 20554


December 1, 2017

Marcia M. Waldron, Clerk
United States Court of Appeals
 for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA  19106-1790


  RE: *Prometheus Radio Project, et al. v. FCC*, Nos. 17-1107, et al.

Dear Ms. Waldron:

  Pursuant to Fed. R. App. P. 28(j), I write to inform the Court of a recent FCC order that pertains to this case.  On November 20, 2017, the FCC issued an order granting reconsideration of the order on review in this case.  *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, FCC 17-156 (released Nov. 20, 2017) ("*Reconsideration Order*").  A copy of the *Reconsideration Order* is attached.

  Three of the petitioners in this case—News Media Alliance (No. 17-1108), the Scranton Times (No. 17-1110), and Bonneville International Corp. (No. 17-1111)—seek review of the FCC's 2016 decision to retain a rule banning common ownership of daily newspapers and broadcast stations.  In the *Reconsideration Order*, the FCC eliminated that rule.  Accordingly, the Commission believes that the pending challenges to the rule will become moot after the *Reconsideration Order* becomes effective (30 days after its publication in the Federal Register).

  As for the claims raised by the other petitioners—Prometheus Radio Project, et al. (No. 17-1107) and Multicultural Media, Telecom and Internet Council, Inc., et al. (No. 17-1109)—the Court should grant the FCC's pending motion to hold this case in abeyance until the expiration of the period for filing petitions for

review of the *Reconsideration Order*. (That period will run for 60 days after the *Reconsideration Order* is published in the Federal Register.) The Court should then direct the parties to file motions to govern further proceedings within 30 days after the period for seeking judicial review of the *Reconsideration Order* has expired.

Sincerely,

/s/James M. Carr

James M. Carr
Counsel

cc:   Counsel for all parties
(via CM/ECF)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| 2014 Quadrennial Regulatory Review – Review of | **)** | MB Docket No. 14-50 |
| the Commission's Broadcast Ownership Rules and | **)** | |
| Other Rules Adopted Pursuant to Section 202 of | **)** | |
| the Telecommunications Act of 1996 | **)** | |
| | **)** | |
| 2010 Quadrennial Regulatory Review – Review of | **)** | MB Docket No. 09-182 |
| the Commission's Broadcast Ownership Rules and | **)** | |
| Other Rules Adopted Pursuant to Section 202 of | **)** | |
| the Telecommunications Act of 1996 | **)** | |
| | **)** | |
| Promoting Diversification of Ownership | **)** | MB Docket No. 07-294 |
| In the Broadcasting Services | **)** | |
| | **)** | |
| Rules and Policies Concerning Attribution of Joint | **)** | MB Docket No. 04-256 |
| Sales Agreements in Local Television Markets | **)** | |
| | **)** | |
| Rules and Policies to Promote New Entry and | **)** | MB Docket No. 17-289 |
| Ownership Diversity in the Broadcasting Services | **)** | |

**ORDER ON RECONSIDERATION AND NOTICE OF PROPOSED RULEMAKING**

**Adopted: November 16, 2017** **Released: November 20, 2017**

**Comment Date: (60 days after publication in the Federal Register)**
**Reply Comment Date: (90 days after publication in the Federal Register)**

By the Commission: Chairman Pai and Commissioners O'Rielly and Carr issuing separate statements;
Commissioners Clyburn and Rosenworcel dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                                                   Paragraph #
I. INTRODUCTION ....................................................................................................................... 1
II. BACKGROUND ....................................................................................................................... 4
III. MEDIA OWNERSHIP RULES ................................................................................................ 8
    A. Newspaper/Broadcast Cross-Ownership Rule ................................................................... 8
    B. Radio/Television Cross-Ownership Rule .......................................................................... 49
    C. Local Television Ownership Rule ..................................................................................... 66
    D. Local Radio Ownership Rule ............................................................................................ 86
IV. TELEVISION JOINT SALES AGREEMENTS ....................................................................... 96
V. SHARED SERVICE AGREEMENTS ...................................................................................... 114
VI. DIVERSITY/INCUBATOR PROGRAM .................................................................................. 121
VII. NOTICE OF PROPOSED RULEMAKING .............................................................................. 126
VIII. PROCEDURAL MATTERS ..................................................................................................... 146
IX. ORDERING CLAUSES ............................................................................................................ 153
APPENDIX A – Final Rule Changes
APPENDIX B – Supplemental Final Regulatory Flexibility Analysis
APPENDIX C – Initial Regulatory Flexibility Analysis

## I.    INTRODUCTION

1.    Today we end the 2010/2014 Quadrennial Review proceeding.  In doing so, the Commission not only acknowledges the dynamic nature of the media marketplace, but takes concrete steps to update its broadcast ownership rules to reflect reality.  Indeed, the Commission plainly stated in its 2010 *NOI* initiating this proceeding that the broadcast ownership rules required a fresh look in light of "[d]ramatic changes in the marketplace,"[1] yet the resulting *Second Report and Order* issued in August 2016 manifestly failed to adopt any meaningful changes to these rules—and *effectively tightened* the Local Television Ownership Rule.[2]  In this Order on Reconsideration, we refuse to ignore the changed landscape and the mandates of Section 202(h), and we deliver on the Commission's promise to adopt broadcast ownership rules that reflect the present, not the past.  Because of our actions today to relax and eliminate outdated rules, broadcasters and local newspapers will at last be given a greater opportunity to compete and thrive in the vibrant and fast-changing media marketplace.  And in the end, it is consumers that will benefit, as broadcast stations and newspapers—those media outlets most committed to serving their local communities—will be better able to invest in local news and public interest programming and improve their overall service to those communities.

2.    Accordingly, in today's Order on Reconsideration, we grant in part and deny in in part, as set forth herein, various petitions for reconsideration[3] of the *Second Report and Order*.  Specifically, we (1) eliminate the Newspaper/Broadcast Cross-Ownership Rule; (2) eliminate the Radio/Television Cross-Ownership Rule; (3) revise the Local Television Ownership Rule to eliminate the Eight-Voices Test and to modify the Top-Four Prohibition to better reflect the competitive conditions in local markets; (4) decline to modify the market definitions relied on in the Local Radio Ownership Rule, but provide a presumption for certain embedded market transactions; (5) eliminate the attribution rule for television joint sales agreements (JSAs); and (6) retain the disclosure requirement for shared service agreements (SSAs) involving commercial television stations.

---

[1] *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Inquiry, 25 FCC Rcd 6086, 6087, para. 1 (2010) (*NOI*).

[2] *See generally 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Second Report and Order, 31 FCC Rcd 9864 (2016) (*Second Report and Order*).

[3] Petition of Connoisseur Media for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (Connoisseur Petition); Petition of the National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (NAB Petition); Petition of Nexstar Broadcasting, Inc. for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (Nexstar Petition).  In addition, various parties filed *ex parte* comments—well after the filing deadline for petitions for reconsideration—urging the Commission to address other aspects of the *Second Report and Order* that were not raised in any petition for reconsideration.  *See, e.g.*, Letter from Barry A. Friedman, Thompson Hine, Counsel for Dick Broadcasting Company, Inc. of Tennessee, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50, 09-182, and 07-294, at 2 (filed Mar. 24, 2017) (Dicks Broadcasting Mar. 24, 2017 *Ex Parte*) (stating that "continued applicability of the [AM/FM] subcaps warrants a hard look from the Commission").  In effect, these *ex parte* filings are untimely petitions for reconsideration, which we lack discretion to consider absent extraordinary circumstances not present here.  *See* 47 U.S.C. § 405(a) ("A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of."); *Reuters, Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986) (express statutory limitations barred the Commission from acting on a petition for reconsideration that was filed after the due date); *Adelphia Commc'ns Corp.*, 12 FCC Rcd 10759 (1997) ("The Commission may entertain petitions for reconsideration filed beyond the statutory deadline only where 'extraordinary circumstances indicate that justice would thus be served.'") (citing *Gardner v. FCC*, 530 F.2d 1086, 1091 (D.C. Cir. 1976)).  Accordingly, we limit our action today to those issues properly raised in timely petitions for reconsideration.

3. In addition, we find that the present record supports adoption of an incubator program to promote ownership diversity; however, the structure and implementation of such a program requires further exploration. Accordingly, in the accompanying Notice of Proposed Rulemaking (NPRM), we seek comment on structuring our incubator program to help facilitate new entry into the broadcast services.

## II. BACKGROUND

4. Congress requires the Commission to review these rules every four years to determine whether they "are necessary in the public interest as the result of competition" and to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest."[4] The history of this review proceeding is long and well documented and need not be repeated in detail here.[5] In relevant part, on August 10, 2016, the Commission adopted the *Second Report and Order* (released on August 25, 2016) to resolve both the 2010 and 2014 quadrennial review proceedings, as well as to address various issues related to the attribution of television JSAs, diversity initiatives, and SSAs. Then-Commissioner Pai and Commissioner O'Rielly dissented in part.

5. The *Second Report and Order* largely retained the existing broadcast ownership rules, reinstated the previously vacated Television JSA Attribution Rule, and adopted a definition of SSAs and a disclosure requirement for SSAs involving commercial television stations. The Commission reinstated the revenue-based eligible entity standard, as well as associated measures, to help promote small business participation in the broadcast industry. However, the Commission determined that it could not meet the demanding legal standards the courts have said must be met before the Government may implement preferences based on race or gender. Finally, the Commission committed to explore various diversity-related proposals in the record, while declining to adopt other proposals, including an incubator program.

6. Several parties seek reconsideration of various aspects of the *Second Report and Order*. The National Association of Broadcasters (NAB) petitions the Commission to reconsider its decisions regarding the Local Television Ownership Rule, television JSA attribution, SSA disclosure, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the rejection of NAB's proposal to create an incubator program to encourage diversity.[6] Nexstar

---

[4] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act). In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially. *See* Appropriations Act § 629, 118 Stat. at 100.

[5] The *Second Report and Order* provides a detailed accounting of the history of this proceeding, which we incorporate by reference herein. *Second Report and Order*, 31 FCC Rcd at 9866, paras. 7-15.

[6] NAB Petition at i-v. On January 24, 2017, UCC et al. filed a motion to strike and dismiss the NAB Petition on the grounds that the petition "improperly evades the strict 25-page limit on reconsideration petitions by using a prohibited, undersized font for footnotes and inserting a substantial portion of its argument into those footnotes" in violation of 47 CFR § 1.49(a). Motion of United Church of Christ et al. to Strike and Dismiss Petition of the National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 2 (filed Jan. 24, 2017) (UCC et al. Motion to Strike and Dismiss). The motion also alleges that NAB's summary was "well over twice the permissible length, and improperly contains additional arguments" in violation of 47 CFR § 1.49(c). *Id.* In reply, NAB states that it did not intend to evade any Commission rules and offers to refile if the Commission is concerned about UCC et al.'s allegations. Reply of the National Association of Broadcasters to Oppositions of American Cable Association and United Church of Christ et al. to Petition of the National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 2, n.4 (filed Feb. 3, 2017) (NAB Reply to Oppositions). In addition, NAB cites precedent that the Commission has considered previously the merits of an application for review well in excess of the 25-page limit and notes that both UCC et al. and ACA have pleadings in the proceeding that violate 47 CFR § 1.49 but have been considered on the merits by the Commission. *Id.* We deny UCC et al.'s motion. We find that, to the extent that NAB's pleading does not precisely conform to 47 CFR § 1.49,

(continued....)

Broadcasting, Inc. (Nexstar) also challenges the Local Television Ownership Rule and the attribution of television JSAs,[7] while Connoisseur Media LLC (Connoisseur) challenges an aspect of the Local Radio Ownership Rule related to embedded markets.[8] Oppositions to the reconsideration petitions were filed by the American Cable Association (ACA), opposing reconsideration of the Local Television Ownership Rule and television JSA attribution,[9] and UCC et al., opposing reconsideration of the Local Television Ownership Rule, television JSA attribution, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and SSA disclosure.[10] Subsequently, NAB, Nexstar, and Sinclair Broadcast Group, Inc. (Sinclair) filed replies to the oppositions.[11]

7.    In addition, multiple parties sought judicial review of the *Second Report and Order* in the D.C. Circuit and the Third Circuit. The D.C. Circuit was selected initially as the venue for the case through the judicial lottery, though the case has since been transferred to the Third Circuit.[12] Prometheus Radio Project (Prometheus) challenges various diversity-related decisions, certain media ownership rules,

(Continued from previous page) ———————————————

no party has been prejudiced, and the public interest is best served by considering NAB's arguments. We remind parties, however, to be mindful of the requirements of Section 1.49. *See* 47 CFR § 1.49.

[7] Nexstar Petition at 4.

[8] Connoisseur Petition at 1-2.

[9] Opposition of American Cable Association to Petitions of National Association of Broadcasters and Nexstar Broadcasting, Inc. for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 1-2 (filed Jan. 24, 2017) (ACA Opposition).

[10] Opposition of UCC et al. to Petitions for Reconsideration of National Association of Broadcasters and Nexstar Broadcasting, Inc. of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at ii-iii (filed Jan. 24, 2017) (UCC et al. Opposition).

[11] NAB Reply to Oppositions; Reply of Nexstar Broadcasting, Inc. to Oppositions of American Cable Association and UCC et al. to Petition of National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al. (filed Feb. 3, 2017) (Nexstar Reply to Oppositions); Reply of Sinclair Broadcast Group, Inc. to Oppositions of American Cable Association and UCC et al. to Petitions of National Association of Broadcasters and Nexstar Broadcasting, Inc. for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al. (filed Feb. 3, 2017) (Sinclair Reply to Oppositions). In addition, various parties filed comments in support of reconsideration of certain issues. *See* Reply of Cox Media Group, LLC in Support of Petition of National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 1 (filed Jan. 24, 2017) (Cox Reconsideration Comments) (supporting NAB Petition and seeking repeal of the Newspaper/Broadcast Cross-Ownership Rule); Reply of News Media Alliance in Support of Petition of National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 1 (filed Jan. 24, 2017) (NMA Reconsideration Comments) (supporting NAB Petition and seeking repeal of the Newspaper/Broadcast Cross-Ownership Rule); Reply Comments of Bonneville International Corporation and Scranton Times, L.P. in Support of Petition of National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 1-2 (filed Feb. 3, 2017) (Bonneville/Scranton Reconsideration Reply Comments) (supporting the NAB Petition, in particular elimination of the newspaper/radio cross-ownership restriction, although also supporting the elimination of the Newspaper/Broadcast Cross-Ownership Rule in its entirety); Reply Comments of News Media Alliance in Support of Petition of National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Second Report and Order, MB Docket Nos. 14-50 et al., at 1 (filed Feb. 3, 2017) (NMA Reconsideration Reply Comments) (supporting the NAB Petition and asserting that the UCC et al. Opposition provides "no valid reason for the Commission to refrain from reconsidering its decision to maintain the Newspaper/Broadcast Cross-Ownership Rule").

[12] Order, *Prometheus Radio Project et al. v. FCC*, No. 17-1107, Document No. 003112514755 (3rd Cir. Jan. 18, 2017).

and the decision not to attribute SSAs.[13]  The Multicultural Media, Telecom and Internet Council (MMTC) and the National Association of Black Owned Broadcasters (NABOB) jointly challenge the Commission's decision not to apply the cable procurement rule to all communications sectors.[14]  Finally, the News Media Alliance (NMA), Bonneville International Corporation (Bonneville), and The Scranton Time, L.P. (Scranton) challenge the Newspaper/Broadcast Cross-Ownership Rule adopted in the *Second Report and Order*.[15]  NAB initially sought judicial review, but withdrew its petition for review after filing a petition for reconsideration with the Commission,[16] though NAB has requested intervenor status with the court.[17]  No briefing schedule has been set and the Commission has asked the court to hold the proceeding in abeyance pending potential action on the Petitions for Reconsideration.  The court has not yet made a decision on this issue.

## III.    MEDIA OWNERSHIP RULES

### A.    Newspaper/Broadcast Cross-Ownership Rule

#### 1.    Introduction

8.    Upon reconsideration, we repeal the Newspaper/Broadcast Cross-Ownership (NBCO) Rule in its entirety.[18]  For more than forty years, the NBCO Rule has prohibited common ownership of a daily print newspaper and a full-power broadcast station (AM, FM, or TV) if the station's service contour encompasses the newspaper's community of publication.[19]  After reviewing the record from the 2010 and

---

[13] Petition for Review of Prometheus Radio Project and Media Mobilizing Project, *Prometheus Radio Project et al. v. FCC*, No. 16-4046, Document No. 003112457854 (3rd Cir. Nov. 3, 2016).

[14] Petition for Review of Multicultural Media, Telecom and Internet Council and the National Association of Black Owned Broadcasters, *Multicultural Media, Telecom and Internet Council et al. v. FCC*, No. 16-1398, Document No. 1646418 (DC Cir. Nov. 15, 2016).

[15] Petition for Review of News Media Alliance, *News Media Alliance v. FCC*, No. 16-1395, Document No. 1646214 (D.C. Cir. Nov. 14, 2016); Petition for Review of Bonneville International Corporation, *Bonneville Intl. Corp. v. FCC*, No. 16-1452, Document No. 1653313 (D.C. Cir. Dec. 28, 2016); Petition for Review of The Scranton Times, L.P., *The Scranton Times, L.P. v FCC*, No. 16-451, Document No. 1653302 (D.C. Cir. Dec. 28, 2016).  On September 7, 2016, the Newspaper Association of America changed its name to the News Media Alliance (NMA).  Press Release, News Media Alliance, Newspaper Association of America Changes Name to News Media Alliance (Sept. 7, 2016), https://www.newsmediaalliance.org/naa-name-change-news-media-alliance/.  To avoid confusion, we will use NMA when referring to any filings by this organization, even if they were made before the name change.

[16] Unopposed Motion to Voluntarily Dismiss Appeal of National Association of Broadcasters, *National Association of Broadcasters v. FCC*, No. 16-1394, Document No. 1649059 (D.C. Cir. Dec. 2, 2016).

[17] Motion to Intervene of National Association of Broadcasters, *Prometheus Radio Project et al. v. FCC*, No. 16-1403, Document No. 1649063 (D.C. Cir. Dec. 2, 2016).

[18] The NBCO Rule adopted in the *Second Report and Order* is currently on appeal to the Third Circuit.  *See supra* para. 7.

[19] *See Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, Second Report and Order, 50 FCC 2d 1046, 1074-78, 1099-1106, paras. 99-107, App. F (1975) (*1975 Second Report and Order*).  The Commission attempted to modify the rule in its 2002 and 2006 ownership reviews, but those modifications never became effective.  Thus, the rule in effect before the *Second Report and Order* was adopted in 2016 was the same as it existed in 1975.  Specifically, the rule prohibited the licensing of an AM, FM, or TV broadcast station to a party (including all parties under common control) that directly or indirectly owns, operates, or controls a daily newspaper, if the entire community in which the newspaper is published would be encompassed within the service contour of the station, namely:  (1) the predicted or measured 2 mV/m contour of an AM station, computed in accordance with Section 73.183 or Section 73.186; (2) the predicted 1 mV/m contour for an FM station, computed in accordance with Section 73.313; or (3) the Grade A contour of a TV station, computed in accordance with Section 73.684.  *See* 47 CFR § 73.3555(d) (2002).

2014 ownership reviews, and the issues raised on reconsideration, we find that the Commission failed to give adequate consideration to the significant record evidence demonstrating that the media marketplace has changed significantly. The Commission's prior reasoning reflected a time long past when consumers had access to only a few sources of news and information in the local market, including significantly fewer broadcast outlets. Our decision to repeal the rule means that all newspapers (print or digital) now will be allowed to combine with television and radio stations within the same local market, subject to the remaining broadcast ownership rules and any other applicable laws, including antitrust laws.

9. The Commission adopted the NBCO Rule in 1975 primarily to promote viewpoint diversity, observing that "it is essential to a democracy that its electorate be informed and have access to divergent viewpoints on controversial issues."[20] In the past, the Commission maintained that requiring separate ownership of local broadcasters and newspapers served the rule's purpose because broadcast stations and local newspapers generally were successful enterprises providing strong local voices in a marketplace containing a very limited number of speakers. We find upon further review, however, that prohibiting newspaper/broadcast combinations is no longer necessary to serve the Commission's goal of promoting viewpoint diversity in light of the multiplicity of sources of news and information in the current media marketplace and the diminished voice of daily print newspapers. Whatever the limited benefits for viewpoint diversity of retaining the rule, in today's competitive media environment, they are outweighed by the costs of preventing traditional news providers from pursuing cross-ownership investment opportunities to provide news and information in a manner that is likely to ensure a more informed electorate. As such, we conclude that the NBCO Rule no longer serves the public interest and must be repealed pursuant to Section 202(h).[21]

10. The conclusion that the time has come to eliminate the NBCO Rule is shared by many beyond the Commission. For example, following the Commission's ill-advised decision essentially to retain the existing ban in the *Second Report and Order*, Rep. Greg Walden (R-OR) and Rep. John Yarmuth (D-KY) introduced legislation, with additional bipartisan cosponsors, to eliminate the NBCO Rule.[22] Rep. Walden stated that eliminating the rule would "provide much needed flexibility to the many newspapers and broadcasters throughout the country that provide important local news coverage and encourage greater investment in original journalism."[23] And according to Rep. Yarmuth, "it is increasingly important that we do all we can to protect legitimate sources of news."[24] Reed Hundt, a former Commission Chairman during the Clinton Administration, has endorsed the rule's repeal in light of increased access to news and information over the Internet and the financial support that a broadcaster could offer to a troubled newspaper.[25] There also is support for eliminating the rule, as discussed below,

---

[20] *See 1975 Second Report and Order*, 50 FCC 2d at 1074, para. 99 (also taking competition into account as a correlative goal).

[21] 1996 Act § 202(h).

[22] To Eliminate the Daily Newspaper Cross-Ownership Rule of the Federal Communications Commission, H.R. 6474, 114th Cong. (2016); *see also* Press Release, Energy and Commerce Committee, Walden and Yarmuth Introduce Bill Eliminating Disco Era Media Ownership Rules (Dec. 7, 2016) (Walden/Yarmuth Press Release), https://energycommerce.house.gov/news-center/press-releases/walden-and-yarmuth-introduce-bill-eliminating-disco-era-media-ownership. The bill's cosponsors included Rep. Gene Green (D-TX), Rep. Bobby Rush (D-IL), Rep. Gus Bilirakis (R-FL), Rep. Pete Olson (R-TX), Rep. Brett Guthrie (R-KY), and Rep. Billy Long (R-MO).

[23] Walden/Yarmuth Press Release.

[24] *Id.*

[25] Reed Hundt, Opinions, *The FCC Should Repeal Its Newspaper-Broadcast Ownership Rule*, Washington Post (June 6, 2013), https://www.washingtonpost.com/opinions/the-fcc-should-repeal-its-newspaper-broadcast-ownership-rule/2013/06/06/7084e764-cebb-11e2-8845-d970ccb04497_story.html?utm_term=.5caff689bc73.

among organizations representing minority-owned media outlets.[26] They assert that the rule is constraining the ability of minority-owned media outlets to serve their local communities and has outlived its usefulness. Finally, the Third Circuit in May 2016 noted that among the "costs of delay" in repealing the rule has been continuance of a blanket ban on newspaper-broadcast cross-ownership that "the FCC determined more than a decade ago . . . is no longer in the public interest"[27]—a determination that the Third Circuit had upheld in 2004.[28] With this decision, the Commission will finally acknowledge what is clear to so many—it is time to eliminate the NBCO Rule.

## 2. Background

11.     We incorporate by reference the description of the background of the NBCO Rule in the *Second Report and Order* and confine our summary to a brief overview of the rule's history.[29] As we stated, the Commission's primary intent in adopting the rule in 1975 was to preserve and promote a diversity of viewpoints at the local level.[30] To that end, the Commission prohibited cross-ownership of what it determined to be the predominant providers of local news within a market—daily newspapers and television and radio broadcast stations—although it acknowledged that radio stations generally play a smaller role than newspapers and television stations in the dissemination of local news.[31] The Supreme Court upheld the NBCO Rule in 1978 and found that the Commission reasonably relied on separation of ownership as a means to promote viewpoint diversity.[32] Viewpoint diversity has remained the principal basis for newspaper/broadcast cross-ownership restrictions for over forty years and currently provides the sole support for the rule given the Commission's conclusions since 2003 that the rule is not necessary to promote the goals of competition or localism, and may even hinder localism.[33] The rule's reliance on viewpoint diversity is significant in light of the Supreme Court's recognition on review of this rule that diversity "has not been the sole consideration thought relevant to the public interest" and that the

---

[26] *See* Letter from James L. Winston, President, National Association of Black Owned Broadcasters (NABOB), to Hon. Ajit Pai, Chairman, FCC, MB Docket No. 14-50 et al. (Feb. 24, 2017) (NABOB Feb. 24, 2017 *Ex Parte* Letter) (supporting elimination of the ban on newspaper/radio combinations); Letter from Dr. Benjamin F. Chavis, Jr., President and CEO, National Newspaper Publishers Association (NNPA), to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50, at 1 (Feb. 13, 2017) (NNPA Feb. 13, 2017 *Ex Parte* Letter) (supporting elimination of the entire NBCO Rule); *see also infra* paras. 44-45. NABOB's *ex parte* letter did not address newspaper/television combinations.

[27] *Prometheus Radio Project v. FCC*, 824 F.3d 33, 51 (3d Cir. 2016) (*Prometheus III*).

[28] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 398-400 (3d Cir. 2004) (*Prometheus I*).

[29] *Second Report and Order*, 31 FCC Rcd at 9914-17, paras. 135-40.

[30] *1975 Second Report and Order*, 50 FCC 2d at 1048-49, 1074, 1075, 1078-81, paras. 9-11, 99, 101, 110-12 (also taking competition into consideration). In evaluating viewpoint diversity, the Commission has focused on local news providers, as opposed to those that offer mostly regional or national news. *See id.* at 1080-81, para. 112; *see also Second Report and Order*, 31 FCC Rcd at 9914, para. 135 & n.338.

[31] *See 1975 Second Report and Order*, 50 FCC 2d at 1075, 1080-83, paras. 101, 112-15.

[32] *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 796 (1978) (*NCCB*).

[33] *See 2002 Biennial Regulatory Review - Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13748-67, paras. 330-69 (2003) (*2002 Biennial Review Order*); *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2021-22, 2038-39, paras. 18-19, 46-49 (2008) (*2006 Quadrennial Review Order*); *Second Report and Order*, 31 FCC Rcd at 9912-13, 9917, 9928, 9930, paras. 129-30, 142, 162, 166-67.

Commission's "other, and sometimes conflicting, goal has been to ensure 'the best practicable service to the public.'"[34]

12.　　Despite the importance of the rule's purpose to promote viewpoint diversity, the Commission recognized from the outset that there may be circumstances where the cross-ownership restriction should not apply. When it adopted the initial NBCO Rule in 1975, the Commission applied the rule prospectively and limited divestiture of existing newspaper/broadcast combinations to "only the most egregious cases."[35] In addition, it contemplated various situations potentially warranting a waiver of the divestiture requirement.[36] In its 2002 and 2006 ownership review proceedings, the Commission retained cross-ownership restrictions generally, but attempted to relax the NBCO rule, concluding that application of an absolute ban was overly restrictive.[37] The Third Circuit deemed that conclusion reasonable but found fault in both instances with the way the Commission executed its decisions to revise the rule, and thus, the 1975 ban remained in effect.[38] In 2016, the Third Circuit observed in *Prometheus III* that the ban's continued operation had imposed "significant expense" on parties that otherwise might be permitted "to engage in profitable combinations."[39]

13.　　In the *Second Report and Order*, the Commission affirmed its previous findings that an absolute ban was overly restrictive, but concluded that some newspaper/broadcast cross-ownership restrictions continued to be necessary to promote viewpoint diversity.[40] It retained the general prohibition on common ownership of a broadcast station and a daily print newspaper in the same local market, but adopted minor changes to the rule to accomplish what the Commission called a "modest loosening" of the absolute ban. The Commission: (1) modified the geographic scope of the rule to update its analog parameters and to reflect more accurately the markets that newspapers and broadcasters actually serve;[41] (2) adopted an explicit exception for failed and failing broadcast stations and newspapers;[42] and

---

[34] *NCCB*, 436 U.S. at 782; *see also id.* at 807, 809-14 (citing a Commission study showing that cross-owned stations had "statistically significant superiority" in terms of percentage of time devoted to several categories of local programming).

[35] *1975 Second Report and Order*, 50 FCC 2d at 1076, 1080-81, paras. 103, 112.

[36] *Id.* at 1084-85, paras. 117-19 (finding that a waiver of the divestiture requirement might be appropriate where: (1) there was an inability to dispose of an interest to conform to the rules; (2) the only possible sale was at an artificially depressed price; (3) separate ownership of the newspaper and station could not be supported in the locality; or (4) the purposes of the rule would be disserved by divestiture).

[37] *2002 Biennial Review Order*, 18 FCC Rcd at 13760, 13790, paras. 355, 432 (replacing the NBCO Rule with a set of cross-media limits); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2021-23, paras. 18-20 (adopting a waiver standard that granted a favorable presumption to proposed newspaper/broadcast mergers meeting certain criteria).

[38] *Prometheus I*, 373 F.3d at 399-413 (remanding the 2002 cross-media limits due to certain deficiencies in the Commission's analysis); *Prometheus Radio Project v. FCC*, 652 F.3d 431, 445-53 (3d Cir. 2011) (*Prometheus II*) (vacating and remanding the 2006 modifications to the NBCO Rule after finding that the Commission failed to comply with public notice and comment requirements); *see also Prometheus III*, 824 F.3d at 51-52 (noting court's agreement in *Prometheus I* that a complete ban no longer serves the public interest).

[39] *Prometheus III*, 824 F.3d at 51-52.

[40] *Second Report and Order*, 31 FCC Rcd at 9913, para. 130.

[41] *Id.* at 9930-33, paras. 168-71 (limiting the rule's prohibition to newspaper/television combinations within the same Nielsen DMA and, in areas where Nielsen has designated an Audio Metro market, to newspaper/radio combinations within the same Nielsen Audio Metro market). Regarding the contour trigger requirement for newspaper/television combinations, the Commission updated the geographic scope of the restriction by replacing its reliance on a television station's obsolete Grade A analog contour with the station's digital principal community contour, as defined in Section 73.625 of the Commission's rules. *See* 47 CFR § 73.625.

[42] *Second Report and Order*, 31 FCC Rcd at 9933-34, paras. 172-75.

(3) created a case-by-case waiver standard whereby the Commission would grant relief from the rule if the applicants showed that a proposed merger would not unduly harm viewpoint diversity in the market.[43] The Commission declined to eliminate the newspaper/radio cross-ownership restriction from the NBCO Rule after finding that, despite its earlier tentative conclusion that radio stations typically are not primary outlets for local news, radio stations nonetheless provide a meaningful amount of local news and information such that lifting the restriction could harm viewpoint diversity.[44] In addition, the Commission explained that, although the rule may benefit ownership diversity incidentally, the agency's purpose in retaining the rule was not to promote minority or female ownership.[45]

14. NAB petitioned the Commission to reconsider its retention of the NBCO Rule.[46] NMA, Cox, Sinclair, and Bonneville/Scranton filed comments and/or reply comments in support of NAB's petition.[47] UCC et al. filed an opposition to NAB's petition, in which they urge the Commission to retain the NBCO Rule adopted in the *Second Report and Order*.[48]

### 3. Discussion

15. We find that the NBCO Rule must be repealed because it is not necessary to promote the Commission's policy goals of viewpoint diversity, localism, and competition, and therefore does not serve the public interest.[49] The parties that support reconsideration of the NBCO Rule argue that the modifications adopted in the *Second Report and Order* were insufficient and that the rule is obsolete and should be eliminated. We agree. We affirm the Commission's longstanding determination that the rule does not advance localism and competition goals, and find today that it is no longer necessary to promote viewpoint diversity, the rule's only remaining policy justification. Although elimination of the rule could

---

[43] *Id.* at 9934-41, paras. 176-89.

[44] *Id.* at 9921-26, paras. 150-59. *But see 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Notice of Proposed Rulemaking, 26 FCC Rcd 17489, 17529-30, para. 112 (2011) (*NPRM*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4435-36, para. 145 (2014) (*FNPRM and Report and Order*).

[45] *Second Report and Order*, 31 FCC Rcd at 9944, para. 197.

[46] NAB Petition at 14-25; *see also* NAB Reply to Oppositions at 5-6.

[47] NMA Reconsideration Comments at 1-8; NMA Reconsideration Reply at 1-3; Cox Reconsideration Comments at 1-8; Sinclair Reconsideration Reply at 9-10; Bonneville/Scranton Reconsideration Reply at 1-10.

[48] UCC et al. Opposition at 6-7.

[49] The Commission has consistently concluded that the NBCO Rule is not necessary to promote competition because broadcasters and newspapers do not compete in the same product markets. *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 9928-29, 9930, paras. 163, 166-67; *2002 Biennial Review Order*, 18 FCC Rcd at 13748-53, paras. 331-41. Because we are repealing the NBCO Rule on other grounds, we need not address arguments that the rule should be repealed on competition grounds. *See, e.g.*, NABOB Feb. 24, 2017 *Ex Parte* Letter at 2-3; NNPA Feb. 13, 2017 *Ex Parte* Letter at 1-2; NMA Mar. 27, 2017 *Ex Parte* Letter at 1-2; NMA Reconsideration Comments at 2. Similarly, we need not reach arguments that ownership does not influence viewpoint. *See Second Report and Order*, 31 FCC Rcd at 9917-18, paras. 142-44. Views on that issue diverge among interested parties. *See, e.g.*, NAB Petition at 14-15; UCC et al. Opposition at 6; *see also* Cox Reconsideration Comments at 6-7 (asserting that consumer demand, not ownership, drives viewpoint); NMA Reconsideration Comments at 6 (arguing that cross-ownership does not result in a single viewpoint). *But see Prometheus I*, 373 F.3d at 400-01 (finding that the possibility of a connection between ownership and viewpoint is not disproved by evidence that a connection is not always present). However, we need not resolve the issue here because we are eliminating the rule on the ground that, even if ownership might influence viewpoint in certain circumstances, the NBCO Rule is not necessary to foster viewpoint diversity (nor to promote localism or competition).

theoretically diminish viewpoint diversity to a limited extent due to the loss of an independent voice as a result of any newspaper/broadcast combination, we find that this impact will be mitigated by the multiplicity of alternative sources of local news and information available in the marketplace and the overall financial decline of newspapers. In addition, we find that this concern is outweighed by the countervailing benefits to consumers that can result from newspaper/broadcast combinations. Finally, based on our review of the record, we find that eliminating the rule will have no material effect on minority and female broadcast ownership. Accordingly, we grant NAB's request that we eliminate the NBCO Rule.

### a. The Marketplace Has Changed Dramatically

16. On reconsideration, we find that the Commission's decision to retain the NBCO Rule failed to acknowledge the current realities of the media marketplace. In 1975, the broadcast industry was still relatively young, but it had found its footing, owing in part to the role that newspaper/broadcast cross-ownership had played in its success.[50] Supporters of common ownership claimed that "joint ownership of newspapers and broadcast stations made possible the early development of FM and TV service even though these pioneering stations often had to be operated at a loss."[51] In adopting the cross-ownership rule, the Commission acknowledged the pioneering role of newspapers in the broadcast medium but found that common ownership with newspapers was no longer a critical factor for broadcaster success.[52] The Commission observed that, on the whole, the broadcast industry had "matured" to the point that new entrants could be expected to have an interest in pursuing station ownership.[53] It concluded that "the special reason for encouraging newspaper ownership, even at the cost of a lessened diversity, [was] no longer generally operative in the way it once was."[54] The Commission understood its obligation "to give recognition to the changes which have taken place and see to it that its rules adequately reflect the situation as it is, not was."[55]

17. That same obligation now requires us to eliminate the NBCO Rule. Not only have the means of accessing content changed dramatically, but the media marketplace has seen an explosion in the number and variety of sources of local news and information since the Commission adopted the NBCO Rule in 1975. Opponents of the rule point to this increase and argue that the NBCO Rule has become obsolete as a result.[56]

---

[50] *See 1975 Second Report and Order*, 50 FCC 2d at 1064, 1074-75, paras. 62, 100. In the *2006 Quadrennial Review Order*, the Commission stated that "[i]n the early days of broadcasting, when the success of the then-new medium was not assured, the Commission had actively encouraged newspaper owners to apply for newly available licenses in their local communities . . . hop[ing] that such established local media entities would bring both expertise and financial support to the development of broadcasting as a viable mass medium." *2006 Quadrennial Review Order*, 23 FCC Rcd at 2023, para. 22 (citing *1975 Second Report and Order*, 50 FCC 2d at 1066, 1074-75, paras. 70, 100).

[51] *1975 Second Report and Order*, 50 FCC 2d at 1064, para. 62.

[52] *Id.* at 1074-75, para. 100.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *See, e.g.*, NAB Petition at 16-21; Cox Reconsideration Comments at 7; Bonneville/Scranton Reconsideration Reply at 8-10; Sinclair Reconsideration Reply at 9-10; NMA Reconsideration Comments at 2, 6-8; NMA Reconsideration Reply at 2; Letter from Danielle Coffey, Vice President, Public Policy, NMA, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 1-2 (Mar. 27, 2017) (NMA Mar. 27, 2017 *Ex Parte* Letter); *see also* Letter from Robert M. McDowell and John R. Feore, Counsel to Gray Television, Inc., Cooley LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 3 (June 28, 2017) (Gray June 28, 2017 *Ex Parte* Letter). *But see* UCC et al. Opposition at 6 (arguing that the Commission repeatedly has considered and rejected the

(continued….)

18.     In particular, Bonneville/Scranton provided evidence in the record demonstrating the substantial increase in the number of broadcast sources (AM, FM, TV, LPTV) since the Commission originally contemplated the NBCO Rule.[57]  The Commission failed to properly credit this increase in the *Second Report and Order*.[58]  From the 6,197 full-power radio stations and 851 full-power television stations that existed in the late 1960s, the Commission's latest broadcast totals place the number of full-power radio stations at 15,512 and full-power television stations at 1,775.[59]  Contrary to the Commission's conclusion in the *Second Report and Order*, the fact that the number of full-power broadcast stations has more than doubled represents a significant increase that should be considered when evaluating the continued necessity of the NBCO Rule.[60]  In addition, the Commission should have taken into account the number of low-power broadcast stations, which, as of June 2017, includes 417 Class A television stations; 1,968 low-power television (LPTV) stations; and 1,966 low-power FM (LPFM) stations—none of which services existed when the rule was adopted.[61]  This situation is a stark contrast to the state of affairs in 1975, when the "changed circumstances in the broadcasting industry" that prompted adoption of the NBCO Rule included a trend in which "the number of channels open for new licensing had diminished substantially."[62]

19.     Equally, if not more significantly, NAB cites evidence of the growing prevalence of independent digital-only news outlets with no print or broadcast affiliation, many with a local or hyperlocal focus.[63]  Thirteen years ago, the Third Circuit agreed with the Commission that the record suggested that "cable and the Internet contribute to viewpoint diversity"; the panel members simply disagreed about the "degree" and importance of this trend at that time.[64]  Since then, however, the picture

---

(Continued from previous page) ——————————

argument that the rule is unjustified given consumers' access to a multitude of voices).  We note that the Gray June 28, 2017 *Ex Parte* Letter addresses issues that are not properly before us on reconsideration (e.g., modifying the failed or failing waiver standard in the Local Television Ownership Rule).  As discussed above in footnote 3, *supra*, we decline to reach these issues, but we note that the Commission will be reviewing all its broadcast ownership rules in the 2018 Quadrennial Review proceeding.

[57] Bonneville/Scranton FNPRM Reply at 4 n.7.

[58] *See Second Report and Order*, 31 FCC Rcd at 9921, para. 149.

[59] Broadcast Station Totals as of June 30, 2017, Press Release (MB July 11, 2017) (June 30, 2017 Broadcast Station Totals), https://apps.fcc.gov/edocs_public/attachmatch/DOC-345720A1.pdf; Bonneville/Scranton FNPRM Reply at 4 n.7.  The Commission referenced a total of 757 commercial television stations when it adopted the NBCO Rule in 1975.  *1975 Second Report and Order*, 50 FCC 2d at 1080, para. 112 n.30; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13647-67, paras. 86-128 (discussing changes in the media marketplace 1960-2000); *id.* at 13656, para. 106 ("There were more than 9,278 radio stations in 1980, and 1,011 broadcast television stations.").  As discussed in greater detail below, the impact of the incentive auction on the number of full-power broadcast television stations does not appear to be significant at this time.  *See infra* note 248.

[60] *See Second Report and Order*, 31 FCC Rcd at 9921, para. 149; June 30, 2017 Broadcast Station Totals.  We also find that it was improper for the Commission to dismiss Bonneville/Scranton's data simply because it represented a nationwide increase which may have been spread unevenly across individual local markets without citing any evidence to support this notion.  *See Second Report and Order*, 31 FCC Rcd at 9921, para. 149.

[61] June 30, 2017 Broadcast Station Totals.  Class A television stations must broadcast an average of at least three hours per week of locally produced programming each quarter.  47 CFR § 73.6001(b).  Unlike translators, LPTV stations may originate programming.  *Id.* § 74.701(f).  Under the Commission's LPFM rules, all applicants must demonstrate a local presence; mutually exclusive applicants receive preference points for established local presence and pledges to originate locally at least eight hours of programming per day.  *Id.* §§ 73.853(b), 73.872(b).

[62] *NCCB*, 436 U.S. at 797.

[63] NAB Petition at 19-20.

[64] *Compare Prometheus I,* 373 F.3d at 400, *with id.* at 439, 448, 464-69 (Scirica, Chief Judge, dissenting in part).

has changed significantly. Even the U.S. Supreme Court recently recognized the importance of the Internet and social media as sources of news and information for many Americans.[65] As this trend continues to gain momentum and new voices proliferate, the dominance of traditional news outlets diminishes. Although the record contains some evidence that local television stations and newspapers may still be consumers' primary sources of local news and information,[66] we find that the Commission improperly discounted the role of non-traditional news outlets, including Internet and digital-only, in the local media marketplace.

20. The Commission concluded in the *Second Report and Order* that online outlets do not serve as a "substitute" for newspapers and broadcasters providing local news and information.[67] As noted below, this conclusion does not appear to reflect the record evidence as to "how the Internet has transformed the American people's consumption of news and information,"[68] the direction of current trends in this regard,[69] and in particular how those trends have affected younger adults. At a minimum, the record reflects studies that reject the premise "that people have a primary or single source for most of their local news and information." Rather, "the picture revealed by the data is that of a richer and more nuanced ecosystem of community news and information than researchers have previously identified," in which "Americans turn to a wide range of platforms to get local news and information."[70] Thus, the contributions of such outlets cannot be dismissed out of hand as the existence of these non-traditional news outlets nevertheless results in greater access to independent information sources in local markets. Furthermore, the Commission failed to acknowledge adequately evidence in the record demonstrating the emergence of online outlets that offer local content and have no affiliation with traditional broadcast or print sources.

21. Numerous studies cited in the record establish the emergence and growth of alternative sources of local news and information, including digital-only local news outlets as well as other online sources of local news and information.[71] For example, according to a 2014 Pew Research study, out of

---

[65] *Packingham v. North Carolina*, No. 15–1194, 137 S.Ct. 1730, slip op. at 8 (S.Ct. June 19, 2017) (describing social media as "for many . . . the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge").

[66] *See Second Report and Order*, 31 FCC Rcd at 9920-21, paras. 147-48.

[67] *Id.* at 9920, para. 148.

[68] *Id.* at 10049 (Dissenting Statement of then-Commissioner Pai).

[69] In the *FNPRM*, the Commission acknowledged that "the extent to which Americans turn to news websites unaffiliated with traditional media may be increasing." *FNPRM*, 29 FCC Rcd at 4426, para. 130 (citing 2012 Pew Research Center study).

[70] Pew Research Center and Knight Foundation, How People Learn About Their Local Community 1 (Sept. 26, 2011) (How People Learn About Their Local Community), http://www.pewinternet.org/2011/09/26/how-people-learn-about-their-local-community (cited in NAB FNPRM Comments at 25 & n.83 (cited in NAB Petition at ii & n.4) and Morris FNPRM Reply at 5).

[71] *See, e.g.,* Letter from Erin L. Dozier, Senior Vice President and Deputy General Counsel, Legal and Regulatory Affairs, National Association of Broadcasters, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50, 09-182, and 07-294, at 2 (filed July 15, 2016) (citing two recent Pew Research Center studies examining digital local news sites); Letter from Rick Kaplan, General Counsel and Executive Vice President, Legal and Regulatory Affairs, National Association of Broadcasters, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50, 09-182, and 07-294, Attach. at 6 (filed July 8, 2016) (documenting several dozen local news sources, including digital-only outlets, in Washington, D.C.); Tribune 2010 NPRM Comments at 28, 37-38, 47-48, 57, 67 (identifying local independent news websites and other sources in five specific markets). Several studies referenced in the above-referenced filings document the prevalence of online local news sources in today's media marketplace. For instance, a 2015 Pew Research Center study—which looked specifically at news providers in Denver, Colorado,

(continued….)

438 digital news sites examined, more than half had a local focus, with the "typical outlet" described as "focused on coverage of local or even neighborhood-level news."[72]  Even by 2011, a Pew study confirmed that while newspapers remain popular sources for some such information, 69 percent of those surveyed said that if their local newspaper no longer existed, it would not have a major impact on their ability to keep up with information and news about their community.[73]  By 2016, Pew reported that just 20 percent of U.S. adults often get news from print newspapers, with even steeper declines in particular demographics—only 5 percent of those aged 18 through 29, and only 10 percent of those aged 30 through 49.[74]  According to the earlier Pew study, for the 79 percent of Americans who are online, "the internet is the first or second most important source for 15 of the 16 local topics examined."[75]  Nearly half of adults (47 percent) use mobile devices to get local news and information, and for none of Pew's topics did more than 6 percent of respondents say they depended on the website of a legacy news organization.[76]  Among adults under age 40, "the web ranks first or ties for first for 12 of the 16 local topics asked about."[77]  Furthermore, in the *Second Report and Order*, the Commission too readily dismissed cable news programming as primarily targeted to a wide geographic audience,[78] without considering that most of the major cable operators carry locally-focused cable news networks in parts of their footprint.[79]

22.    On reconsideration, we find that the record clearly demonstrates that the wealth of additional information sources available in the media marketplace today, apart from traditional newspapers and broadcasters, strongly supports repealing the NBCO Rule.  These dramatic and ongoing changes in the media industry negate concerns that repealing the NBCO Rule will harm viewpoint

(Continued from previous page) ————————————————————

Macon, Georgia, and Sioux City, Iowa—found over 140 news providers in Denver, including 25 digital-only news outlets (two of which are affiliated with *The Denver Post*).  Pew Research Center, Local News in a Digital Age (Mar. 5, 2015), http://www.journalism.org/2015/03/05/local-news-in-a-digital-age/.  Moreover, in a smaller market—Sioux City, Iowa—the study found nearly as many digital-only news outlets (three) as local news/talk radio stations (four).  *Id.*

[72] Mark Jurkowitz, Small Digital News Sites: Young, Lean, and Local (Apr. 10, 2014), http://www.pewresearch.org/fact-tank/2014/04/10/small-digital-news-sites-young-lean-and-local/.

[73] How People Learn About Their Local Community at 1 (cited in NAB NPRM Comments at 42-43, n.162); *see also id.* at 4 ("The new data explodes the notion, for instance, that people have a primary or single source for most of their local news and information.").

[74] Letter from Rick Kaplan, General Counsel and Executive Vice President, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 1-2 (July 18, 2016) (citing A. Mitchell, J. Gottfried, M. Barthel and E. Shearer, Pew Research Center, The Modern News Consumer (July 7, 2016) (Modern News Consumer), http://assets.pewresearch.org/wp-content/uploads/sites/13/2016/07/07104931/PJ_2016.07.07_Modern-News-Consumer_FINAL.pdf).

[75] How People Learn About Their Local Community at 22.  For this survey, the websites of print newspapers and broadcast television stations were treated as non-Internet sources, i.e., respondents who relied on those websites were grouped with respondents who relied on the print or broadcast source, as the case may be.  *Id.* at 4.

[76] *Id.* at 4, 27.  According to Pew, "The websites of newspapers and TV stations do not score highly as a relied-upon information source on any topics."  *Id.* at 5.

[77] *Id.* at 22; *see also* Letter from Rick Kaplan, General Counsel and Executive Vice President, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 9-10 (July 7, 2016) (citing study finding that millennials obtain 74 percent of their news from online sources).

[78] *See Second Report and Order*, 31 FCC Rcd at 9920, para. 148.

[79] *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Seventeenth Report, MB Docket No. 15-158, 31 FCC Rcd 4472, 4579-80, App. C (MB 2016) (*Seventeenth Video Competition Report*); *see also* Gray June 28, 2017 *Ex Parte* Letter at 3 (identifying niche cable news channels as alternative sources of viewpoint diversity in local markets).

diversity. We do not perceive a need for the rule in light of the current trends toward greater consumer reliance on these alternative sources of local news and information. The Commission's failure to account properly for the multiplicity of news and information sources available in the current media marketplace factored heavily in its unjustified retention of the NBCO Rule.

### b. The Decline of the Newspaper Industry Has Diminished its Voice

23. In addition, restrictions on common ownership of daily print newspapers and broadcast stations are no longer justified to protect viewpoint diversity as the strength of daily print newspapers has declined significantly since 1975. In the *Second Report and Order*, the Commission failed to credit properly the evidence in the record regarding the challenges facing the newspaper industry and the resulting effects on the ability of print newspapers to serve their readers. Rather than merely modifying the rule's waiver standard and adjusting its carve-outs, the Commission should have acknowledged the diminution of newspapers' voices and concluded that the time has come to eliminate the rule altogether.

24. There was ample evidence in the Commission's record in the 2010/2014 review confirming then-Commissioner Pai's assessment that the "newspaper industry is in crisis."[80] Given that the record is public and extensive, we recount here only a sampling of the comments, which we believe suffices to depict the overall state of the newspaper industry. For example, NAB provided evidence that print newspaper advertising revenue had decreased more than 50 percent since 2008 and nearly 70 percent since 2003, newsroom employees were one-third fewer than at their peak in 1989, and only 17 percent of Americans paid for newspaper subscriptions.[81] NAB stated that digital advertising did not compensate for the losses in print advertising, as evidenced by the fact that total newspaper advertising revenues in 2013, including online advertising, were lower than the total advertising revenues in 1954, after adjusting for inflation.[82] Bonneville/Scranton observed that hundreds of newspapers had closed, with 175 closures between 2007 and 2010, 152 closures in 2012, and 114 closures in 2013.[83] NMA reported that classified advertising, which had accounted for 40 percent of print advertising revenue in 2000, plummeted by 71 percent between 2000 and 2010.[84] As NMA noted, decreased revenue has led to lower editorial spending, the shedding of thousands of journalists, and reductions in paper size and the amount of space in a paper devoted to news.[85] NMA remarked that the Information Needs of Communities report warned that the threat to independent reporting, particularly of local affairs, due to

---

[80] *Second Report and Order*, 31 FCC Rcd at 10046 (Dissenting Statement of then-Commissioner Pai). Then-Commissioner Pai lamented, among other things, the fact that over 400, or one-quarter, of the country's newspapers had gone out of business since the NBCO Rule was adopted, including in major cities. He pointed to other newspapers that no longer publish on a daily basis. He cited newspapers' declining circulations, decreased advertising revenues, and shrinking newsrooms. He observed that broadcasters and newspapers would make particularly suitable partners given the compatibility of their businesses. *Id.* at 10046-48 (Dissenting Statement of then-Commissioner Pai). Noting newspapers' "well-documented struggles," Commissioner O'Rielly agreed that allowing newspaper/broadcast cross-ownership might provide newspapers with "much-needed relief in the form of committed and knowledgeable investors." *Id.* at 10059-60 (Dissenting Statement of Commissioner O'Rielly).

[81] NAB FNPRM Comments at 32, 35-37, 71; *see also* Bonneville/Scranton FNPRM Comments at 8.

[82] NAB FNPRM Comments at 70-71.

[83] Bonneville/Scranton FNPRM Comments at 7-8 & n.26; *see also* NMA NPRM Comments at 6-7 (noting that most of the newspapers that closed served smaller markets).

[84] NMA NPRM Comments at 5.

[85] *Id.* at 5-6.

the diminished number of professional journalists was having a substantial negative civic impact around the country, particularly in small-to-midsize markets.[86]

25.    In light of the long decline of the newspaper industry, the loss of an independent daily newspaper voice in a community will have a much smaller impact on viewpoint diversity than would have been the case in 1975.  In addition, as discussed below, repeal of the NBCO Rule will permit newspaper/broadcast combinations that can strengthen local voices and thus enable the combined outlets to better serve their communities.

### c.    The NBCO Rule Prevents Combinations that Could Benefit Localism

26.    The Commission repeatedly has recognized that the NBCO Rule does not promote localism and actually may hinder it by preventing local news outlets from achieving efficiencies by combining resources needed to gather, report, and disseminate local news and information.[87]  The Commission nevertheless retained newspaper/broadcast cross-ownership restrictions in order to promote its goal of viewpoint diversity.[88]  Because the NBCO Rule is no longer necessary to foster viewpoint diversity, and the rule can be repealed without harming the public interest, the potential benefits to localism arising from common ownership finally can accrue.  We expect that eliminating the NBCO Rule will allow both broadcasters and newspapers to seek out new sources of investment and operational expertise, increasing the quantity and quality of local news and information they provide in their local markets.[89]

27.    There is ample evidence in the record that eliminating the rule will help facilitate such investment and enable both broadcasters and newspapers to better serve the public.  For example, in support of NAB's petition for reconsideration, Cox asserts that collaboration and cost-sharing between its television station and its newspaper in Dayton, Ohio, helped them be the first to report on what became a national story about the failures of the Veterans Administration to provide adequate medical services.[90]  In addition, Cox previously provided several examples showing how the combination of resources across its commonly owned newspaper, television, and radio properties in both Dayton and Atlanta, Georgia,

---

[86] NMA NPRM Comments at 7-8 (citing Steve Waldman & the Working Group on Information Needs of Communities:  The Changing Media Landscape in a Broadband Age at 10, 21, 24, 43-55 (2011), https://transition.fcc.gov/osp/inc-report/The_Information_Needs_of_Communities.pdf).

[87] *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 9928, para. 162; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2032-38, paras. 39-46; *2002 Biennial Review Order*, 18 FCC Rcd at 13753-60, paras. 342-54.

[88] *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 9928, para. 162; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2038-39, paras. 47-49; *2002 Biennial Review Order*, 18 FCC Rcd at 13790-91, paras. 432-35.

[89] The argument that newspaper/broadcast cross-ownership promotes localism has been advanced in several media ownership reviews, and it is put forth again in this reconsideration proceeding.  *See, e.g.*, NAB Petition at 15-16; Cox Reconsideration Comments at 3-5; NMA Reconsideration Comments at 5-6; NMA Reconsideration Reply Comments at 2; Bonneville/Scranton Reconsideration Reply Comments at 3-4; Letter from Danielle Coffey, Vice President, Public Policy, NMA, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 1-2 (Feb. 27, 2017) (NMA Feb. 27, 2017 *Ex Parte* Letter); *see also* Letter from Mark J. Prak, Counsel to Independent Broadcasters, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al., at 1-2 & Att. (July 12, 2017) (Independent Broadcasters July 12, 2017 *Ex Parte* Letter) (asserting that the NBCO Rule affirmatively harms local journalism and that owners of local media outlets should be allowed to combine properties in order to better serve their local markets); Letter from Kurt Wimmer, Counsel to NMA, Covington & Burling LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 14-50 et al. (July 25, 2017) (arguing that the NBCO Rule impedes "newspaper owners seeking investment to fund high-quality, responsible journalism").

[90] Cox Reconsideration Comments at 3-5.

allowed them to report on breaking news stories more quickly and accurately and to also provide more thorough coverage of events, such as political elections, that involve numerous interviews and in-depth issue reporting.[91] Cox asserts that the common ownership of multiple outlets has enabled its media properties "to vastly improve service at a time when the economics of the newspaper and broadcast business would seem to dictate the opposite."[92]

28.     In addition, as the Commission noted in the *Second Report and Order*, NMA provided numerous examples of the benefits to local programming involving cross-owned media outlets in various markets.[93]  For example, a cross-owned newspaper/television combination in Phoenix combined resources to report on stories such as the shooting of Congresswoman Gabrielle Giffords and 18 others in Tucson, the Yarnell Hill fire that killed 19 firefighters and destroyed more than 100 homes, and a massive dust storm.[94]  In South Bend, Indiana, a commonly owned local newspaper, television station, and two radio stations regularly worked together on issues of local significance, such as uncovering harmful substances in drinking water, hosting town-hall meetings for political candidates and local officials, sending a reporter to Iraq, commemorating the 150th anniversary of the local Studebaker factory, providing weather information, and covering Notre Dame sports.[95]  NMA also cited prior Commission studies for the proposition that, on average, a cross-owned television station produces more local news and more coverage of local and state political candidates than comparable non-cross-owned television stations.[96]

29.     The Commission has acknowledged that prior Commission studies have found that cross-owned radio stations are more likely to air news and public affairs programming and are four to five times more likely to have a news format than a non-cross-owned station.[97]  Comments in this proceeding bear that out, providing anecdotal evidence, such as that offered by Morris Communications, which explained that its radio stations in Topeka, Kansas, and in Amarillo, Texas, were able to invest more heavily in local

[91] Cox FNPRM Comments at 8-9; Cox NPRM Reply at 12-17.

[92] Cox FNPRM Comments at 9; *see also* Gray June 28, 2017 *Ex Parte* Letter at 3-4 (discussing the high costs of producing local newscasts and the challenging economics of local television today, especially in mid-sized and small markets).

[93] NMA FNPRM Comments at 3-10 (providing examples from various cities, including Phoenix, Dayton, South Bend, Milwaukee, Cedar Rapids, Atlanta, and Spokane, to demonstrate that cross-ownership leads to more comprehensive local news coverage across platforms).

[94] *Id.* at 3-5.

[95] *Id.* at 6-8.

[96] *Id.* at 3.  NMA pointed to the finding in one Commission study that cross-owned television stations, on average, air 50 percent more local news than non-cross-owned stations.  *See* Jack Erb, Media Ownership Study 4, Local Information Programming and the Structure of Television Markets, 27-28 (2011) (Media Ownership Study 4) (finding that the differential is driven mostly by grandfathered combinations, as opposed to combinations operating under temporary waivers).  Media Ownership Study 4 also found that the total amount of local news aired by all television stations in the market may be negatively correlated with newspaper/broadcast cross-ownership.  *Id.* at 41.  As noted in the *FNPRM*, however, the study authors cautioned that this finding was "'imprecisely measured and not statistically different from zero.'"  *FNPRM*, 29 FCC Rcd at 4431, para. 137 (proposing not to accord much weight to the study's finding that the amount of local news at the market level may be negatively correlated with newspaper/broadcast cross-ownership).  An earlier Commission study cited by NMA found that cross-owned television stations aired between seven to ten percent more local news, which still represents a meaningful increase in the average amount of local news aired on cross-owned television stations.  *See* Jeffrey Milyo, FCC Media Ownership Study 6, Effects of Cross-Ownership on the Local Content and Political Slant of Local Television News, 1 (Sept. 17, 2007).  This study also found that cross-owned television stations, on average, provide roughly 25 percent more coverage of local and state politics.  *Id.* at 1.

[97] *Second Report and Order*, 31 FCC Rcd at 9927-28, para. 161 (citing NAB FNPRM Comments at 83-84, which referenced 2006 Media Ownership Study 4, Sections II, III).

news production and in news staff because of their cross-ownership with the local newspaper.[98]  Cox argues that newspaper owners have "the skill and resources to increase the quality and quantity of local radio news."[99]  Bonneville/Scranton also asserts that newspaper/radio combinations can result in a greater amount of news on radio stations.[100]

30.     As the Commission discussed in the *Second Report and Order*, the record contains support for the proposition that newspaper/broadcast combinations can promote localism by creating efficiencies through the sharing of expertise, resources, and capital that can lead to a higher quantity and quality of local news programming.[101]  The Commission "has long accepted that proposition,"[102] but it concluded in its previous decisions that some restrictions remained necessary to promote viewpoint diversity.  We conclude now that the potential public interest benefits of permitting newspaper/broadcast combinations outweigh the minimal loss of viewpoint diversity that may result from eliminating the rule.  With the elimination of the NBCO Rule these localism benefits can finally begin to materialize.

31.     In light of the well-documented and continuing struggles of the newspaper industry, the efficiencies produced by newspaper/broadcast combinations are more important than ever.  A report in February 2017 examining the health of small newspapers was cautiously optimistic about the future of publications with a community or hyperlocal focus but acknowledged that their "battle for survival will not be easy" and will require new approaches and strategies that take advantage of their niche position.[103]  Removing the regulatory obstacle of this outdated rule will help financially troubled newspapers carry on their important work.  While we recognize that cost-savings gained from common ownership will not necessarily be invested in the production of local news,[104] by allowing newspapers and broadcasters to collaborate and combine resources, our action today creates new opportunities for local broadcasters and newspapers to better serve the local news and information needs of their communities.

### d.     The NBCO Rule Must be Eliminated

32.     Our decision today to repeal the rule reflects the situation as it currently is, not as it was more than 40 years ago.  Whereas the Commission determined in 1975 that newspaper/broadcast combinations were no longer necessary to support the growth of the broadcast industry and that the interest in viewpoint diversity required separate ownership of newspapers and broadcast licenses, we now determine that this restriction is no longer necessary to promote viewpoint diversity and can potentially harm localism, and that removing the restriction best serves the public interest.

33.     Indeed, even to the extent that eliminating the rule would permit transactions that would reduce the number of outlets for news and information in local markets, the markets will continue to have far more voices than when the rule was enacted.  The modern media marketplace abounds with new, non-traditional voices, the number of local broadcasters has increased dramatically, and the strength of local

---

[98] Morris FNPRM Comments at 17-23.

[99] Cox FNPRM Comments at 5.

[100] *See* Bonneville/Scranton FNPRM Comments at 9.

[101] *See Second Report and Order*, 31 FCC Rcd at 9926-28, paras. 160-61.  *But see id.* at 9927, para. 160 (discussing comments suggesting that cross-ownership may reduce the total amount of local news available in the market).  The limitations with the finding in Media Ownership Study 4 associated with overall reductions in local news in markets with cross-owned combinations is discussed in footnote 96, *supra*.

[102] *Second Report and Order*, 31 FCC Rcd at 9928, para. 162.

[103] Damian Radcliffe and Christopher Ali, *If Small Newspapers Are Going to Survive, They'll Have to Be More Than Passive Observers to the News* (Feb. 2, 2017), http://www.niemanlab.org/2017/02/if-small-newspapers-are-going-to-survive-theyll-have-to-be-more-than-passive-observers-to-the-news/.

[104] *See id.* at 9928, para. 162; *FNPRM*, 29 FCC Rcd at 4431-32, paras. 136-38.

newspapers relative to other media has diminished as a result of the difficulties facing the industry and the rise of new voices. And we expect the number of voices to continue to grow, as the Internet, in particular, has lowered the barriers to entry and provided a publicly accessible platform for individuals and organizations to serve the news and information needs of their local communities. Furthermore, eliminating the NBCO Rule will permit efficient combinations that will allow broadcasters and newspapers to combine resources and enable them to better serve their local communities. On balance, therefore, we conclude that retaining the rule does not serve the public interest.

34. The Commission consistently has recognized that changing circumstances in the marketplace warrant a retreat from a total ban; accordingly, the Commission has attempted to impose various limits on the rule through the years.[105] The Commission's overall direction has been toward a growing acknowledgment that the rule is not always necessary to promote viewpoint diversity and should be modified to reflect changes in the marketplace.[106] Our action today is simply the logical extension of this acknowledgment in response to the radically altered media marketplace.

35. As noted in the *2002 Biennial Review Order*, the Commission "must consider the impact of [its] rules on the strength of media outlets, particularly those that are primary sources of local news and information, as well as on the number of independently owned outlets. . .. [M]aximizing the number of independent voices does not further diversity if those voices lack the resources to create and publish news and public information."[107] In *Prometheus I*, the court affirmed the Commission's finding in the *2002 Biennial Review Order* that the NBCO Rule was overbroad and should be relaxed.[108] In the *2006 Quadrennial Review Order*, the Commission took into consideration the imperiled state of the newspaper industry, recounting statistics and data showing that the shrinking newspaper industry had suffered circulation declines, staff layoffs, shuttered news bureaus, flat advertising revenues, rising operating costs, and falling stock prices.[109] These hardships influenced the Commission's finding that the existing ban on newspaper/broadcast combinations continued to be overly restrictive.[110]

36. The newspaper industry had not recovered when the Commission began its 2010/2014 ownership review and, indeed, the hardships continued to mount. In its 2010 *NOI*, the Commission described newspapers' declining circulation and advertising revenues and asked whether relaxing the rule would help newspapers to survive.[111] In the *FNPRM*, the Commission expressed concern for the future of newspapers but disagreed with the suggestion that the NBCO Rule should be repealed or relaxed on that basis alone.[112] The Commission was reluctant to jeopardize viewpoint diversity in local markets in response to assertions that the rule limited opportunities for traditional media owners to expand their revenues.[113] Now, however, we conclude that the continuance of the NBCO Rule is not necessary or

---

[105] *See supra* para. 12.

[106] *See supra* para. 12.

[107] *2002 Biennial Review Order*, 18 FCC Rcd at 13762, para. 360 (noting that both newspapers and broadcasters had seen declining consumer interest).

[108] *Prometheus I*, 373 F.3d 399-400. Though it agreed that the complete ban was no longer in the public interest, the court held that the modified rule adopted in the *2002 Biennial Review Order* was arbitrary and capricious and the court left in place the 1975 ban. *Id.* at 402.

[109] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2026-30, paras. 27-34.

[110] *Id.* at 2039, para. 51. In *Prometheus II*, the court vacated the revised NBCO Rule adopted in the *2006 Quadrennial Review Order* on procedural grounds. *Prometheus II*, 652 F.3d at 445.

[111] *NOI*, 25 FCC Rcd at 6088-90, 6101, 6112-13, paras. 6-9, 47, 87.

[112] *FNPRM*, 29 FCC Rcd at 4432-35, paras. 139-43.

[113] *Id.*; *see also Second Report and Order*, 31 FCC Rcd at 9928-30, paras. 163-67.

appropriate to preserve or promote viewpoint diversity under Section 202(h). We anticipate that both newspapers and broadcasters will benefit from the rule's repeal, as will, ultimately, the public, as we discuss above.

37.     The Commission recognized in the *FNPRM* that the NBCO Rule does not promote viewpoint diversity when a newspaper is in financial distress, and the *FNPRM* proposed an exception to the rule for failed and failing merger applicants.[114] In the *Second Report and Order*, the Commission adopted that exception and explained that allowing such mergers is not likely to harm viewpoint diversity.[115] In addition, the Commission incorporated into the rule a case-by-case waiver standard for markets of all sizes to account for merger situations that do not pose an undue risk to viewpoint diversity.[116]

38.     On reconsideration, we find that the Commission's modifications to the NBCO Rule in the *Second Report and Order* were inadequate. Given the current state of the newspaper industry, it might very well be too late to save a newspaper that would qualify as failed or failing under the exception adopted in the *Second Report and Order*. Our goal should be to keep local voices strong, not to maintain artificial barriers that prevent efficient combinations and then wait until newspapers reach a failed or failing state before providing regulatory relief. In addition, the Commission's case-by-case waiver standard was wholly insufficient because the Commission failed to provide any meaningful guidance on how it would evaluate each waiver request.[117] An exception or a waiver standard may be appropriate when a rule is sound and exceptional circumstances exist, but such mechanisms do not redeem an unsound rule, as we find this one to be.

39.     In addition, the modified rule inexplicably left in place a definition of "daily newspaper" that is outdated and illogical in that it applies only to newspapers printed at least four days a week.[118] The distinction between print newspapers and digital outlets has become blurred as some newspapers reduce the number of days a week they publish in print and rely more heavily on their online distribution.[119] Indeed, many publishers today continuously update the content of the online versions of their newspapers as they compete with bloggers and social media that rapidly produce and update their own content. Applying the NBCO Rule to newspapers only if they are printed in hardcopy at least four days per week ignores the reality that what defines a "newspaper" has changed and that many consumers access the paper's news and information over the Internet throughout the day. A newspaper's influence should no longer be measured by how many mornings a week it is delivered to the doorstep. Doing so would exacerbate the perverse incentive for a newspaper seeking to combine with a broadcaster to reduce its

---

[114] *FNPRM*, 29 FCC Rcd at 4434-35, 4453-54, paras. 142, 188.

[115] *Second Report and Order*, 31 FCC Rcd at 9933-34, paras. 172-75.

[116] *Id.* at 9934-41, paras. 176-89.

[117] *See Second Report and Order*, 31 FCC Rcd at 9934-41, paras. 176-89. By contrast, as discussed below, we are adopting a case-by-case review process in the Local Television Ownership Rule for proposed combinations involving top-four rated stations, and we provide a significant list of factors to help guide parties when making a showing that application of the Top-Four Prohibition is not in the public interest. *See infra* para. 82.

[118] *See* 47 CFR § 73.3555, Note 6.

[119] For example, the *New Orleans Times-Picayune* and the *Birmingham News* reduced their print publications to three days a week, while the *Seattle Post-Intelligencer* eliminated its print publications in favor of a digital-only platform. *See Second Report and Order*, 31 FCC Rcd at 10047 (Dissenting Statement of then-Commissioner Pai); *see also 3 Gannett Papers Moving to 3-Day-A-Week Print Editions*, USNews.com (Mar. 9, 2017), https://www.usnews.com/news/best-states/louisiana/articles/2017-03-09/3-gannett-papers-moving-to-3-day-a-week-print-editions; Andrew Beaujon, *Patriot-News, Post-Standard will reduce print frequency to three days a week*, Poynter.org (Aug. 28, 2012), http://www.poynter.org/2012/patriot-news-will-reduce-print-frequency-to-three-days-a-week/186824/.

print editions in order to avoid triggering the rule. Given the current media marketplace and the way consumers access content, the rule's reliance on a newspaper's printing schedule makes no sense.

40.     As the modified rule adopted in the *Second Report and Order* is not necessary to promote the public interest, we cannot retain it consistent with Section 202(h). We emphasize that the rule's repeal in no way reflects a lessening of the importance of viewpoint diversity as a Commission policy goal. Rather, we conclude that the rule is no longer necessary to promote viewpoint diversity.

41.     We find also that the NBCO Rule should be eliminated rather than relaxed. The Commission's previous attempts to relax the rule demonstrate the difficulty in designing an approach that works effectively for the range of market circumstances across the country. Paradoxically, previous attempts at relaxing the rule arguably threatened the greatest harm in small markets where cross-ownership may be needed most to sustain local news outlets.[120] The record does not provide an adequate basis for distinguishing areas where application of the rule could serve the public interest from those where it would not. There was significant opposition to the modified rule proposed by the Commission in this proceeding,[121] and only Cox proposed a detailed alternative approach, and the Commission explained why it declined to adopt it.[122] Thus, the record does not support a narrowed restriction. Moreover, as discussed above, we find that it would be outdated and illogical to adopt a rule based on the distinction between print newspapers and digital outlets. Indeed, any modified rule that continues to single out newspapers of any kind cannot be sustained.

42.     In light of the significantly expanded media marketplace and the overall state of the newspaper industry, and our conclusion that the rule is not necessary to promote viewpoint diversity, competition, or localism, and may hinder localism, we conclude that immediate repeal is required by Section 202(h) and will permit combinations that would benefit consumers. Our decision will enable all broadcasters and newspapers to attract new investment in order to preserve and expand their local news output.

43.     In addition, though we find that the entire NBCO Rule must be eliminated, we find that the record provides an additional and independent justification for eliminating the restriction on newspaper/radio combinations.[123] Opponents of this aspect of the rule argue that evidence in the record

---

[120] For example, under the modified NBCO Rule adopted in the *2006 Quadrennial Review Order*, a waiver of the rule was presumed to be inconsistent with the public interest if the proposed newspaper/broadcast combination was located in any market smaller than the top 20 DMAs in the country. 23 FCC Rcd at 2022-23, para. 20.

[121] *See FNPRM*, 29 FCC Rcd at 4445-51, paras. 167-181; *NPRM*, 26 FCC Rcd at 17527-29, paras. 105-111. Both Cox and NMA criticized the Commission's modified approach as harmful to small and mid-sized markets where investment in local newsrooms may be needed most. NMA FNPRM Comments at 20-21; NMA FNPRM Reply at 5; Cox FNPRM Comments at 13-18; *see also Second Report and Order*, 31 FCC Rcd at 9937, para. 181.

[122] Cox proposed a presumptive waiver standard that it argued should apply to NBCO waiver requests in all markets. Cox argued that the first part of its proposed two-part test would protect diversity by requiring that at least 20 independently owned major media voices remain in the market following a newspaper/broadcast combination. Cox considered major media voices to include independently owned daily newspapers, full-power television and radio stations, cable and satellite television systems (counted as one voice), and the Internet (counted as one voice). The second part of Cox's test, intended to preserve localism, would require that at least three independent media voices that produce and distribute local news and information programming, other than the combining properties, remain in the market post-transaction. The Commission found that the first prong of the proposed test defined independent media voices too broadly and that the second prong could not be applied or enforced in an objective, content-neutral manner. *See Second Report and Order*, 31 FCC Rcd at 9936-37, 9939, paras. 180, 185; *FNPRM*, 29 FCC Rcd at 4447, para. 171.

[123] *See, e.g.*, NAB Petition at 21-25; Bonneville/Scranton Reconsideration Reply at 2, 4-6; Cox Reconsideration Comments at 2, 5-6. Reversing its past position, NABOB now supports elimination of the newspaper/radio cross-

(continued….)

does not provide adequate support for the Commission's conclusion that radio is a sufficiently meaningful source of local news and public interest programming such that allowing newspaper/radio combinations could harm viewpoint diversity.[124] We agree. As discussed in the following section, we are eliminating the Radio/Television Cross-Ownership Rule based on our finding that the diminished contributions of local broadcast radio stations to viewpoint diversity, together with increasing contributions from new media outlets and the public interest benefits of radio/television combinations, no longer justify continued radio/television cross-ownership regulation.[125] For the same reasons relating to viewpoint diversity contributions of radio and the proliferation of alternative media voices, as well as the countervailing public interest benefits of newspaper/radio combinations, we conclude that the restriction on newspaper/radio combinations is not in the public interest and must be eliminated pursuant to Section 202(h).

### e. Minority and Female Ownership

44. We find that repealing the NBCO Rule will not have a material impact on minority and female ownership. After seeking public comment on this topic a number of times, the Commission expressed its view that the rule does not promote or protect minority and female ownership.[126] Not only have past debates on this issue not persuaded the Commission that the ban on newspaper/broadcast combinations is necessary to protect or promote minority and female ownership,[127] no arguments were made in this reconsideration proceeding that would lead us to conclude otherwise. On the contrary, two organizations representing minority media owners seek relief from the rule's restrictions. The National Newspaper Publishers Association (NNPA), a trade organization representing more than 200 Black-owned media companies, claims that the NBCO Rule should be eliminated because it impedes its members, which are "trusted community voices," from competing with large, unregulated rivals.[128] NNPA decries the rule's disincentive for its newspaper members to maximize their publication schedules given that the rule applies to daily newspapers.[129] It argues that the rule "prevents diverse local voices with strong community ties from identifying and investing in new ways to serve their readers, listeners and viewers."[130] In addition, NABOB has reversed its long-held opposition to the elimination of the ban on newspaper/radio cross-ownership, arguing that the broadcast industry—particularly NABOB's minority-owned member stations—should not be constrained from competing for audience share and

---

(Continued from previous page) ——————————

ownership restriction in order to help minority-owned broadcasters compete against larger players for audience and advertising revenues. NABOB Feb. 24, 2017 *Ex Parte* Letter at 2-3.

[124] *See Second Report and Order*, 31 FCC Rcd at 9921-26, paras. 150-58. Among other things, commenters point to previous Commission statements, including in the *NPRM* and *FNPRM*, to buttress their position that radio is a less significant source of local news and information. *See, e.g.*, NAB Petition at 21-22; Bonneville/Scranton Reconsideration Reply at 4 n.11; *see also NPRM*, 26 FCC Rcd at 17529-30, para. 112; *FNPRM*, 29 FCC Rcd at 4435-38, paras. 144-48.

[125] We incorporate by reference the relevant discussion in Section III.A, *infra*.

[126] *FNPRM*, 29 FCC Rcd at 4454-55, para. 190.

[127] *See Second Report and Order*, 31 FCC Rcd at 9942-44, paras. 192-97; *FNPRM*, 29 FCC Rcd at 4454-60, paras. 189-99.

[128] NNPA Feb. 13, 2017 *Ex Parte* Letter at 1.

[129] *Id*. at 2 ; *see also* 47 CFR § 73.3555, Note 6 (defining a daily newspaper as one that is published at least four days a week, in the dominant language in the market, and circulated generally in the community of publication).

[130] NNPA Feb. 13, 2017 *Ex Parte* Letter at 2.

advertising revenue.[131]  According to NABOB, the ban on newspaper/radio cross-ownership has "outlived its usefulness," and we agree.[132]

45.     These comments directly refute arguments in the record that repealing the rule will harm small broadcasters, including minority and women broadcasters, because they are at a competitive disadvantage compared to large media outlets.[133]  As the Commission contemplated in the *FNPRM*, merging with a newspaper could boost the ability of a small broadcaster to compete more effectively in the market and to improve its local news offerings.[134]  NNPA and NABOB seek—and our action today will provide—the flexibility to do just that.

46.     We agree with Bonneville/Scranton that lifting the ban on newspaper/radio combinations is unlikely to have a significant effect on minority and female ownership in the radio market given that the thousands of radio stations across the country offer plenty of purchasing opportunities for minorities and women and at lower cost than most other forms of traditional media.[135]  In addition, we do not anticipate that lifting the ban on newspaper/television combinations will lead to a meaningful decrease in the number of minority-owned television stations.  Some groups previously expressed concern that minority-owned television stations would be targeted for acquisition if the ban were relaxed to favor waiver requests for certain newspaper/television combinations with stations ranked below the top four television stations in a market—a category that includes many minority-owned stations.[136]  Removing the ban across-the-board will ensure that no artificial incentives are created, and the record provides no evidence that minority- and female-owned stations will be singled out for acquisition, as some commenters have speculated.[137]  To the contrary, record evidence demonstrates that previous relaxations of other ownership rules have not resulted in an overall decline in minority and female ownership of broadcast stations, and we see no evidence to suggest that eliminating the NBCO Rule will produce a different result and precipitate such a decline.[138]  Ultimately, given the state of the newspaper industry, we expect that broadcasters may be better positioned to be the buyer, rather than the seller, in most transactions that flow from the rule's repeal.  Furthermore, NNPA's submission suggests that some minority media owners may be poised to pursue cross-ownership acquisition and investment opportunities.[139]  Therefore, eliminating the rule potentially could increase minority ownership of newspapers and broadcast stations.

---

[131] NABOB Feb. 24, 2017 *Ex Parte* Letter at 1-3 (citing its concerns that relaxation of the media ownership rules has contributed to a decline in minority ownership, but supporting the repeal of the newspaper/radio cross-ownership restriction).

[132] *Id*. at 3 (citing NAB Petition at 14-16).

[133] *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 9943-44, paras. 194-95; *FNPRM,* 29 FCC Rcd at 4457-58, para. 195.

[134] *FNPRM,* 29 FCC Rcd at 4457, para. 194.

[135] Bonneville/Scranton Reconsideration Reply Comments at 6-8; Bonneville/Scranton FNPRM Reply at 8-9.  *But see* WGAW FNPRM Comments at 10-11 (arguing that eliminating the newspaper/radio cross-ownership restriction would reduce the number of independently owned radio stations and thus decrease ownership diversity because radio is one of the affordable entry points for minorities and women to enter the media industry).

[136] *FNPRM*, 29 FCC Rcd at 4455-57, paras. 192-94.

[137] *See, e.g.*, Free Press NPRM Comments at 21-22; Free Press NPRM Reply at 53-54; UCC *et al*. NPRM Comments at 26-27.

[138] *See Second Report and Order*, 31 FCC Rcd at 9894-95, 9911-12, paras. 77, 126.

[139] NNPA Feb. 13, 2017 *Ex Parte* Letter at 1-2.

47.     In addition, we reject UCC et al.'s assertion that *Prometheus III* prevents us from repealing or modifying any of our broadcast ownership rules on reconsideration.[140]  Contrary to UCC et al.'s argument, the Third Circuit's holding in *Prometheus III* does not require the Commission to adopt a socially disadvantaged business (SDB) definition before it can revise or repeal any rules; rather, the court simply required the Commission to complete its analysis of whether to adopt such a definition.[141]  The Commission completed that required analysis in the *Second Report and Order* and declined to adopt an SDB standard.[142]

48.     Finally, in the *Second Report and Order*, the Commission stated that the revised NBCO Rule it adopted would help promote ownership diversity.[143]  The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by requiring the separation of newspaper and broadcast station ownership.  Moreover, the Commission made it clear that promoting viewpoint diversity, as opposed to preserving or promoting minority and female ownership, was the purpose of its revised rule.[144]  The record does not suggest that restricting common ownership of newspapers and broadcast stations promotes minority and female ownership of broadcast stations, and there is evidence in the record that tends to support the contrary.[145]  Thus, fostering minority and female ownership does not provide a basis to retain the rule.

## B.     Radio/Television Cross-Ownership Rule

### 1.     Introduction

49.     We grant NAB's request for reconsideration of the Commission's decision in the *Second Report and Order* to retain the Radio/Television Cross-Ownership Rule.[146]  The Radio/Television Cross-Ownership Rule prohibits an entity from owning more than two television stations and one radio station in the same market, unless the market meets certain size criteria.[147]  In the *Second Report and Order*, the

---

[140] *See* UCC et al. Opposition at 2-3 (citing *Prometheus III*, 824 F.3d at 49-50).

[141] *See Prometheus III*, 824 F.3d at 49–50 ("[The Commission] must make a final determination as to whether to adopt a new definition. . .. We do not intend to prejudge the outcome of this analysis; we only order that it must be completed. Once the agency issues a final order either adopting an SDB- or ODP-based definition (or something similar) or concluding that it cannot do so, any aggrieved parties will be able to seek judicial review."); *see also FNPRM*, 29 FCC Rcd at 4454-55 ("Moreover, we reject the argument that the *Prometheus II* decision requires us to take no action unless we can show definitively that a rule change would have no negative impact on minority ownership levels.").

[142] *See Second Report and Order*, 31 FCC Rcd at 9976-10001, paras. 271-316 (readopting a revenue-based eligible entity standard and concluding that the record did not currently support the adoption of an additional race- and/or gender-based standard, such as an SDB standard).

[143] *Id.* at 9944, para. 197 (stating that the rule would "increase the likelihood of a variety of viewpoints and [] preserve potential ownership opportunities for new voices").

[144] *Id.*

[145] *See FNPRM*, 29 FCC Rcd at 4456-57, para. 193.

[146] *See* NAB Petition at 14-25; *see also Second Report and Order*, 31 FCC Rcd at 9945-52, paras. 198-215.

[147] 47 CFR § 73.3555(c)(2).  Specifically, if at least 10 independently owned media voices would remain in the market post-merger, an entity may own up to two television stations and four radio stations.  If at least 20 independently owned media voices would remain in the market post-merger, an entity may own either:  (1) two television stations and six radio stations, or (2) one television station and seven radio stations.  In all instances, entities also must comply with the local radio and local television ownership limits.  The market is determined by looking at the service contours of the relevant stations.  *Id.* § 73.3555(c)(1).  The rule specifies how to count the number of media voices in a market, including television stations, radio stations, newspapers, and cable systems.  *Id.* § 73.3555(c)(3)(i)-(iv).  The rule applies only to commercial stations.

Commission retained the Radio/Television Cross-Ownership Rule with only minor modifications, finding that the rule remained necessary to promote viewpoint diversity.[148] On reconsideration, we eliminate the Radio/Television Cross-Ownership Rule, concluding that the Commission erred in finding the rule necessary to promote viewpoint diversity in local markets. Specifically, we find that we can no longer justify retention of the rule in light of broadcast radio's diminished contributions to viewpoint diversity and the variety of other media outlets that contribute to viewpoint diversity in local markets. In addition, given that the current rule already permits a significant degree of common ownership, we conclude that its elimination will have a negligible effect in most markets, particularly as ownership will continue to be limited by the Local Television and Local Radio Ownership Rules.

## 2. Background

50. The Commission originally restricted cross-ownership of radio and television stations with "the principal purpose" of promoting viewpoint diversity in local markets.[149] The *Second Report and Order* contains a detailed history of the rule, which we incorporate herein.[150] In relevant part, in the *2006 Quadrennial Review Order*, the Commission retained the rule as adopted in 1999—a decision that the Third Circuit found to be "plausibly justified."[151] However, the Commission tentatively concluded in the *NPRM* that, based on information in the record and changes in the media marketplace, the Radio/Television Cross-Ownership Rule is no longer necessary to promote the public interest.[152] Consistent with past Commission findings, the *NPRM* tentatively concluded that the rule does not promote competition or localism.[153] The *NPRM* also tentatively concluded that the rule is no longer necessary to promote viewpoint diversity.[154] In support of this tentative conclusion, the Commission noted that the media ownership studies (specifically studies 8A and 8B) provided little evidence that radio/television cross-ownership impacted viewpoint diversity in local markets.[155] In addition, the Commission discussed the growth of alternate media outlets (e.g., Internet and cable) as sources of viewpoint diversity.[156]

51. The *FNPRM* sought further comment on the extent to which the Radio/Television Cross-Ownership Rule promotes the public interest.[157] Specifically, the Commission sought comment on evidence in the record suggesting that radio stations are not primary outlets that contribute to viewpoint diversity.[158] The Commission reiterated its tentative conclusions that the rule is not necessary to promote competition or to promote localism.[159]

---

[148] *See Second Report and Order*, 31 FCC Rcd at 9945, 9948-50, paras. 199-200, 207-10.

[149] *Amendment of Sections 73.35, 73.240 and 73.636 of the Commission Rules Relating To Multiple Ownership of Standard, FM and Television Broadcast Stations*, First Report and Order, 22 F.C.C.2d 306, 313, para. 25 (1970). At the time, the Commission also believed that the cross-ownership restrictions would benefit competition. *Id.*

[150] *Second Report and Order*, 31 FCC Rcd at 9945-47, paras. 202-04.

[151] *Prometheus II,* 652 F.3d at 457.

[152] *NPRM*, 26 FCC Rcd at 17532-39, paras. 118-35.

[153] *Id.* at 17535-37, paras. 123-30.

[154] *Id.* at 17537-38, paras. 131-33.

[155] *Id.* at 17537, para. 132.

[156] *Id.* at 17537-38, para. 133.

[157] *FNPRM*, 29 FCC Rcd at 4460-61, 4465-67, paras. 200, 210-25.

[158] *Id.* at 4465-68, paras. 210-17.

[159] *Id.* at 4465, 4468-69, paras. 210, 218-21.

52.     Nevertheless, in the *Second Report and Order*, the Commission retained the Radio/Television Cross-Ownership Rule with only minor technical modifications, finding that the rule remained necessary to promote viewpoint diversity.[160]  Despite its prior tentative conclusion to the contrary, the Commission concluded that the Radio/Television Cross-Ownership Rule remains necessary given that radio stations and television stations both contribute in meaningful ways to promote viewpoint diversity in local markets.[161]  The Commission further claimed that the rule continues to play an independent role in serving the public interest separate and apart from the Local Radio and Local Television Ownership Rules, which are designed primarily to promote competition.[162]

53.     In its petition for reconsideration, NAB asserts that the decision in the *Second Report and Order* to retain the Radio/Television Cross-Ownership Rule (with only minor technical modifications) was arbitrary and capricious and contrary to Section 202(h) of the 1996 Act.[163]  UCC et al. oppose NAB's request for reconsideration of the rule.[164]

### 3.     Discussion

54.     On reconsideration, we eliminate the Radio/Television Cross-Ownership Rule, concluding that it is no longer necessary to promote viewpoint diversity in local markets.[165]  We conclude that the Commission erred in finding in the *Second Report and Order* that broadcast radio stations contribute to viewpoint diversity to a degree that justifies retention of the rule, particularly in light of other local media outlets that contribute to viewpoint diversity.  We also conclude that, given that the rule already permits a significant degree of common ownership, it is doing very little to promote viewpoint diversity and its elimination therefore will have a negligible effect.  Finally, we find that elimination of the rule is not likely to have a negative impact on minority and female ownership.

55.     Contrary to the Commission's findings in the *Second Report and Order*, as discussed below, we find that broadcast radio stations' contributions to viewpoint diversity in local markets no longer justify retention of the Radio/Television Cross-Ownership Rule.  As noted above, the Commission tentatively concluded in the *NPRM* that the rule was no longer necessary to promote viewpoint diversity.[166]  It then sought further comment on that tentative conclusion in the *FNPRM*.[167]  The Commission's approach in the *NPRM* and *FNPRM* was based on an already robust record—which was

---

[160] *See Second Report and Order*, 31 FCC Rcd at 9945, 9948-50, paras. 199-200, 207-10.  The Commission modified the rule only to the extent necessary to update its references to two analog television service contours that became obsolete with the transition to digital television service.  *See id.* at 9950-51, paras. 211-14.

[161] *See id.* at 9948-49, paras. 207-09.

[162] *See id.* at 9949, para. 209.

[163] NAB Petition at 14-25.

[164] UCC et al. Opposition at 6-8.

[165] The Commission has previously concluded that Radio/Television Cross-Ownership Rule is not necessary to promote competition or localism, and we affirm that conclusion here.  *See, e.g., Second Report and Order*, 31 FCC Rcd at 9948, para. 207 n.631; *FNPRM*, 29 FCC Rcd at 4465, para. 210.  NAB argues there is evidence that radio/television cross-ownership produces localism benefits and that retention of the Radio/Television Cross-Ownership Rule therefore serves to harm localism.  NAB Petition at 15-16.  By contrast, UCC et al. argue that the Commission adequately supported its finding that cross-ownership of media outlets harms localism.  UCC et al. Opposition 6-7.  The record in this proceeding, including the reconsideration pleadings, gives us no cause to disturb the long-standing conclusion that the rule is not necessary to promote localism.  We note, however, that elimination of the rule is likely to have a negligible impact in most markets, so any impact on localism—positive or negative— will be similarly negligible.  *See infra* para. 62.

[166] *See NPRM*, 26 FCC Rcd at 17537-38, paras. 131-33.

[167] *See FNPRM*, 29 FCC Rcd at 4465-68, paras. 210-17.

strengthened by comments filed in response to the *FNPRM*—demonstrating that local radio stations are not primary sources of viewpoint diversity in local markets and that alternative media outlets are a growing and important source of viewpoint diversity. The Commission, however, reversed itself in the *Second Report and Order*, concluding that the rule should be retained. In doing so, the Commission largely relied on limited evidence, much of it anecdotal or immaterial, to conclude that radio contributes to viewpoint diversity in local markets to a degree sufficient to justify retention of the rule.[168] For example, the comments cited by the Commission primarily discussed format selection, music programming, and national news content, all of which are aspects of radio programming that do not inform our viewpoint diversity analysis.[169]

56. The Commission also discussed broadcast radio's contributions to viewpoint diversity in the NBCO Rule Section of the *Second Report and Order*.[170] That discussion was equally unpersuasive. The Commission failed to demonstrate that broadcast radio stations are significant independent sources of local news, relied on statistics that failed to distinguish between local and national news content,[171] referenced examples of broadcast content on low-power stations,[172] and relied heavily on only a handful of anecdotes regarding broadcast radio's contributions to viewpoint diversity.[173] All of these flaws undermine the broad finding that broadcast radio stations contribute to viewpoint diversity to an extent that continues to justify cross-ownership regulation.

57. NAB argues that the Commission failed to justify its departure from its position in the *NPRM* and *FNPRM* that radio stations make only limited contributions to local viewpoint diversity.[174] We agree and find that the Commission's conclusion in the *Second Report and Order* that radio contributes to local viewpoint diversity in "meaningful" ways, such that it justified retention of the rule— a clear departure from its earlier, well-supported position—was not supported by the record.[175] The Commission has long maintained that broadcast radio stations are not a primary source of viewpoint diversity in local markets.[176] While the record indicates that broadcast radio stations may contribute to

---

[168] *See Second Report and Order*, 31 FCC Rcd at 9949, para. 209.

[169] *See* UCC et al. FNPRM Comments at 35-43; NHMC FNPRM Comments at 6-11. The *2002 Biennial Review Order* contains a lengthy discussion of the five types of diversity—viewpoint, outlet, program, source, and minority and female ownership—including how they are defined and how they relate to the Commission's media ownership analysis. *2002 Biennial Review Order*, 18 FCC Rcd at 13627-37, paras. 18-52. Viewpoint diversity, for example, is measured by independent media outlets that provide local news and information, as opposed to those outlets that primarily offer regional and national content. *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 9914, 9917-26, paras. 135, 142-59 (discussing viewpoint diversity in the context of the NBCO Rule).

[170] *See Second Report and Order*, 31 FCC Rcd at 9924-25, paras. 154-56.

[171] For example, an RTDNA survey cited by the Commission failed to describe the types of content that were included in the category of local news, while a study by the Media Insight Project did not differentiate between local news and news in general. *See id.* at 9924-25, para. 155 & n.426.

[172] *Id.* at 9925, para. 156 n.431. The rule does not apply to low-power stations, and their contribution to diversity is unaffected by the decision to retain or repeal the radio-television cross-ownership rule.

[173] *See id.* at 9925-26, 157.

[174] *See* NAB Petition at 21-25. *But see* UCC et al. Opposition 7-8 (arguing that NAB has incorrectly characterized the Commission's decision as an abrupt reversal of a longstanding view).

[175] *See Second Report and Order*, 31 FCC Rcd at 9948, para. 207.

[176] *See id.* at 9921-26, paras. 150-59; *FNPRM*, 29 FCC Rcd at 4465-67, paras. 212-15.

viewpoint diversity in local markets to a certain degree,[177] we find that, in the current media marketplace, these contributions no longer justify restrictions on television/radio cross-ownership.

58. For example, the Commission itself acknowledged that consumers' reliance on radio for some local news and information has declined significantly over time—falling from 54 percent to 34 percent over the last two decades—as has the number of all-news commercial radio stations—down to 30 stations from (the already low) 50 stations in the mid-1980s out of over 11,000 commercial radio stations.[178] Moreover, the overwhelming majority of programming on news-talk stations is nationally syndicated, rather than locally produced.[179] Comments in the record, which the *Second Report and Order* did not address or dispute, support these findings. A Gallup poll found that only six percent of Americans turn to radio as their main news source, and a Pew study found that the percentage of Americans reporting that they got any news from radio on the previous day dropped from more than 50 percent in 1990 to 33 percent in 2012 (consistent with earlier findings cited by the Commission).[180] Only five percent cite radio as a main source for political and arts and cultural information, four percent for crime updates, and three percent or less for information on various other topics.[181] A 2013 Pew study confirmed the overall trend, finding that news programming had been "relegated to an [even] smaller corner of the listening landscape."[182] As we discuss above, the attempt in the *Second Report and Order* to overcome the record in this proceeding of radio's relatively minor contribution as a source of local news and the Commission's historical recognition of radio's reduced role in promoting viewpoint diversity is unpersuasive.[183] The record supports far better the Commission's tentative conclusions in the *NPRM* and *FNPRM* regarding radio's limited contributions to viewpoint diversity in local markets.

59. In addition, we find that, as NAB contends, the Commission's decision to retain the rule did not properly acknowledge the realities of the digital media marketplace, in which consumers now have access to a multitude of information sources that contribute to viewpoint diversity in local markets.[184] In the *Second Report and Order*, the Commission found that platforms such as the Internet or cable do not contribute significantly to viewpoint diversity in local markets and therefore do not meaningfully protect against the potential loss of viewpoint diversity that would result from increased radio/television cross-ownership.[185] UCC et al. argue that the Commission properly found that cable and satellite programming do not meaningfully contribute to coverage of local issues and that information

---

[177] *See, e.g.*, UCC et al. FNPRM Comments at 35-43, App. D (Examples of Editorial Programming on Minority-Owned Radio Stations); NHMC FNPRM Comments at 6-11. As noted above, however, these comments rely primarily on issues that are not relevant to our viewpoint diversity analysis, such as program diversity or national news content. *See supra* note 169 and accompanying text.

[178] *See FNPRM*, 29 FCC Rcd at 4467, para. 215.

[179] *Id.*

[180] Morris Communications FNPRM Comments at 14.

[181] Morris Communications FNPRM Reply at 4.

[182] *Id.* at 3 (citing PEW Research Center, Audio: Digital Drives Listening Experience 1 (2013), http://stateofthemedia.org/2013/audio-digital-drives-listener-experience). Even within this smaller universe, a substantial segment consists of National Public Radio (NPR)-affiliated noncommercial broadcast radio stations, which are not subject to the broadcast ownership limits. At present, NPR has over 900 member stations in the U.S. NPR, NPR Member Stations and Public Media, http://www.npr.org/about-npr/178640915/npr-stations-and-public-media (visited Oct. 11, 2017).

[183] *Supra* para. 56.

[184] *See* NAB Petition at 16-21.

[185] *Second Report and Order*, 31 FCC Rcd at 9948-49, para. 208.

available online usually originates from traditional media sources.[186]  We disagree with UCC et al.  We find instead that the Commission erred in discounting the role that non-traditional sources play in the local media marketplace and that the contributions of such outlets result in greater access to independent information sources in local markets.  In particular, evidence in the record clearly demonstrates the emergence of online outlets—including many unaffiliated with broadcast or print sources—that now offer local news and information.[187]  And as discussed above, we find that the Commission failed to properly credit the local news offerings of cable operators.[188]  Even if cable and online outlets are not yet primary sources of local news and information programming, their contributions cannot be overlooked.  While the Commission relied on a handful of anecdotes to overcome its earlier, compelling findings regarding broadcast radio's limited contributions to local news and information programming, it refused to give appropriate consideration to more persuasive evidence of the increasing contributions of non-traditional media—a trend the Commission had previously noted, and which has continued.[189]

60.     The decline of radio's role in providing local news and information, together with the rise of online sources, marks a change from the circumstances the Commission faced when it upheld the rule in the *2006 Quadrennial Review Order*.[190]  Accordingly, we find that contributions to viewpoint diversity from platforms such as the Internet and cable, while not primary sources of viewpoint diversity in local markets, help mitigate any potential loss of viewpoint diversity that might result from limited increases in radio/television cross-ownership.[191]

61.     Importantly, we do not mean to suggest that broadcast radio stations make no contribution to viewpoint diversity in local markets—they do.  In order to continue to justify the radio/television cross-ownership limits under Section 202(h), however, we are compelled to consider these contributions in the context of the broader marketplace as it exists today, in which broadcast television, print, cable, and online sources all contribute to viewpoint diversity.  Broadcast radio's contributions notwithstanding, the wide selection of sources now available renders the Radio/Television Cross-Ownership Rule obsolete in today's vibrant media marketplace.

62.     Moreover, we find that because the rule already permits significant cross-ownership in local markets, eliminating it will have only a minimal impact on common ownership, as parties will continue to be constrained by the applicable ownership limits in the Local Television and Local Radio Ownership Rules.[192]  For example, pursuant to the Radio/Television Cross-Ownership Rule, in the largest markets, entities are permitted to own, in combination, either two television stations and six radio stations or one television station and seven radio stations.  The Local Radio Ownership Rule permits an entity to own a maximum of eight radio stations in a single market.  Therefore, in the largest markets, absent the Radio/Television Cross-Ownership Rule, an entity approaching the limits of the existing cap will be permitted to acquire only one additional radio station and remain in compliance with the Local Radio

---

[186] *See* UCC et al. Opposition at 7.

[187] *See supra* para. 19.

[188] *See supra* para. 19.

[189] *See, e.g.*, *NPRM*, 26 FCC Rcd at 17537-38, para. 133 (noting the evidence demonstrating that new media outlets are a growing contributor to viewpoint diversity in local markets); *see also supra* note 187 (citing record evidence of the growing contributions of online local news outlets).

[190] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2059-60, para. 84 (affirming that, at that time, the public continued to rely on both radio and television for news and that the two therefore served as substitutes for diversity purposes); *see also Prometheus II*, 652 F.3d at 456-58 (finding that the Commission provided "a reasoned explanation" for its decision to retain the rule).

[191] *See Second Report and Order*, 31 FCC Rcd at 9918-21, paras. 145-49.

[192] *FNPRM*, 29 FCC Rcd at 4467, para. 216 (citing *NPRM*, 26 FCC Rcd at 17535-36, para. 126).

Ownership Rule. Likewise, an entity with one television station already could acquire only one additional station in these large markets under the Local Television Ownership Rule. Thus, the effect of eliminating the radio/television cross-ownership rule will be small and, as discussed above, mitigated by contributions to viewpoint diversity from other media outlets. In addition, the local ownership limits for television and radio, while intended primarily to promote competition, will continue to prevent an undue concentration of broadcast facilities, thereby preserving opportunities for diverse local ownership, and are therefore adequate to serve the goals the Radio/Television Cross-Ownership Rule was intended to promote.[193]

63.　　In light of its limited benefits, we find that the Radio/Television Cross-Ownership Rule no longer strikes an appropriate balance between the protection of viewpoint diversity and the potential public interest benefits that could result from the efficiencies gained by common ownership of radio and television stations in a local market, efficiencies that the Commission has previously recognized.[194] For example, NAB cites numerous Commission studies that found that radio/television cross-ownership produces public interest benefits, including increased news and public affairs programming.[195] Tribune also provides examples of how its co-owned radio/television combinations have been able to improve outreach to their local community and work collaboratively to improve coverage of issues of local concern.[196] The current rule prevents these types of localism benefits from accruing more broadly, without providing meaningful offsetting benefits to viewpoint diversity. As such, we can no longer justify retention of the Radio/Television Cross-Ownership Rule under Section 202(h).[197]

64.　　*Minority and Female Ownership.* Lastly, consistent with our preliminary view in the *FNPRM*, we find that the record fails to demonstrate that eliminating the Radio/Television Cross-Ownership Rule is likely to harm minority and female ownership.[198] While broadcast radio remains an important entry point into media ownership,[199] eliminating this rule will not result in significant additional

---

[193] In this order, we deny requests to modify or relax the ownership limitations in the Local Radio Ownership Rule, which the Commission retained without change in the *Second Report and Order*, and although we modify the Local Television Ownership Rule, we find that the revised rule remains sufficient to protect against excessive consolidation in local television markets, such that retention of the Radio/Television Cross-Ownership Rule is no longer necessary in the public interest.

[194] *See 2006 Quadrennial Review Order*, 23 FCC Rcd at 2060, para. 83 (noting that the Radio/Television Cross-Ownership Rule seeks to strike a balance between "protection of diverse viewpoints and the 'efficiencies' and 'public service benefits' that can result from 'joint ownership and operation of both television and radio stations in the same market.'").

[195] *See* NAB Petition at 15-16 n.38; NAB FNPRM Comments at 85-86.

[196] Tribune NPRM Comments at 77.

[197] In light of the significant common ownership already allowed under the rule, we do not believe it appropriate to modify and retain the rule, having found that the current rule is no longer in the public interest under Section 202(h). Indeed, the record demonstrates that there is no policy justification—competition, localism, or viewpoint diversity— upon which to base such a revised rule. Because we are eliminating the Radio/Television Cross-Ownership Rule on the grounds discussed herein, we need not reach alternative arguments involving the impact of ownership on viewpoint diversity. *See* NAB Petition at 14-15 (arguing that the Commission failed to establish that diverse ownership of media outlets leads to viewpoint diversity). *But see* UCC et al. Opposition at 6 (arguing that the Commission cited ample evidence of a connection between ownership of media outlets and the content they deliver).

[198] *FNPRM*, 29 FCC Rcd at 4469-70, para. 222 (noting the lack of evidence in the record to suggest that eliminating the rule would harm minority and female ownership or that the rule has protected or promoted minority or female ownership).

[199] UCC et al. FNPRM Comments at 41-43 (arguing that permitting further consolidation would disserve the public interest because radio provides one of the few entry points into media ownership for minorities and women and that radio stations owned by minorities and women promote diversity).

consolidation because of the constraints of the Local Radio Ownership Rule.[200] Furthermore, there is no evidence that any additional common ownership that would be permitted as a result of eliminating the Radio/Television Cross-Ownership Rule would disproportionately or negatively impact minority- and female-owned stations. Indeed, the analyses within the contexts of the Local Television Ownership Rule and the Local Radio Ownership Rule suggest that previous relaxations of those rules have not resulted in reduced levels of minority and female ownership.[201] We find that the record provides no information to suggest that eliminating the Radio/Television Cross-Ownership Rule will have a different impact on minority and female ownership.[202]

65.     In the *Second Report and Order*, the Commission found that although the rule could help promote opportunities for diversity in broadcast television and radio ownership, it was not being retained for "the purpose of preserving or creating specific amounts of minority and female ownership."[203] The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by requiring the separation of radio and television broadcasters. We cannot justify retaining the rule under Section 202(h) based on the unsubstantiated hope that the rule will promote minority and female ownership.

### C.     Local Television Ownership Rule

#### 1.     Introduction

66.     Upon reconsideration, we find that the Local Television Ownership Rule adopted in the *Second Report and Order* is not supported by the record and must be modified. Specifically, we eliminate the requirement that at least eight independently owned television stations must remain in the market after combining ownership of two stations in a market (Eight-Voices Test), as the Commission's rationale for retaining the test was unsupported by the record and we conclude that it is no longer necessary in the public interest. Furthermore, we adopt a hybrid approach to application of the restriction on ownership of two top-four ranked stations in the same market (Top-Four Prohibition) that will include an opportunity for case-by-case evaluation to account for circumstances in which application of the prohibition may be unwarranted given certain factors affecting a particular market or a particular transaction.[204]

#### 2.     Background

67.     The *Second Report and Order* effectively retained the existing Local Television Ownership Rule (with only a minor technical modification of the contour overlap provision to reflect the transition to digital broadcasting), finding that the rule remained necessary to promote competition. Despite a record replete with evidence of the significant changes in the video marketplace, the Commission's decision left in place ownership restrictions originally implemented in 1999.[205] Under the rule adopted in the *Second Report and Order*, an entity may own up to two television stations in the same market if: (1) the digital noise limited service contours (NLSCs) of the stations (as determined by Section

---

[200] *See supra* para. 62 & note 193.

[201] *See Second Report and Order*, 31 FCC Rcd 9894-95, 9911-12, paras. 77, 126.

[202] We disagree with the general assertion by UCC et al. that the Commission cannot modify any of its media ownership rules without further study of the impact on minority and female ownership. For a discussion of this issue, see paragraph 47, *supra*.

[203] *See Second Report and Order*, 31 FCC Rcd at 9951-52, para. 215.

[204] The text of the revised rule can be found in Appendix A, hereto.

[205] *See Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12924-43, paras. 42-91 (1999) (*1999 Ownership Order*).

73.622(e) of the Commission's rules) do not overlap; or (2) at least one of the stations is not ranked among the top-four stations in the market and at least eight independently owned television stations would remain in the market following the combination.

68.     NAB and Nexstar filed petitions for reconsideration of the Local Television Ownership Rule, specifically challenging the Top-Four Prohibition and the Eight-Voices Test.[206] ACA and UCC et al. opposed reconsideration, arguing that the petitions failed to identify any material error or omission in the *Second Report and Order* with respect to the Local Television Ownership Rule.[207]

### 3.     Discussion

69.     On reconsideration, we adopt a revised Local Television Ownership Rule, finding that the rule adopted in the *Second Report and Order* is no longer "necessary in the public interest as a result of competition."[208] Our revised rule reflects our assessment of both the current video marketplace and the continued importance of broadcast television stations in their local markets. Specifically, we find that the Eight-Voices Test is not supported by the record and must be eliminated. In addition, we modify the Top-Four Prohibition by incorporating a new case-by-case review process to address evidence in the record that the prohibition may be unwarranted in certain circumstances. We find that these modifications to the Local Television Ownership Rule are not likely to have a negative impact on minority and female ownership.

70.     In adopting these changes, we reject the argument made by ACA that reconsideration is inappropriate because petitioners rely on arguments that have been fully considered and rejected by the Commission within the same proceeding.[209] Neither the Communications Act nor the Commission's rules preclude granting petitions for reconsideration that fail to rely on new arguments.[210] Commission precedent establishes that reconsideration is generally appropriate where the petitioner shows either a material error or omission in the original order or raises additional facts not known or not existing until after the petitioner's last opportunity to respond.[211] While the petitioners repeat some arguments made

---

[206] *See* NAB Petition at 1-9; Nexstar Petition at 4-11.

[207] *See* ACA Opposition at 8; UCC et al. Opposition at 5-6.

[208] 1996 Act § 202(h).

[209] ACA Opposition at 3-4.

[210] *See* 47 U.S.C. § 405 ("[I]t shall be lawful for . . . the Commission . . ., in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. . .. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate . . . ."); 47 CFR § 1.429 (i) ("The Commission may grant the petition for reconsideration in whole or in part or may deny or dismiss the petition. Its order will contain a concise statement of the reasons for the action taken."). Likewise, we reject UCC's claim that reconsideration is not warranted unless petitioners present new evidence. Letter From Cheryl A. Leanza, Policy Advisor, UCC OC Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 at al. (Nov. 9, 2017). UCC's reliance on Section 1.429(b) of our rules is misplaced, as this section does not *require* petitioners to support their claims of Commission error with new evidence. 47 CFR § 1.429(b); *see also infra* note 211 (discussing circumstances warranting reconsideration).

[211] *See, e.g.*, *Petition for Reconsideration by Acadiana Cellular General Partnership*, Order on Reconsideration, 20 FCC Rcd 8660, 8663, para. 8 (2006); *Universal Service Contribution Methodology et al.*, Order on Reconsideration, 27 FCC Rcd 898, 901, para. 8 (2012) ("Reconsideration of a Commission's decision may be appropriate when the petitioner demonstrates that the original order contains a material error or omission, or raises additional facts that were not known or did not exist until after the petitioner's last opportunity to present such matters. If a petition simply repeats arguments that were previously considered and rejected in the proceeding, the Commission may deny them for the reasons already provided."). Even if a petition is repetitious, the Commission can, in its discretion, consider it. *See Universal Service Contribution Methodology et al.*, 27 FCC Rcd at 901, para. 8 (Commission "may deny" repetitious petition); *Application of Paging Systems, Inc.*, Order on Reconsideration, 22 FCC Rcd 4602, 4604

(continued....)

earlier in this proceeding, they nonetheless provide valid grounds for the Commission to reconsider its previous action.[212]  As discussed below, we find that the petitioners have identified material errors in the *Second Report and Order* warranting reconsideration of certain aspects of the Local Television Ownership Rule.

71.     *Market*.  We find that the Commission's decision in the *Second Report and Order* to adopt a rule focused on promoting competition among broadcast television stations in local television viewing markets was appropriate given the record compiled in this proceeding.[213]  Commenters in this reconsideration proceeding—and the proceeding in general—express conflicting views on the impact of non-broadcast video sources on the Commission's market definition.  NAB and Nexstar urge the Commission to expand the market definition to include non-broadcast video alternatives, such as online and multichannel video programming distributors (MVPD) video programming sources.[214]  On the other hand, ACA argues that the Commission properly determined in the *Second Report and Order* that local broadcast television remains the relevant product market.[215]  While the video marketplace has changed substantially since the current television ownership limits were adopted in 1999 and since the last Commission review of these rules concluded in 2008, broadcast television stations still play a unique and important role in their local communities.[216]  As such, we believe that, on the current record, a rule focused on preserving competition among local broadcast television stations is still warranted.  Thus, we do not include other types of video programming providers within the market to which the restriction applies.  We emphasize, however, that this conclusion could change in a future proceeding with a different record.

72.     Our finding does not mean, however, that changes outside the local broadcast television market should not factor into the Commission's assessment of the rule under Section 202(h) or that the Commission is free to retain its existing rule without any adjustments that take into account marketplace

---

(Continued from previous page)  ————————————————

n.23 (WTB 2007) (considering repetitious petition on the merits, even though staff could dismiss it); *Sequoia Cablevision*, 58 FCC 2d 669, 672, para. 6 (1976) (decision by the full Commission partially granting a repetitious petition for reconsideration of an order denying reconsideration despite procedural objections because "the language of Section 1.106(k)(3) of the Rules [applicable to petitions for reconsideration of orders denying reconsideration] is permissive, not mandatory").

[212] *See* NAB Petition at 5-6; Nexstar Petition at 9, 11.

[213] *See Second Report and Order*, 31 FCC Rcd at 9872-75, paras. 23-30.  The Commission concluded in the *Second Report and Order* that non-broadcast video offerings still do not serve as meaningful substitutes for local broadcast television and that competition within a local market motivates a broadcast television station to invest in better programming and to provide programming tailored to the needs and interests of the local community in order to gain market share.  *Id.*

[214] NAB Petition at 2-3 (arguing that non-broadcast video sources should be considered in the relevant market because they divert audiences and advertisers away from local television stations despite the national focus of online and cable network programming); Nexstar Petition at 8 (asserting that, regardless of whether these other forms of media focus on local content, new media has an undeniable impact on the competitive realities faced by local television broadcasters).

[215] ACA Opposition at 8, 11 (stating non-broadcast video offerings are not meaningful substitutes for local broadcast television and that competition within a local market amongst broadcasters motivates broadcast television stations to invest in better programming tailored to local needs and interests).

[216] *Second Report and Order*, 31 FCC Rcd at 9872-75, paras. 23-30.  *But see* Nexstar Petition at 7-8 (citing a Pew Internet study that found the Internet ranked as either the first or second most important source of information for the vast majority of local subjects examined).

changes.[217]  Indeed, television broadcasters' important role makes it critical for the Commission to ensure that its rules do not unnecessarily restrict their ability to serve their local markets in the face of ever-growing video programming options.  Consumers are increasingly accessing video programming delivered via MVPDs, the Internet, and mobile devices.[218]  Moreover, the online video distributor (OVD) industry—which includes entities such as Netflix and Hulu—continues to grow and evolve.  In addition to providing on-demand access to vast content libraries, many OVDs are now offering original programming and/or live television offerings similar to traditional MVPD offerings.[219]  The *Second Report and Order* acknowledged the popularity of these services but failed to properly account for this in its analysis.  Accordingly, we reconsider the Local Television Ownership Rule and adopt common sense modifications that will help local television broadcasters achieve economies of scale and improve their ability to serve their local markets in the face of an evolving video marketplace.

73.     *Eight-Voices Test*.  Upon reconsideration, we find that the Eight-Voices Test is unsupported by the record or reasoned analysis and is no longer necessary in the public interest.[220]  Accordingly, we grant the NAB Petition and the Nexstar Petition with respect to this issue.

74.     Despite the fact that the Commission has spent years seeking comment regarding the local ownership rule, the record lacks evidence sufficient to support the Commission's decision to retain the Eight-Voices Test.  In the *Second Report and Order*, the Commission asserted that competition among stations affiliated with the Big Four networks (often the top-four rated broadcast stations in a local market) and at least four independent competitors unaffiliated with a Big Four network motivates all of the stations in a market to improve their programming, including providing additional local news and public interest programming.[221]  Yet the Commission did not provide or cite any evidence to support this argument, even though the Eight-Voices Test has been around since 1999 (more than enough time to observe whether the Eight-Voices Test has been having the expected impact in local markets).

75.     The Commission also failed to explain adequately why the number of independent television stations must be equal to the number of top-performing stations in a market.  The Commission stated that a significant gap in audience share persists between the top-four rated stations in a market and the remaining stations in most markets, but it offered no justification for the notion that the dominance of four top-performing stations must be balanced by an equal number of independent, lower-performing stations.  The Commission provided no precedent, record evidence, or economic theory to support this notion.  Moreover, a significant gap in audience share between the top-four stations and the other stations in a market could also logically justify permitting the common ownership of non-top-four stations to form

---

[217] *See, e.g.*, *Second Report and Order*, 31 FCC Rcd at 10060 (Dissenting Statement of Commissioner O'Rielly).  We note that the Commission will consider the state of the marketplace in its review of the Local Television Ownership Rule in the 2018 Quadrennial Review proceeding.

[218] *See, e.g.*, Nexstar Petition at 4-6.

[219] *See, e.g.*, *Seventeenth Video Competition Report*, 31 FCC Rcd at 4529, para. 136 ("In 2015, Netflix secured 34 Emmy nominations for its original programming, just behind the 41 nominations received by both NBC and CBS and FX's 38 nominations."); *id.* at 4570, para. 224 ("Sony's PlayStation Vue is a cloud-based streaming service available in seven major U.S. cities offering live TV, movies, and sports through their PS3 and PS4 consoles.").  The options for live online streaming services continue to grow.  *See, e.g.*, Press Release, Hulu, *Hulu Launches New Live TV Streaming Service, Adds Channels from Scripps Network Interactive* (May 3, 2017), https://www.hulu.com/press/hulu-launches-new-live-tv-streaming-service-adds-channels-from-scripps-networks-interactive/; Press Release, AT&T, *The Revolution is Here: AT&T Offers 3 Ways to Stream Premium Video Content* (Nov. 28, 2016), http://about.att.com/story/att_offers_three_ways_to_stream_premium_video_content.html.

[220] *See* NAB Petition at 5; Nexstar Petition at 11; Sinclair Reply to Opposition at 3; *see also Second Report and Order*, 31 FCC Rcd at 10053-54 (Dissenting Statement of then-Commissioner Pai).

[221] *Second Report and Order*, 31 FCC Rcd at 9886-87, para. 56.

a stronger competitor to the top-four stations and thus promote competition, even if fewer than eight independent voices remain.

76.    Instead, the Commission's primary justification for retaining the Eight-Voices Test apparently stems from the historical use of the number eight as the proper number of voices when the rule was revised in 1999 to permit duopoly ownership in certain circumstances.[222]  Notably, that decision relied on viewpoint diversity grounds to determine the appropriate numerical limit.[223]  The Commission subsequently determined that the rule was no longer necessary to promote viewpoint diversity and instead relied on competition to support its adoption of the exact same voices limit in the *2006 Quadrennial Review Order*.[224]  The Commission, however, offered no empirical evidence to support this line drawing in the *2006 Quadrennial Review Order* as necessary to preserve competition, and as discussed above, we find that the rationale set forth in the *Second Report and Order* was flawed.  Although the Commission's decision to retain the Eight-Voices Test in the *2006 Quadrennial Review Order* was upheld in *Prometheus II*,[225] the Commission is obligated under Section 202(h) to justify its broadcast ownership rules based on the existing record and in light of current marketplace realities.  On reconsideration, we find no record support for retaining the Eight-Voices Test, and we conclude that retaining it does not serve the public interest.  Further, as discussed below, the Eight-Voices Test prevents the realization of public interest benefits.  Accordingly, it must be eliminated.[226]

77.    The Commission not only failed to provide a reasoned basis for retaining the Eight-Voices Test; it also ignored evidence in the record demonstrating that the Eight-Voices Test lacks any economic support, is inconsistent with the realities of the television marketplace, and prevents

---

[222] *See 1999 Ownership Order*, 14 FCC Rcd at 12934, para. 67.

[223] *Id.* ("The 'eight independent voice' component of the rule provides a clear benchmark for ensuring a minimum amount of diversity in a market. … Taking into account current marketplace conditions, the eight voice standard we adopt today strikes what we believe to be an appropriate balance between permitting stations to take advantage of the efficiencies of television duopolies while at the same time ensuring a robust level of diversity.").

[224] *2006 Quadrennial Review Order*, 23 FCC Rcd 2010, 2066, para. 101 ("While other outlets contribute to the diversity of voices in local markets, we still find that it is necessary in the public interest to ensure that there are at least eight independently owned local television stations in order to ensure robust competition for local television viewers and the continued provision of video programming responsive to the needs and interest of viewers in local markets."); *see also id.* at 2064 ("[T]the Commission's local television ownership rule promotes competition … within local television markets."); *id.* at 2065 ("We conclude that the local television ownership rule is no longer necessary to foster diversity because there are other outlets for diversity of viewpoint in local markets, and a single-service ownership restriction is not necessary to foster diversity.").

[225] *Prometheus II*, 652 F.3d at 459-60.

[226] We also find that the record fails to support the adoption of a different voice test, e.g., six voices, despite specific requests for comment on alternative voice tests in this proceeding.  *See, e.g.*, *NPRM*, 26 FCC Rcd at 17506, para. 46.  One commenter argued for lowering the voice count in general, and another proposed changing the test to four voices—a proposal we reject because such a restriction would be redundant given our decision, as discussed below, to retain the Top-Four Prohibition.  *See* Tribune NPRM Reply at 35; Grant Group NPRM Comments at 9.  NAB argued that the Eight-Voices Test should be eliminated and not replaced with an alternative test.  NAB NPRM Comments at 28-29 (stating that reducing the voice count to six or seven would not provide adequate relief to broadcasters).  No other commenters offered support for a different voice test.  We find no justification for relying on an arbitrary voice count to promote competition, and we conclude that the public interest is better served by the revised rule we adopt today, which will allow combinations that will help lower-rated stations better serve their viewers while preserving the restriction that an entity may not own two top-four rated stations in a market unless it can demonstrate that such a combination will serve the public interest and in no event will allow common ownership of more than two stations in a market, subject to the contour overlap provision.  We find that this is a more effective way to promote competition and still avoid harms associated with significant concentration in local markets than an arbitrary "remaining voices" test

combinations that would likely produce significant public interest benefits. Indeed, no commenter has produced evidence of any other industry where the government employs an eight-competitor test. In multiple instances, the Commission acknowledged the potential public interest benefits of common ownership, which potentially allow a local broadcast station to invest more resources in news or other public interest programming that meets the needs of its local community.[227] We find that the Eight-Voices Test denies the public interest benefits produced by common ownership without any evidence of countervailing benefits to competition from preserving the requirement. Furthermore, these markets—including many small and mid-sized markets that have less advertising revenue to fund local programming—are the places where the efficiencies of common ownership can often yield the greatest benefits.[228] Our action in repealing the Eight-Voices Test will enable local television broadcasters to realize these benefits and better serve their local markets. In particular, the record suggests that local news programming is typically one of the largest operational costs for broadcasters; accordingly, stations may find that common ownership enables them to provide more high-quality local programming, especially in revenue-scarce small and mid-sized markets.[229]

78. *Top-Four Prohibition*. In contrast to the Eight-Voices Test, we find that the Commission's decision in the *Second Report and Order* to treat combinations of two top-four stations differently from other combinations is supported in the record. We therefore deny the NAB Petition and the Nexstar Petition to the extent each requested complete elimination of the Top-Four Prohibition. As discussed below, however, we find that modification of the Top-Four Prohibition to include a case-by-case analysis is appropriate in order to address instances in which the application of the Top-Four Prohibition may not be warranted based on the circumstances in a particular market or with respect to a particular transaction. This hybrid approach will allow for a more refined application of the Local Television Ownership Rule that will help facilitate the public interest benefits associated with common ownership in local markets.

---

[227] *See Second Report and Order*, 31 FCC Rcd at 9878, 9881, paras. 38, 44.

[228] *See id.* at 10053 (statement of then-Commissioner Pai highlighting the potential benefits achieved by repealing the Eight-Voices Test); *see also* Nexstar Petition at 14 (identifying adverse consequences of the Eight-Voices Test in small markets); Gray June 28 *Ex Parte* Letter at 4 (arguing that mid-sized and small markets are especially susceptible to the challenges of decreased revenue and increased operational costs).

[229] *See, e.g.*, Gray June 28 *Ex Parte* Letter at 3-4, 7-8. After the draft order in this proceeding was publicly released, DISH submitted an economic study based on viewer ratings data applicable to existing combinations of local television stations as compared with ratings data from independently owned stations in DMAs deemed comparable to the DMAs served by commonly owned stations. DISH claims that the study shows that common ownership of local television stations does not produce increased ratings for local programming; therefore, common ownership does not produce higher-quality local programming. *See* Letter from Pantelis Michalopoulos & Stephanie A. Roy, Counsel to DISH, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 et al. (Nov. 9, 2017). We note that DISH provides no reason it could not have submitted this study earlier in response to broadcasters' claims that relaxation of the rule would lead to more locally responsive and higher quality programming. *See, e.g.*, Nexstar Petition at 9 (asserting common ownership of local television combinations leads to an increase in "local news and high-quality programming"). Thus, it is inexcusably late. 47 CFR § 1.429(b), (f). Moreover, based on our review of the study, we find that it suffers from significant methodological issues and fails to provide a sufficient basis upon which to draw any conclusions. For example, the study employs a simplistic analysis covering a small sample size and the results are highly dependent on the selection of data points, such as control DMAs, viewing period, and time slot. Furthermore, the analysis fails to address issues of statistical significance regarding viewership, and the cross-sectional analysis fails to account for other variables that may influence viewership in different markets or otherwise address the cases in the filing for which viewership is higher in duopoly markets. Ultimately, the study does not undermine our finding that efficiencies gained through common ownership can allow broadcasters to invest more resources in producing more and higher-quality locally responsive programming.

79.     The ratings data in the record generally supported the Commission's line drawing, and the potential harms associated with top-four combinations find support in the record.[230] We also find that the data were sufficiently recent and uncontradicted by any newer ratings data in the record, such that it was appropriate for the Commission to rely on the data in reaching its decision.[231] The Commission considered alternative arguments and data in the record and ultimately found that the Top-Four Prohibition, last endorsed in the *2006 Quadrennial Review Order*, continued to be supported.[232] In arguing that the Top-Four Prohibition should be eliminated, NAB notes that evidence in the record demonstrated that the concerns that the Top-Four Prohibition is intended to address may not be present in many markets.[233] NAB also provides additional information demonstrating that some markets do not have a gap between the ratings of the fourth- and fifth-ranked stations or that the gap is larger between second- and third-ranked stations in some markets.[234] The Commission has long conceded that the justification for the Top-Four Prohibition does not apply in all markets.[235] Thus, the rule may prohibit combinations that do not present public interest harms or that offer potential public interest benefits that outweigh any potential harms. To this extent, the bright-line prohibition is over-inclusive. On reconsideration, we believe that it is appropriate to modify the rule to allow for more flexibility.

80.     In particular, we take steps to mitigate the potentially detrimental impacts of applying the Top-Four Prohibition in certain circumstances. In the *Second Report and Order*, the Commission conceded the potential public interest benefits from allowing additional common ownership, yet found that the harms associated with top-four combinations exceeded these benefits.[236] This logic no doubt holds when the rationale for adopting the Top-Four Prohibition applies, though the benefits could exceed the harms in certain circumstances based on an evaluation of the characteristics of a particular market or a particular transaction.

81.     Instead of relying solely on the bright-line application of the Top-Four Prohibition, we are adopting a hybrid approach that will allow applicants to request a case-by-case examination of a

---

[230] *Second Report and Order*, 31 FCC Rcd at 9880-81, paras. 43-44. The Commission has repeatedly concluded that the Top-Four Prohibition is necessary to promote competition in the local television marketplace. *See, e.g., id.*; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2066-67, para. 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13695, para. 194; *see also Prometheus II*, 652 F.3d at 460-61 (upholding retention of the Top-Four Prohibition in the *2006 Quadrennial Review Order* as supported by "ample evidence in the record"). As the Commission has consistently found, there is generally a "significant 'cushion' of audience share percentage points" that "separate[s] the top four stations from the fifth-ranked stations." *Prometheus II*, 652 F.3d at 460 (quoting *2006 Quadrennial Review Order*). In the *Second Report and Order*, the Commission found that this pattern has not changed. *Second Report and Order*, 31 FCC Rcd at 9880-81, para. 43. Thus, top-four combinations would generally result in a single firm's obtaining a significantly larger market share than other stations and reduced incentives for commonly owned local stations to compete for programming, advertising, and audience shares. *Id.* at 9881, para. 44.

[231] *See* NAB Petition at 8-9. While we do find the data to be sufficiently recent in this context, we note that we are approaching the 2018 Quadrennial Review proceeding, in which the Commission's broadcast ownership rules, including the Top-Four Prohibition, will again be subject to review based on an updated record.

[232] *Second Report and Order*, 31 FCC Rcd at 9880-81, paras. 43-44.

[233] *See, e.g., id.* at 9880, para. 43 nn.104 & 106.

[234] *See* NAB Petition at 8-10.

[235] *See, e.g., Second Report and Order*, 31 FCC Rcd at 9880, para. 43 n.104; *FNPRM*, 29 FCC Rcd at 4390, para. 44 n.111; *2002 Biennial Review Order*, 18 FCC Rcd at 13694-95, para. 195.

[236] *Second Report and Order*, 31 FCC Rcd at 9881, para. 44. *But see* Nexstar Petition at 9-10 (asserting that the Top-Four Prohibition prevents station combinations that produce public interest benefits, including an increase in local programming and news).

proposed combination that would otherwise be prohibited by the Top-Four Prohibition.[237] Such an approach will help mitigate the potential drawbacks associated with strict application of the Top-Four Prohibition, while still preserving the ease and efficiency of applying the rule. This revised rule will continue to promote robust competition in local markets while also facilitating transactions, in appropriate circumstances, that will allow broadcast stations to achieve economies of scale and better serve their local viewers.

82.     As we have just discussed, the record demonstrates the need for flexibility in the application of the Top-Four Prohibition.[238] Given the variations in local markets and specific transactions, however, we do not believe that applicants would be well served by a rigid set of criteria for our case-by-case analysis. The record does, however, suggest the types of information that applicants could provide to help establish that application of the Top-Four Prohibition is not in the public interest because the reduction in competition is minimal and is outweighed by public interest benefits. Such information regarding the impacts on competition in the local market could include (but is not limited to): (1) ratings share data of the stations proposed to be combined compared with other stations in the market; (2) revenue share data of the stations proposed to be combined compared with other stations in the market, including advertising (on-air and digital) and retransmission consent fees;[239] (3) market characteristics,

---

[237] Under a hybrid approach, a rule includes both bright-line provisions and a case-by-case element to allow for consideration of market-specific factors. *See NOI*, 25 FCC Rcd at 6115, paras. 95-96 (seeking comment on whether to adopt a hybrid approach for any or all of the broadcast ownership rules). Such an approach provides certainty and flexibility when determining whether a particular transaction should be granted. Though no party commented on this issue, we find that the record supports our approach. As discussed herein, special scrutiny of combinations of two top-four rated stations is still supported by the record, though the record also demonstrates a need for flexibility in addressing circumstances in which application of the Top-Four Prohibition may not be appropriate due to the particular circumstances in a local market. The hybrid approach is well suited for such circumstances.

[238] *See supra* paras. 79-81.

[239] We disagree with the American Television Alliance's (ATVA) contention that affording licensees a case-by-case opportunity to seek approval of top-four combinations cannot "be squared" with the bright-line rule adopted in the Commission's *2014 Retransmission Consent Report and Order*. Letter from Michael Nilsson, Counsel to ATVA, to Marlene Dortch, Secretary, FCC, MB Docket Nos. 14-50 et al. at 6 (Aug. 17, 2017) (ATVA Aug. 17, 2017 *Ex Parte* Letter) (citing *Amendment of the Commission's Rules Related to Retransmission Consent*, Report and Order, 29 FCC Rcd 3351 (2014) (*2014 Retransmission Consent Report and Order*)). There, the Commission concluded that the potential competitive harms arising from joint negotiation of retransmission consent by non-commonly owned stations outweighed the potential benefits and determined that a bright-line prohibition would be "more administratively efficient" than case-by-case review because it would provide the bargaining parties with "advance notice of the appropriate process for such negotiation." *2014 Retransmission Consent Report and Order*, 29 FCC Rcd at 3358, 3364, paras. 12, 18. Here, however, the result of the Commission's case-by-case review of proposed top-four combinations will provide bargaining parties with advance notice of whether joint retransmission consent negotiations for the two stations in question will be allowed. Moreover, common ownership of two top-four stations implicates a broader range of potential benefits and harms than a narrow agreement between two top-four stations to jointly negotiate retransmission consent so there is no inherent inconsistency between adopting a bright-line rule in the latter case and a case-by-case review in the former case. Additionally, we reject ATVA's contention that adopting a case-by-case review is inconsistent with the statute. ATVA Aug. 17, 2017 *Ex Parte* Letter at 6. To the extent that the existing Top-Four Prohibition is overbroad given the current state of competition, as we conclude here, then the existing prohibition, absent modification, is "not necessary in the public interest as a result of competition" and should be modified. *See* 1996 Act § 202(h) ("The Commission shall repeal or modify any regulation it determines to be no longer in the public interest."). Moreover, in adopting this approach, we decline to adopt specific criteria related to the issue of retransmission consent, as recently advocated by some commenters. *See* Letter from Rick Chessen, Senior Vice President, Law and Regulatory Policy, NCTA – The Internet & Television Association, to Marlene Dortch, Secretary, FCC, GN Docket No. 16-142 et al. (Nov. 6, 2017); Letter from Michael Nilsson, Counsel to ATVA, to Marlene Dortch, Secretary, FCC, MB Docket Nos. 14-50 et al. (Nov. 3, 2017). *But see* Letter from Rick Kaplan, General Counsel and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene Dortch, Secretary, FCC, MB Docket Nos. 14-150 et al. (Nov. 9, 2017) (objecting to

(continued….)

such as population and the number and types of broadcast television stations serving the market (including any strong competitors outside the top-four rated broadcast television stations); (4) the likely effects on programming meeting the needs and interests of the community; and (5) any other circumstances impacting the market, particularly any disparities primarily impacting small and mid-sized markets.[240]  Applicants are encouraged to provide data over a substantial period (e.g., the past three years, similar to the requirement in the failing/failed station waiver test) to strengthen their request and to help avoid circumvention of the Top-Four Prohibition based on anomalous data over a short period of time or manipulation of program offerings prior to the proposed transaction.  In the end, applicants must demonstrate that the benefits of the proposed transaction would outweigh the harms , and we will undertake a careful review of such showings in light of the record with respect to each such application.[241]

83.    *Minority and Female Ownership*.  We find that the modifications we adopt to the Local Television Ownership Rule are not likely to harm minority and female ownership.  As noted in the *Second Report and Order*, data in the record demonstrate that relaxation of the Local Television Ownership Rule in 1999 did not have a negative impact on overall minority ownership levels.[242]  In this lengthy proceeding, no party has presented contrary evidence or a compelling argument demonstrating why relaxing this rule will have a different impact.  Indeed, consistent with the *Second Report and Order*, we find that the record does not support a causal connection between modifications to the Local Television Ownership Rule and minority and female ownership levels.[243]

84.    In the *Second Report and Order*, the Commission stated that ensuring the presence of independently owned broadcast television stations in the local market indirectly increases the likelihood of a variety of viewpoints and preserving ownership opportunities for new entrants.  The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by limiting common

---

(Continued from previous page) ————————————

inclusion of specific retransmission consent-related criteria).  Instead, as discussed herein, we believe that the case-by-case review process will allow parties to advance any relevant concerns—including concerns related to retransmission consent issues—in the context of a specific proposed transaction if such issues are relevant to the particular market, stations, or transaction.  Similarly, we reject Independent Television Group's recommendation that we adopt a presumption in favor of top-four combinations in small and mid-sized markets.  *See* Letter from Jack N. Goodman, Counsel to the Independent Television Group, to Marlene Dortch, Secretary, FCC, MB Docket No. 14-50, at 4-5 (Nov. 8, 2017).  ITG provides no evidence sufficient to support such a presumption.  It simply relies on NAB's assertion in its 2014 comments that in some markets, there may have been significant disparities in audience share among some of the top-four rated stations.  The case-by-case analysis is not weighted in favor of transactions in any particular market, and applicants in small and mid-sized markets will be able to provide market-specific evidence supporting their requests.

[240] *See, e.g.*, Gray June 28 *Ex Parte* Letter at 2-6 (identifying circumstances where factors such as revenue data, operation costs, market size, and lack of local news in some markets may inform consideration for relief from common ownership prohibitions in smaller markets).  Gray proposes that, at least in smaller markets, two stations be permitted to combine ownership if one of the stations has not produced a local newscast in the previous two years.  *Id.* at 6.  We find, however, that market characteristics and the state of local programming, including local news offerings, are better considered in our case-by-case analysis at this time.  We anticipate that any transactions processed under this case-by-case approach will help inform any consideration of specific criteria that could be included in any future revision of the Local Television Ownership Rule, which will be reviewed again in the forthcoming 2018 Quadrennial Review proceeding.

[241] *See* Letter from Representatives Anna G. Eshoo and Michael F. Doyle to Ajit Pai, Chairman, FCC (Nov. 8, 2017) (expressing concerns regarding the case-by-case approach).

[242] *See Second Report and Order*, 31 FCC Rcd at 9894-95, para. 77 (showing an overall increase in minority ownership in the years following relaxation of the rule).

[243] *See id.* at 9895, para. 78.

ownership of broadcast television stations. This statement will continue to be true with respect to the revised rule that we adopt today. Under Section 202(h), however, we cannot continue to subject broadcast television licensees to aspects of the Local Television Ownership Rule that can no longer be justified based on the unsubstantiated hope that these restrictions will promote minority and female ownership.[244]

85.    *Incentive Auction*. We reiterate that it remains premature to analyze the implications of the incentive auction on the Local Television Ownership Rule.[245] Contrary to the position of certain parties, the Commission cannot—and did not in the *Second Report and Order*—use the auction as an excuse for delaying action and refusing to fulfill its obligations under Section 202(h).[246] While we find fault today in the prior Commission's decision to retain the existing television ownership restrictions without modification, the incentive auction was not a factor in that decision. Instead, the Commission properly found that it could not delay a decision on its rules because of the auction nor could it adopt changes to its rules based on speculation as to the final results of the auction. We agree. Section 202(h) compels the Commission to act on the record before it and determine whether to retain, repeal, or modify the Local Television Ownership Rule based on the realities of the current marketplace, which we have done.[247] Though the auction has finished, it is still too soon to evaluate its impacts on the television marketplace.[248] As noted in the *Second Report and Order*, the Commission will evaluate the broadcast marketplace post-auction, and we expect that these issues will be considered in the forthcoming 2018 Quadrennial Review proceeding.[249]

---

[244] 1996 Act § 202(h). In addition, we disagree with the general assertion by UCC et al. that the Commission cannot modify any of its media ownership rules without further study of the impact on minority and female ownership. For a discussion of this issue, see paragraph 47, *supra*. We also disagree with assertions by MMTC and NABOB that the rules can be retained based on promoting news coverage of specific issues. *See* Letter from David Honig, President Emeritus and Senior Advisor, MMTC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 et al. (Nov. 9, 2017) (MMTC/NABOB Nov. 9, 2017 *Ex Parte*) (submitted on behalf of MMTC and NABOB with accompanying Fact Sheet).

[245] *Second Report and Order*, 31 FCC Rcd at 9895-96, paras. 79-81.

[246] *See* UCC et al. Opposition at 3-4 (arguing that the Commission may not repeal or significantly alter the local television rule until it can determine how the incentive auctions will affect minority and female ownership). *But see* NAB Reply to Oppositions at 6 (arguing that Section 202(h) does not include a "wait and see" exception and that the Commission erred in not modifying the rule to account for the reduction in television stations likely to result from the incentive auction); NMA Reconsideration Reply Comments at 2-3 (disputing the claim that the Commission may not reconsider any of its media ownership rules until it conducts a study of the impact of any changes on minority and female ownership and assesses the results of the television incentive auction); Nexstar Reply to Oppositions at 9 (pointing out that Congress did not include an exemption or delay to the Commission's quadrennial review duties when enacting the incentive auction legislation).

[247] *See* 1996 Act § 202(h).

[248] While there is still time for stations to change their post-auction channel sharing elections, the initial results of the auction suggest that the auction may not have a significant impact in the context of the Local Television Ownership Rule, as the overwhelming majority of commercial, full-power winning bidders have elected to channel share once they surrender their spectrum. *See Incentive Auction Closing and Channel Reassignment Public Notice*, Public Notice, DA 17-314, Appx. A (MB/WTB Apr. 13, 2017) (detailing channel sharing elections of winning bidders in reverse auction). We will continue to monitor these elections as part of our continuing efforts to assess the impact of the auction on the television marketplace.

[249] *Second Report and Order*, 31 FCC Rcd at 9896, para. 81.

### D. Local Radio Ownership Rule

#### 1. Introduction

86.     We deny in part and grant in part Connoisseur's petition for reconsideration of the Commission's decision in the *Second Report and Order* to retain the current methodology for determining compliance with the Local Radio Ownership Rule in markets containing embedded markets (i.e., smaller markets, as defined by Nielsen Audio, that are included in a larger parent market).[250]  As discussed in more detail below, we do not find that the Commission acted arbitrarily in the *Second Report and Order* when it rejected Connoisseur's proposal for a blanket change to our embedded market methodology.  At the same time, as explained below, we grant Connoisseur's petition to the extent it seeks a presumption that would apply its two-prong test for waiver requests involving existing parent markets with multiple embedded markets pending further consideration of this issue in the 2018 Quadrennial Review proceeding.[251]

#### 2. Background

87.     In the *Second Report and Order*, the Commission retained the existing Local Radio Ownership Rule and adopted certain clarifications and other actions that were designed to fulfill the intent of the revisions to the rule adopted in the *2002 Biennial Review Order*.[252]  Under the rule, the total number of radio stations that may be commonly owned in a local radio market is tiered, depending on the total number of full-power commercial and noncommercial radio stations in the market.[253]  For example, in markets with 45 or more radio stations, an entity can own no more than eight commercial radio stations, no more than five of which may be in the same service (AM or FM).[254]  The rule relies on Nielsen Audio Metro methodology for determining radio markets, though areas outside of defined Nielsen Audio Metro markets rely on a contour-overlap methodology.  In some instances, smaller Nielsen Audio Metro markets (embedded markets) are located within the boundaries of a larger Nielsen Audio Metro market (parent market).  Under our existing methodology, entities seeking to acquire a radio station in an embedded market must satisfy the numerical limits of the rule for both the embedded market and the overall parent market.[255]

88.     In the *2002 Biennial Review Order*, which adopted the Nielsen Audio Metro (formerly Arbitron Metro) methodology for determining radio markets, the Commission concluded that "[Nielsen Audio's] market definitions are an industry standard and represent a reasonable geographic market

---

[250] *See generally* Connoisseur Petition; *see also Second Report and Order*, 31 FCC Rcd at 9903-04, paras. 101-03.

[251] *See* Connoisseur Petition at 13 ("[O]wnership should be reviewed by the following two tests: (1) whether the ownership of the stations in question comply with the ownership rules in the embedded market to which they are home (using the Nielsen data for that market), and (2) whether the ownership of the stations in question comply with the ownership rules using the contour methodology that would apply in non-rated markets."); *see also* Letter from David Oxenford, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50 (filed Nov. 9, 2017) (Connoisseur Nov. 9, 2017 *Ex Parte*) (reiterating its support for a presumptive waiver approach).

[252] *See Second Report and Order*, 31 FCC Rcd at 9897-9910, paras. 82-120.

[253] *See* 47 CFR § 73.3555(a).

[254] *See id.*  In addition, the Local Radio Ownership Rule includes separate ownership limits for radio markets with 30-44 radio stations, markets with 15-29 stations, and markets with 14 or fewer stations.  *Id.*  In the *Second Report and Order*, the Commission retained the local radio ownership limits, including the AM/FM subcaps, which separately limit the number of stations from the same service—AM or FM—that an entity may own in a single market.  *See Second Report and Order*, 31 FCC Rcd at 9897, 9907-10, paras. 82-83, 113-20.

[255] *See Second Report and Order*, 31 FCC Rcd at 9903, para. 101.

delineation within which radio stations compete."[256]  The Commission further concluded that "[g]iven the long-standing industry recognition of the value of [Nielsen Audio's] service,…there is strong reason to adopt a local radio market definition that is based on this established industry standard."[257]  In the *2002 Biennial Review Order*, the Commission also expressly declined to treat embedded markets differently.[258]  Specifically, the Commission found that requiring proposed combinations to comply with the Local Radio Ownership Rule in each Nielsen Audio Metro implicated by the proposed combination (i.e., in both the embedded and parent markets) "comports with our general recognition that [Nielsen Audio's] market definitions are the recognized industry standard."[259]

89.     In this proceeding, Connoisseur proposed that the Commission adopt a new methodology for analyzing embedded markets, namely, that where a parent market encompasses multiple embedded markets, the ownership analysis for an acquisition in one embedded market should not include stations owned in other embedded markets within the same parent market.[260]  In the *Second Report and Order*, the Commission declined to adopt Connoisseur's proposal, finding that Connoisseur had not presented sufficient evidence to warrant an across-the-board departure from the Commission's longstanding reliance on Nielsen Audio's market analysis, as reported by BIA, as the basis for multiple ownership calculations in embedded and parent markets.[261]

90.     Connoisseur now seeks reconsideration of the decision to retain the existing methodology for embedded markets and asks us to adopt a new two-pronged test for a station owner that seeks to own stations licensed to home counties (i.e., the county in which the station's community of license is geographically located) in different embedded markets within a single parent market.[262]  Connoisseur argues that, as a result of the Commission's existing methodology, a broadcaster which owns stations in one embedded market may be precluded from owning stations in another embedded market, despite the lack of competitive overlap between those markets.[263]  NAB supports Connoisseur's petition for reconsideration and suggests an additional refinement to Connoisseur's proposal.[264]

---

[256] *2002 Biennial Review Order*, 18 FCC Rcd at 13725, para. 276.

[257] *Id.*

[258] *Id.* at 13725-26, para. 276 & n.580 (rejecting a proposal to apply a different test for embedded markets because the Commission concluded the proposed scheme would be inconsistent with the general reliance on Nielsen Audio's market definition and cumbersome to administer).

[259] *Id.*

[260] Connoisseur FNPRM Comments at 8.

[261] *See Second Report and Order*, 31 FCC Rcd at 9903-04, para. 102.

[262] Connoisseur Petition at 13-14; *see also* Letter from Jeffrey Warshaw, CEO, Connoisseur Media, LLC, to Ajit Pai, Chairman, FCC, MB Docket Nos. 14-50 and 09-182, at 3 (filed July 5, 2017) (urging the Commission to act on Connoisseur's proposal on reconsideration rather than in a future proceeding).  Consistent with the Commission's current methodology, under the first part of Connoisseur's proposed test, a station owner would be required to comply with the numerical ownership limits using the Nielsen Audio Metro methodology in each embedded market.  Under the second part, however, the station owner would be required to comply with the ownership limits using a contour-overlap analysis in lieu of the Commission's current parent market analysis.  *Id.* at 13.

[263] Connoisseur Petition at ii.  In addition to the timely filed Connoisseur Petition, the Commission received several requests via *ex parte* letters—filed more than three months after the deadline for the filing of petitions for reconsideration—asking that we reexamine other aspects of the Local Radio Ownership Rule.  *See, e.g.*, Letter from Sally A. Buckman, Lerman Senter PLLC, Counsel for Galaxy Communications LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 and 09-182, at 2 (filed Mar. 10, 2017) (asserting that, given evidence in the record of increasing competition between local radio stations and other media, the Commission should "substantially relax the existing local radio ownership caps in all markets"); Letter from Bob Proffitt, President & CEO, Alpha Media LLC et al., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 and 09-182, at 1-2 (filed Mar. 2,

(continued….)

### 3.    Discussion

91.     We deny in part and grant in part Connoisseur's petition for reconsideration.  First, we find that the Commission's decision to not adopt a blanket change to the current methodology was supported by a reasoned explanation.  Second, we find that the Commission's decision to adopt a contour-overlap methodology for the Puerto Rico market is not at odds with the approach the Commission took regarding embedded markets.  Finally, we grant Connoisseur's alternative request to adopt a presumptive waiver approach for existing parent markets with multiple embedded markets.[265]

92.     We find that the Commission provided a reasoned explanation for its decision in the *Second Report and Order* to not adopt a blanket change to the current embedded market methodology.  Connoisseur argues that the Commission acted arbitrarily in deciding to retain the current methodology.[266]  In particular, Connoisseur maintains that counting stations from multiple embedded markets for purposes of calculating compliance with the numerical limits in the parent market is unreasonable because stations in embedded markets do not compete in any meaningful way with stations in other embedded markets or stations in the central city of the parent market.[267]  The Commission noted in the *Second Report and Order*, it has long relied on Nielsen Audio's market analysis, as reported by BIA, which lists all the

---

(Continued from previous page)

2017) (requesting that the Commission eliminate the AM/FM subcaps on reconsideration based on "record evidence that any technical and marketplace dynamics that may once have differentiated AM and FM stations no longer exist"); Dick Broadcasting Mar. 24, 2017 *Ex Parte* (stating that "continued applicability of the [AM/FM] subcaps warrants a hard look from the Commission").  *But see* Letter from James L. Winston, President, National Association of Black Owned Broadcasters, to Hon. Ajit Pai, Chairman, FCC, MB Docket Nos. 14-50 et al., at 2-5 (filed Apr. 7, 2017) (arguing that continued technological and marketplace disadvantages for AM radio stations supports retention of the AM/FM subcaps); Letter from Saul Levine, President, Mount Wilson FM Broadcasters, Inc., to Hon. Ajit Pai, Chairman, FCC, MB Docket Nos. 14-50 et al., at 1-4 (filed May 11, 2017) (opposing the loosening of local radio ownership limits).  As discussed above, we decline to reconsider issues that were not included in a timely filed petition for reconsideration.  *See supra* note 3.  We note that the Local Radio Ownership Rule, in its entirety, will be subject to review again in the upcoming 2018 Quadrennial Review proceeding, and we encourage interested parties to submit comments and proposals in that proceeding.

[264] Letter from Rick Kaplan, General Counsel and Executive Vice President, Legal and Regulatory Affairs, National Association of Broadcasters, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 and 09-182, at 2 (filed Mar. 10, 2017) (NAB Mar. 10, 2017 *Ex Parte*) (proposing that stations licensed in embedded markets with signal coverage of less than 50 percent of the parent market's population would not be considered part of the parent market for purposes of local ownership limit calculations); *see also* Letter from David Oxenford, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50, at 1 (filed Apr. 17, 2017) (Connoisseur Apr. 17, 2017 *Ex Parte*) (supporting NAB's proposal).  We will consider NAB's alternate methodology (which was not included as part of a timely filed petition for reconsideration or otherwise submitted during the window for reconsideration petitions, oppositions, and replies) in the forthcoming 2018 Quadrennial Review proceeding.  In addition, well after the close of the reconsideration pleading window, various other parties expressed support for Connoisseur's petition.  *See* Letter from Rich Russo, Director of Client Services, JL Media, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 and 09-182, at 1-3 (filed July 7, 2017); Letter from Lawrence M. Miller, Garvey Schubert Barer, Counsel to Pamal Broadcasting, Ltd., to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 14-50 and 09-182, at 1-2 (filed July 5, 2017).

[265] *See, e.g.*, Letter from Melissa Newman, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50 (filed July 20, 2017) (Connoisseur July 20, 2017 *Ex Parte*) (reiterating its support for a presumptive waiver approach).

[266] Connoisseur Petition at 12-13.

[267] *Id*. at 2-10; Letter from David Oxenford, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50, at 5 (filed May 8, 2017) (Connoisseur May 8, 2017 *Ex Parte*) (arguing that the Commission's longstanding adherence to a policy adopted in 2003 "should not preclude it from correcting that error a decade and a half later").

stations that are deemed to compete in a given market (often referred to as "above-the-line" stations), as the basis for multiple ownership calculations for embedded and parent markets.[268]  The Commission found that the Nielsen-defined markets are the primary means by which broadcasters and advertisers place a value on advertising sold by stations listed as participating in the market.[269]  Nielsen Audio's market definitions are recognized as the industry standard and provide for consistency and ease of application in comparison to other possible methods for defining local radio markets.[270]  The inclusion of an embedded market station as an above-the-line station in a parent market therefore has long been thought to reflect a determination by Nielsen Audio that, absent other information, the station competes in that market.[271]  We note that our continued reliance on Nielsen Audio market definitions for purposes of applying the Local Radio Ownership Rule provides an important level of certainty to radio licensees in all markets, including those in embedded markets, and overcomes disadvantages associated with the contour-overlap approach.[272]

93.     We also find that the Commission's decision in the *Second Report and Order* to adopt a contour-overlap methodology for the Puerto Rico market is not inconsistent with the approach to embedded markets.  Connoisseur argues that parent markets containing multiple embedded markets are analogous to the Puerto Rico market where mountainous topography, as opposed to a central city, separates smaller centers of economic activity within the larger parent market.[273]  Accordingly, Connoisseur asserts that the contour-overlap methodology the Commission applies to the Puerto Rico market likewise should be applied in the context of embedded markets in lieu of the Commission's current parent market analysis.[274]  We find that differences between the Puerto Rico market and a parent market that includes embedded markets make the comparison between the two circumstances inappropriate.  As one example, the core location of a station's listenership has the potential to shift geographically over time in a parent/embedded market scenario in a way that would be unlikely, or even

---

[268] *See Second Report and Order*, 31 FCC Rcd at 9903-04, para. 102 (noting the continued validity of the Commission's reasoning—first articulated in 2003—for adopting the embedded market policy and rejecting alternative approaches).

[269] *2002 Biennial Review Order*, 18 FCC Rcd at 13725, para. 276.

[270] *See Second Report and Order*, 31 FCC Rcd at 9903-04, para. 102; *2002 Biennial Review Order*, 18 FCC Rcd at 13720, 13725, paras. 259-60, 276.

[271] *See Second Report and Order*, 31 FCC Rcd at 9903-04, para. 102.  In an *ex parte* submission following the release of the Public Draft of this item, Connoisseur highlights the Commission's decision regarding the inclusion of embedded market stations as "above-the-line" stations in the parent market.  Letter from David Oxenford, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50 (filed Oct. 30, 2017) (Connoisseur Oct. 30, 2017 *Ex Parte*); *see also id*. at Exh. 1 ("[L]isting of an embedded station in the parent market report does not reflect a determination by Nielsen Audio nor BIA/Kelsey that, absent other information, the station competes in that parent market.  It just reflects that their city of license is geographically located within the boundaries of the parent market.  It is a reflection of geography, not an analysis of competition.").  Although Nielsen has historically defined what stations compete in a market based on geographical market boundaries, and the Commission's rules have relied on these determinations in determining compliance with our ownership caps, the Connoisseur Oct. 30, 2017 *Ex Parte* raises issues related to embedded markets that should be further explored in greater detail in the 2018 Quadrennial Review proceeding.  However, the arguments in the *ex parte* letter support our decision to adopt a presumptive waiver approach for transactions involving existing parent markets with multiple embedded markets.  *See infra* para. 95.

[272] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13718-21, 13724-30, paras. 253-63, 273-86 (describing the advantages of using the Nielsen Audio Metro (formerly Arbitron Metro) methodology where available as compared with the contour-overlap methodology).

[273] Connoisseur Petition at 12-14.

[274] *Id*.

impossible, where, as in Puerto Rico, the physical terrain prevents a station from reaching other geographic areas.[275] Indeed, the Commission has long stated that the Puerto Rico market is "unique," even as compared to other large metro areas.[276] We therefore find that the Commission's decision to retain the existing methodology for embedded markets is not undermined by its decision to adopt a contour-overlap methodology in Puerto Rico.

94. For these reasons, we continue to find that, rather than adopting Connoisseur's proposal for an across-the-board change to our embedded market methodology, entertaining a market-specific waiver is the appropriate approach at this time.[277] In the *Second Report and Order*, the Commission acknowledged Connoisseur's concerns with respect to the particular characteristics of the current New York market and indicated its willingness to entertain a waiver specific to that market, a willingness we reiterate herein.[278] Ultimately, the issue continues to appear narrow in scope—largely specific to a small number of parties' concerns with at most two markets.[279]

95. Accordingly, we find Connoisseur's argument regarding a presumptive waiver approach to be persuasive. While a bright-line rule codifying Connoisseur's preferred approach to embedded markets would no doubt provide greater certainty, as discussed herein, we do not believe that such an approach is supported by the record at this time. Instead, we intend to fully examine our existing methodology regarding embedded market transactions in the forthcoming 2018 Quadrennial Review proceeding. Pending the outcome of this review, however, we adopt a presumption in favor of applying Connoisseur's two-prong test proposed on reconsideration to waiver requests involving existing parent markets with multiple embedded markets (i.e., New York and Washington, DC).[280] We find that there is sufficient evidence on the record to support a presumption that a waiver of the Local Radio Ownership Rule as to stations in these markets serves the public interest if the transaction at issue satisfies the two-

---

[275] *See, e.g.*, *WTOK-FM, San Juan, PR*, Letter Order, 27 FCC Rcd 7066, 7073-75 (MB 2012) (describing the "unique" characteristics of Puerto Rico that make it unlikely a station on one side of the island can be heard, let alone compete, in other parts of the island).

[276] *Id.* at 7073-74. We also note that the Commission has a long history—dating back to 2003—of applying the contour-overlap methodology to Puerto Rico on a case-by-case basis due to the unique characteristics of that market. *Second Report and Order*, 31 FCC Rcd at 9907, paras. 111-12.

[277] *See Second Report and Order*, 31 FCC Rcd at 9904, para. 103.

[278] *See id.*

[279] The circumstances Connoisseur describes could apply currently to, at most, two markets—New York City and Washington, D.C. *See* Connoisseur Petition at 9-10. In response to the *FNPRM* in this proceeding, Connoisseur provided detailed analysis only with respect to the New York market. *See Second Report and Order*, 31 FCC Rcd at 9903, para. 101; Connoisseur May 8, 2017 *Ex Parte* at 4-5 (stating that Connoisseur assumed facts regarding the Washington, D.C. market were "self-evident or could be easily verified by FCC personnel"). More recently, Connoisseur submitted supplemental analysis for embedded markets in the Washington, D.C. parent market. Letter from David Oxenford, Counsel to Connoisseur Media, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182 and 14-50 (filed June 6, 2017) (Connoisseur June 6, 2017 *Ex Parte*). We note, however, that embedded market designations are subject to change, with the potential for embedded markets to be created, modified, or eliminated in the future. For instance, in addition to New York and Washington, D.C., Connoisseur previously had identified San Francisco as an example of a parent market with two embedded markets. One of those embedded markets, however, is no longer rated by Nielsen. Accordingly, the San Francisco market now includes only one embedded market and is therefore no longer relevant to the issues discussed in Connoisseur's petition, which pertain solely to parent markets containing multiple embedded markets. Connoisseur Petition at 4 n.5. As such, the potential impact of a proposed transaction involving embedded market stations may vary based on the specific markets, stations, and ownership interests involved.

[280] *See* Connoisseur Petition at 13.

prong test.[281]  Adoption of this presumption will give Connoisseur—and other parties—sufficient confidence with which to assess possible future actions.  Further, we anticipate that any such transactions will help inform our subsequent review of the Local Radio Ownership Rule—and, in particular, the treatment of embedded market transactions.

## IV.  TELEVISION JSA ATTRIBUTION

### A.  Introduction

96.     On reconsideration, we find that the Commission erred in its decision to adopt the Television JSA Attribution Rule.  The underlying record did not support a finding of attribution and the Commission failed to properly consider the record evidence regarding the public interest benefits that television JSAs provide.  Accordingly, based on a full consideration of the record, we eliminate the Television JSA Attribution Rule.[282]

### B.  Background

97.     A JSA is an agreement that authorizes one station (the broker or the brokering station) to sell some or all of the advertising time on another station (the brokered station).[283]  The *Report and Order* contains a detailed discussion of JSAs and the lengthy history of the Commission's consideration of these agreements, which we incorporate herein.[284]  In relevant part, the Commission first considered whether to attribute television JSAs in 1999.  It declined to do so, finding that JSAs did not convey a sufficient degree of influence or control over station programming or core operations to warrant attribution and that JSAs helped produce public interest benefits.[285]  The Commission sought additional comment on this conclusion in a 2004 notice of proposed rulemaking after attributing radio JSAs in the *2002 Biennial Review Order*.[286]  Then in 2014, nearly a decade after initially seeking comment on the issue, the

---

[281] Pursuant to Section 310(d) of the Act, we must make a public interest determination with respect to any future applications based on the entire record with respect to that application.  Throughout the proceeding, Connoisseur has provided information demonstrating that, due to the particular circumstances in these markets, applying the existing market methodology may not be warranted.  *See, e.g.*, Connoisseur Nov. 9, 2017 *Ex Parte*; Connoisseur June 6, 2017 *Ex Parte*; Connoisseur FNPRM Comments.  These showings provide us with sufficient confidence that transactions consistent with this presumption likely will not unduly impact competition in these markets, subject to the Commission's review under Section 310(d).  We find, however, that it is appropriate to limit the presumption to these markets (New York and Washington, DC), pending review in the 2018 Quadrennial Review proceeding, to avoid any potential manipulation of embedded markets in other Nielsen Audio markets.

[282] In addition to the grounds upon which we are eliminating the Television JSA Attribution Rule, petitioners asserted alternative justifications for reversing the Commission's decision to attribute certain television JSAs.  For example, the petitioners also argue that the attribution decision must be reversed on the grounds that (1) the decision had the effect of tightening the media ownership rules, and that the Commission failed to properly analyze the impact of the attribution decision as required under Section 202(h) of the 1996 Telecommunications Act; and (2) the decision was inconsistent with the Commission's repeal of the wireless attributable material relationship (AMR) rule.  *See* NAB Petition at 11-12; Nexstar Petition at 23-24.  Because the Commission is reversing its decision to adopt the Television JSA Attribution Rule on other grounds, we need not reach these arguments.

[283] 47 CFR § 73.3555, Note 2(k).

[284] *Report and Order*, 29 FCC Rcd at 4527-31, paras. 342-48.

[285] *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, Report and Order, 14 FCC Rcd 12559, 12612, para. 122 (1999) (*1999 Attribution Order*).

[286] *See Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, Notice of Proposed Rulemaking, 19 FCC Rcd 15238 (2004) (*2004 Television JSA Attribution NPRM*); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13743, para. 317 (attributing same-market radio JSAs).  The Commission relied on the decision to attribute radio JSAs and the 2002 *Ackerley* case to justify its decision to seek comment on whether to reverse its earlier conclusion and attribute television JSAs.  *See 2004 Television JSA Attribution NPRM*, 19 FCC

(continued….)

Commission changed course and adopted the Television JSA Attribution Rule, despite a lack of evidence suggesting that its prior determination that television JSAs do not convey sufficient influence or control to warrant attribution was wrong.[287]  Specifically, the rule established that JSAs that involve the sale of more than 15 percent of the weekly advertising time of a station (brokered station) by another in-market station (brokering station) are attributable under the Commission's ownership rules.  As a result, the brokering station was deemed to have an attributable interest in the brokered station, and the brokered station would count toward the brokering station's permissible ownership totals.[288]

98.     The Commission found in the *Report and Order* that these arrangements had the potential to permit the brokering station to exert significant influence over the brokered station's operations to such an extent that they should be attributable.[289]  In reaching its decision, however, the Commission failed to cite to any actual evidence of such influence.  It also failed to consider adequately the evidence in the record regarding the public interest benefits of certain television JSAs, particularly in small- and mid-sized markets.[290]  Instead, the Commission stated that these benefits were only relevant in determining where to set the applicable ownership limits, not whether such a relationship was attributable.[291]  Despite that logic, however, the *Report and Order* failed to adopt any changes to the applicable local television ownership limits, further delaying any consideration of the public interest benefits of television JSAs.

99.     Following release of the *Report and Order* in April 2014, the Television JSA Attribution Rule was challenged on appeal, and the Third Circuit subsequently vacated the rule, finding that it had been adopted prematurely because the Commission had not yet determined whether the Local Television Ownership Rule remains necessary pursuant to Section 202(h).[292]  In the *Second Report and Order*, the Commission concluded that the Local Television Ownership Rule (with a minor modification) still served

---

(Continued from previous page) ————————————

Rcd at 15239, 15240-41, paras. 2, 6-7; *see also Shareholders of the Ackerley Group, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 10828 (2002) (*Ackerley*) (finding that a specific television JSA, in conjunction with other agreements, created an attributable interest).  Both the justification for attribution of radio JSAs and *Ackerley* are discussed below.

[287] *Report and Order*, 29 FCC Rcd at 4531-45, paras. 349-72.

[288] *Id.* at 4527, para. 340.  Initially, attributable agreements in place as of March 31, 2014, were given two years from the effective date of the Order to come into compliance with the Commission's ownership limits.  *Id.* at 4542, para. 367.  The STELA Reauthorization Act of 2014 (STELAR), enacted on December 4, 2014, provided that licensees with attributable television JSAs "shall not be considered to be in violation of the ownership limitations [in Section 73.3555 of the Commission's rules, 47 CFR Section 73.3555,] by reason of the application of the [attribution] rule" until six months after the end of the two-year compliance period adopted by the Commission. The six-month period ended on December 19, 2016.  Subsequently, the Consolidated Appropriations Act (2016), enacted on December 18, 2015, extended protections for JSAs through September 30, 2025, providing that "the amendments to the rules of the Commission [adopted in the *Report and Order*] shall not apply to a joint sales agreement (as defined in Note 2(k) to section 73.3555 of title 47, Code of Federal Regulations) that was in effect on March 31, 2014," and "[a] party to a [television] joint sales agreement that was in effect on March 31, 2014, shall not be considered to be in violation of the ownership limitations of section 73.3555 of title 47, Code of Federal Regulations, by reason of the application of the rule in Note 2(k)(2), as so amended, to the joint sales agreement." Attributable JSAs were also required to be filed with the Commission no later than 30 days after the JSA is executed.  *Report and Order*, 29 FCC Rcd at 4541, para. 366 & n.1125; *see also* 47 CFR § 73.3613(d)(2).

[289] *Report and Order*, 29 FCC Rcd at 4533, para. 350.

[290] *Id.* at 4537-38, para. 358.

[291] *Id*.

[292] *Prometheus III*, 824 F.3d at 57-60; *see also Second Report and Order*, 31 FCC Rcd at 9888, para. 61

the public interest and it re-adopted the Television JSA Attribution Rule based on the same rationale articulated in the *Report and Order*.[293]

100.    By their Petitions, NAB and Nexstar now seek reconsideration of the decision to re-adopt the Television JSA Attribution Rule, arguing that the Commission, in adopting the rule, ignored the evidence before it and reached a decision unsupported by the record.[294]  Nexstar, for example, argues that the Commission's attribution analysis lacks a factual basis and that the Commission ignored a record replete with examples of the public interest benefits produced by television JSAs—particularly in smaller markets—including evidence that television JSAs have helped enhance local news programming, finance the purchase of life-saving weather equipment, and support women- and minority-owned stations.[295] Conversely, ACA contends that the petitions fail to demonstrate that reconsideration is justified, arguing that the Commission appropriately weighed the record evidence before finding that the potential public interest benefits of television JSAs do not affect its attribution analysis.[296]  Likewise, UCC et al. support the Television JSA Attribution Rule and argues that the Commission's decision was not only reasonable, but also supported by the record.[297]

## C.    Discussion

101.    We find that Petitioners provide valid reasons to reconsider the Commission's decision to adopt the Television JSA Attribution Rule.  The Commission's attribution analysis was deficient and failed to adequately consider the record, which does not support the Commission's conclusion that television JSAs confer on the brokering station a sufficient degree of influence or control over the core operating functions of the brokered station to warrant attribution.  In addition, the record contains ample evidence of the public interest benefits that these JSAs provide.  Even if the Commission had correctly determined that television JSAs involving more than 15 percent of the brokered station's weekly advertising time confer sufficient influence to warrant attribution, we conclude that the potential benefits of television JSAs outweigh the public interest in attributing such JSAs.[298]  Accordingly, we grant the NAB Petition and the Nexstar Petition with respect to this issue.[299]

---

[293] *Second Report and Order*, 31 FCC Rcd at 9888, paras. 61-62; *see also Report and Order*, 29 FCC Rcd at 4527-45, paras. 340-72.  The Commission adopted less restrictive grandfathering relief in the *Second Report and Order*, consistent with Congressional concerns with the initial decision in the *Report and Order*.  For example, the compliance deadline was extended through September 30, 2025, and parties were permitted to transfer or assign these JSAs to other parties without relinquishing the grandfathered status.  *Second Report and Order*, 31 FCC Rcd at 9889, para. 63.

[294] *See* Nexstar Petition at 18-19 (citing *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Aut. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'")); NAB Petition at 12.

[295] Nexstar Petition at 16-17, 19-22; *see also id.* at 22-23 (arguing that the Commission's reliance on the previous attribution of radio JSAs to justify attribution of television JSAs was misplaced); NAB Petition at 12 (asserting that the Commission's failed to address the "myriad benefits" of JSAs, especially in smaller markets).

[296] ACA Opposition at 23.

[297] UCC et al. Opposition at 8-9.

[298] Though television JSAs will no longer be attributable as a result of the amount of advertising time brokered, we remind licensees that they must retain ultimate control over their programming and core operations so as to avoid the potential for an unauthorized transfer of control or the existence of an undisclosed or unauthorized real party in interest.  47 U.S.C. § 310(d); 47 CFR § 73.3540(a); *see also Solar Broadcasting Co., Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 5467, 5486, para. 71 (2002) ("Although a licensee may delegate certain functions to an agent or employee on a day-to-day basis, ultimate responsibility for essential station matters, such as personnel, programming and finances, is nondelegable."); *Radio Moultrie, Inc.*, Order to Show Cause and Notice of

(continued….)

102.    The Commission failed to demonstrate that television JSAs confer a sufficient degree of influence or control so as to be considered an attributable ownership interest under the Commission's ownership rules. While the Commission pointed out that the attribution analysis traditionally seeks to identify interests that provide the holder with the incentive and ability to influence or control the programming or other core operational decisions of the licensees—an inquiry that often relies on the Commission's predictive judgement—the Commission may not ignore the record or the realities of the marketplace when making this determination.

103.    Here, the Commission's theory of attribution—a reversal of its earlier decision that television JSAs should not be attributable[300]—was belied by its own extensive experience reviewing and approving television JSAs. Between 2008 and the decision to attribute television JSAs in 2014, the Commission's Media Bureau reviewed and approved 85 television JSAs in the context of transaction reviews.[301] Given the Commission's extensive history reviewing specific television JSAs, it is telling that the record was devoid of any evidence that any JSA allowed a brokering station to influence even a single programming decision of a brokered station.

104.    As Nexstar points out, the Commission's only citation in support of the theory that television JSAs might provide some measure of influence or control was inapposite.[302] In *Ackerley*, a decision from 2002, the Commission found that a combination of agreements, which included a flat-fee television JSA, were "substantively equivalent" to an attributable local marketing agreement (LMA).[303] Yet the Commission's attribution analysis in the *Report and Order* relied solely on the sale of advertising time and not a combination of other agreements that may justify attribution under the Commission's rules and precedent. As such, this isolated incident failed to provide support for the Commission's theory of attribution.

105.    The Commission attempted to sidestep the lack of evidence to support its theory of attribution by relying on the decision in the *2002 Biennial Review Order* to attribute radio JSAs. We agree with Nexstar that this reliance was not appropriate. First, the Commission failed to explain why differences in fee structure (typically fixed fees for radio JSAs versus a percentage of advertising revenue for television JSAs) did not mitigate the Commission's earlier concerns that a fixed fee structure—which the Commission found to be common in radio JSAs—effectively transferred the market risk to the

---

(Continued from previous page)

Opportunity for Hearing, 17 FCC Rcd 24304, 24306-07, paras. 7-9 (2002) (stating that "the Commission looks not only to who executes the programming, personnel, and finance responsibilities, but also to who establishes the policies governing those three areas"); *Choctaw Broadcasting Corp.*, Memorandum Opinion and Order, 12 FCC Rcd 8534, 8538-39, para. 11 (1997) ("[A] licensee involved in an LMA is not relieved of its responsibility to retain ultimate control.").

[299] As a result of our decision, 47 CFR § 73.3613(d)(2) and the notes to 47 CFR § 73.3555 will be amended to reflect the fact that television JSAs are no longer attributable. *See Second Report and Order*, 31 FCC Rcd at 9888-89, para. 62 n.168. Additionally, various Commission rules will need to be revised to reflect the other rule changes and decisions adopted in this order, as set forth in Appendix A. We direct the Media Bureau to make all form modifications and to take any other steps necessary to implement all the rule changes and other relevant decisions adopted herein.

[300] *1999 Attribution Order*, 14 FCC Rcd at 12612, para. 122.

[301] Letter from Gordon H. Smith, President and CEO, National Association of Broadcasters, to Tom Wheeler, Chairman, FCC, MB Docket Nos. 10-71, 09-182, 07-294, 04-256 (Mar. 24, 2014) (NAB Mar. 24, 2014 *Ex Parte*).

[302] Nexstar Petition at 21.

[303] *See generally Ackerley*, 17 FCC Rcd 10828. An LMA, also referred to as a time brokerage agreement (TBA), involves "the sale by a licensee of discrete blocks of time to a 'broker' that supplies the programming to fill that time and sells the commercial spot announcements in it." 47 CFR § 73.3555, Note 2(j).

brokering station.[304]  The Third Circuit relied on this finding when upholding the decision to attribute radio JSAs,[305] and the Commission also emphasized the fixed fee structure when it proposed to attribute television JSAs in 2004.[306]  The record shows, however, that television JSAs generally rely on percentage fee arrangements in which the brokered station retains a substantial portion of the advertising revenue, which makes it substantially less likely that the brokered station's programming decisions would be significantly influenced by the brokering station.[307]  This critical difference, however, was simply glossed over without an explanation as to how a percentage fee structure transferred market risk to the brokering station in the same way as a fixed fee structure.  Indeed, it appears that the typical revenue split gives the licensee of the brokered station a significant interest in the operation and success of the station that is not present in a fixed fee arrangement.

106.    The Commission also failed to consider sufficiently other distinctions between the television market and the radio market that undermined its reliance on the radio JSA attribution precedent.  For example, unlike radio stations, television stations typically have network affiliations, which limits the amount of programming that a brokering station could potentially influence and the amount of available advertising time for sale.[308]  To be sure, the Commission disagreed that this is a meaningful distinction, but once again, it failed to provide any record evidence to support its theory.[309]  The Commission similarly brushed aside evidence that television stations rely less on local advertising revenue than radio stations, which would reduce the amount of advertising time sold by the broker.[310]  Accordingly, the

---

[304] In a percentage fee structure, the broker and brokering stations split revenues based on agreed upon percentages. By contrast, a flat fee structure provides a payment to the brokered station regardless of performance or revenues.

[305] *Prometheus I*, 373 F.3d at 429.

[306] *2004 Television JSA Attribution NPRM*, 19 FCC Rcd at 15242–43, paras. 12-14.

[307] *See, e.g.*, *Report and Order*, 29 FCC Rcd at 4598 (Dissenting Statement of then-Commissioner Pai) ("For the Media Bureau has repeatedly approved JSAs only where the brokered station receives at least 70 [percent] of the advertising revenue generated by that station, reasoning that such a division of revenues does not give the brokering station de facto control of or undue influence over the brokered station.") (citation omitted); Letter from Jane Mago, Executive Vice President and General Counsel, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 09-182 et al., Attach. at 1 (filed Mar. 14, 2014) (arguing that television JSAs are "commission-based" and, by "FCC practice and precedent," the commission does not exceed 30 percent, resulting in licensees retaining 70 percent or more of the station's net sales revenue under customary JSAs approved regularly by the Commission); Letter from Paul A. Cicelski, Pillsbury Winthrop Shaw Pittman LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 09-182, at 3 (filed Dec. 6, 2012) ("To meet the Commission's concerns, as expressed in the *Ackerley* decision, Sinclair's JSAs, and other JSAs of which Sinclair is aware, do not adopt a 'flat fee' concept.  Rather, the station licensee shares in the revenue and cash flow of the station, ensuring an incentive for station licensees to program their stations so as to maximize viewership, and thereby advertising revenues"); Comments of Nexstar, MB Docket No. 04-256, at 9 (filed Oct. 27, 2004) (noting that Mission receives 70 percent of the monthly revenues collected under the JSA with Nexstar and not a fixed monthly fee); Comments of Paxson Communications Corp., MB Docket No. 04- 256, at 4 (filed Oct. 27, 2004) (noting that under its JSAs, Paxson "pays the sales agent commissions in the form of revenue shares rather than a fixed fee").  While we decline to attribute television JSAs for the reasons set forth herein, we note that, under *Ackerley*, the Commission could still find that the terms of an individual television JSA (either alone or in conjunction with other agreements) rise to the level of attribution.

[308] *Report and Order*, 29 FCC Rcd at 4534-35, para. 353.  In the Commission's experience reviewing television JSAs in transaction reviews, most of the television JSAs approved by the Commission involved the brokering of stations with network affiliations.

[309] *Id.* at 4535, para. 354.  The Commission claimed that, even with a network affiliation in place, the broker could potentially influence the selection of non-network programming, whether to preempt network programming, and/or the choice of network affiliation.  *Id.*  This claim, however, was not supported with any evidence of such influence being exerted, neither over individual programming decisions nor the selection of a network affiliation.

[310] *Id.* at 4535-36, paras. 355-56.

broker would control less of the television station's advertising revenue, which would limit the ability and incentive of the broker to exert significant influence or control over the brokered station's core operating procedures. The Commission summarily concluded that because both radio JSAs and television JSAs involve the sale of advertising time, both must be treated the same for attribution purposes.[311] But this one-size-fits-all attribution analysis is not supported by the record and cannot be sustained.

107.    The lack of evidence supporting the Commission's determination that television JSAs confer a significant degree of influence or control over the core operating functions of the brokered station provides sufficient reason for us to eliminate the Television JSA Attribution Rule. But even if the Commission had appropriately determined that television JSAs meet the attribution criteria, it still should have evaluated whether the public interest would be served by making the agreements attributable. While the Commission did acknowledge the potential for benefits flowing from the use of television JSAs in the *Report and Order*,[312] the Commission expressly refused to consider these public interest benefits in the context of its attribution decision, claiming that the public interest benefits should be considered in the context of its analysis of the local ownership rules.[313] The Commission was correct that the potential public interest benefits of television JSAs are not relevant to whether these agreements satisfy the Commission's general attribution criteria (i.e., whether they confer the potential for significant influence), but that does not excuse the Commission from assessing the record to determine whether, if the attribution criteria are satisfied, attribution would serve the public interest.[314] Additionally, in the *Second Report and Order*, which reinstated the Television JSA Attribution Rule, the Commission included only a brief, general discussion of the rationale for attributing television JSAs, largely ignoring the benefits of television JSAs.[315] This cursory treatment does not constitute an assessment of the record regarding the

---

[311] *Id.* at 4536, para. 356.

[312] The Commission noted that "[w]hile we recognize that cooperation among stations may have public interest benefits under some circumstances, particularly in small to mid-sized markets, these potential benefits do not affect our assessment of whether television JSAs confer significant influence such that they should be attributed." *Id.* at 4537, para. 358.

[313] *Id.* While declining to evaluate the significant record evidence of the public interest benefits produced by television JSAs, the Commission claimed that it would preserve beneficial television JSAs through a waiver process. *Id.* at 4540-41, para. 364. That process, however, proved to be illusory, as the Commission did not grant a single waiver request while the Television JSA Attribution Rule was initially in effect, which ultimately led to Congressional action to protect existing television JSAs. *See Second Report and Order*, 31 FCC Rcd at 10051 (Dissenting Statement of then-Commissioner Pai). As discussed herein, we find that the record does not support attribution of television JSAs in the first instance, so there is no need to consider whether to adopt a waiver process.

[314] *Report and Order*, 29 FCC Rcd at 4537-38, para. 358. Notably, when the Commission attributed radio JSAs in the *2002 Biennial Review Order*, it did undertake such an assessment and found that the balance of interests, in those particular circumstances, supported the decision to attribute radio JSAs. *2002 Biennial Review Order*, 18 FCC Rcd at 13745, paras. 321-22 (finding that the potential harms to competition and the ability to influence the brokered stations outweighed any potential benefits associated with radio JSAs). That finding was based on the record in that proceeding, which did not present significant or detailed evidence of the claimed public interest benefits of radio JSAs, and does not control our analysis of the potential benefits of television JSAs.

[315] *Second Report and Order*, 31 FCC Rcd at 9888-89, 9889-90, paras. 62, 64. The Commission failed to discuss the voluminous record regarding the benefits produced by JSAs, instead citing anecdotal evidence that attribution of television JSAs—prior to being vacated by the Third Circuit—had produced opportunities for minority and female ownership. Its sole citation for this proposition, however, was a blog post authored by then-Chairman Wheeler and Commissioner Clyburn. *Id.* at 9888-89, para. 62 & n.169. We do not find this claimed benefit to be supported by the record and, in fact, there is record evidence that refutes this assertion. *See, e.g.*, *Report and Order*, 29 FCC Rcd at 4593 (Dissenting Statement of then-Commissioner Pai) (discussing evidence that television JSAs helped promote minority and female ownership).

potential public interest benefits of television JSAs. As such, we are not persuaded by the arguments that the Commission properly weighed the public interest benefits before implementing this new rule.[316]

108. On reconsideration, we conclude that the record demonstrates that television JSAs can promote the public interest, and that this provides an independent reason for eliminating the Television JSA Attribution Rule. Indeed, the record demonstrates that television JSAs have created efficiencies that benefit local broadcasters—particularly in small- and medium-sized markets—and have enabled these stations to better serve their communities.[317] The video marketplace is changing rapidly, and television JSAs can help reduce costs and attract vital revenue at a time of increasing competition for viewership. Broadcasters can turn these efficiencies into increased services for local communities. For example, a JSA between two stations in Kansas helped create cost savings that, in turn, allowed the stations to fund weather emergency-related crawls in Spanish, a service vital to the tornado-prone area.[318] Other stations have been able to increase their local news programming and further invest in investigative reporting due to their JSAs.[319] Additionally, certain JSAs have helped spur minority ownership. As noted in the record, a station owned by Tougaloo College, a historically African-American college, has credited its JSA for providing the resources necessary to upgrade to HD, to produce content relevant to its community, and to cover local sporting events.[320] This is just a sampling of the many examples in the record in which JSAs have benefited local stations and communities.[321]

109. Furthermore, the Commission failed to cite any evidence of actual harm associated with television JSAs.[322] The Commission stated that JSAs could, *possibly*, allow the stations to raise their

---

[316] *See* ACA Opposition at 22-23; UCC et al. Opposition at 8. ACA also argues that eliminating the Television JSA Attribution Rule will allow broadcasters to "covertly coordinate their retransmission consent negotiations . . . in contravention of the joint negotiation prohibition." ACA Opposition at 19-20. This argument is not persuasive. Broadcasters are prohibited from jointly negotiating retransmission consent for stations in the same local market that are not under common *de jure* control permitted by the Commission. 47 CFR § 76.65(b)(1)(viii); *Implementation of Section 103 of the STELA Reauthorization Act of 2014*, 30 FCC Rcd 10327, 10331 (2015). Licensees are expected to comply with the Communications Act and Commission rules and policies, and the Commission has authority to take enforcement action where it finds a licensee has violated any relevant statutes, rules, or policies. We will not assume that our licensees will violate our rules, but entities can file a complaint if they believe that any broadcaster is violating the joint negotiation prohibition, and we will take appropriate action.

[317] *Report and Order*, 29 FCC Rcd at 4590-91 (Dissenting Statement of then-Commissioner Pai) (citing Letter from Clifford M. Harrington, Counsel for Sinclair Broadcast Group, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, et al., Attach. at 3 (Feb. 5, 2014); Letter from John H. Kane, Counsel for LIN Television Corporation d/b/a LIN Media, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 09-182, at 1-2 (Jan. 16, 2013)).

[318] *Report and Order*, 29 FCC Rcd at 4592 (Dissenting Statement of then-Commissioner Pai).

[319] *Id.* at 4592-93 (Dissenting Statement of then-Commissioner Pai).

[320] *See id.* at 4593 (Dissenting Statement of then-Commissioner Pai); Letter from Jennifer A. Johnson & Eve Pogoriler, Counsel for Tougaloo College (WLOO), to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 09-182, et al. at 2 (Feb. 28, 2014).

[321] Then-Commissioner Pai's dissent contains a robust discussion of such examples. *See Report and Order*, 29 FCC Rcd at 4591-95 (Dissenting Statement of then-Commissioner Pai).

[322] The Commission's analysis here under the public interest standard does not supersede any antitrust analysis performed by the Department of Justice Antitrust Division (DOJ) on a case-by-case basis regarding JSAs or other agreements among broadcasters that are similar in function. Indeed, the Commission's public interest analysis differs from DOJ's antitrust review, reflecting a broader evaluation of the potential harms and benefits of ownership combinations in light of the requirements of the Communications Act and Commission rules and the objectives of the Act and rules. *See, e.g., Applications of Level 3 Communications, Inc. and CenturyLink, Inc. For Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, FCC 17-142, at 3, para. 9 (Oct. 30, 2017); s*ee also FCC v. RCA Commc'ns*, 346 U.S. 86, 98 (1953). Consequently, nothing in this Order, or any

(continued….)

advertising rates above what could be achieved if the ad time were sold independently.[323] The Commission, however, failed to engage in any actual analysis of the impact of television JSAs on advertisers, and the record in this proceeding contained no evidence of stations charging higher rates for advertising sold pursuant to a JSA and no support from advertisers for the Television JSA Attribution Rule. On the contrary, there was evidence in the record that advertisers have benefitted from JSAs, which make their ad buys more efficient.[324] Similarly, as discussed above, the Commission did not identify a single instance of harm to viewers or competition in local markets resulting from a broker's exercise of influence over the programming or other core operations of a brokered station—indeed, as discussed above, the Commission did not cite a single instance of such influence even being exerted.

110. We find that, on balance, the public interest is best served by *not* attributing television JSAs, regardless of whether they technically satisfy the attribution criteria.[325] It is well within the Commission's authority to decline to attribute an agreement or relationship that might otherwise satisfy the attribution criteria in order to help foster public interest benefits. For example, in the *EDP Attribution Modification Order*, the Commission modified the Equity/Debt Plus Attribution Rule (EDP Rule) by carving out an exemption in certain circumstances to encourage investment in eligible entities.[326] There, the record demonstrated that small businesses, including those owned by minorities and women, were having difficulty obtaining financing.[327] The Commission acknowledged the potential role that the EDP Rule had in hindering investment in eligible entities and found that it was justified in relaxing the EDP Rule to help address this issue.[328] This decision demonstrates the need to balance the purpose of the attribution rules—that is, to identify potentially influential interest holders—with the Commission's public interest goals.

111. Similarly, even if some television JSAs were to provide the brokering station some ability to influence the operations of the brokered station, we find that attribution is not warranted here in light of the significant public interest benefits produced by these agreements. Television JSAs can help promote diverse ownership and improve program offerings, including local news and public interest programming, in local markets.[329] While we agree that it is important that our attribution rules reflect accurately the competitive conditions of local markets, particularly in the context of our local broadcast ownership rules,

---

(Continued from previous page) ————————————
amendment made by this Order, should be construed to modify, impair, or supersede the operation or applicability of any state or federal antitrust laws.

[323] *See Report and Order*, 29 FCC Rcd at 4534, para. 352.

[324] *See, e.g.*, Letter from Rob Fellman, Boardman Subaru, to David Coy, President/General Manager (Mar. 6, 2014) (Attachment to Coalition of Smaller Market Television Stations Ex Parte) ("As a[n] advertiser in the Youngstown market, I have purchased time from both WKBN and WYTV through your shared sales force. I've found your shared sales force to be honest, reasonable, and time-saving. Instead of having multiple account executives pitching me, I'm able to get exactly what I want from both WKBN and WYTV by contacting a single sales person. . .. I hope that the FCC doesn't take away this great service.")

[325] As discussed above, the Commission's attribution analysis was not supported by the record, and this failure provides an independent reason for eliminating the Television JSA Attribution Rule. *Supra* paras. 102-106.

[326] *Promoting Diversification of Ownership in Broadcasting Services*, Report and Order and Third Further Notice of Proposed Rulemaking, 23 FCC Rcd 5922, 5936, para. 31 (2008) (*Diversity Order and Diversity Third FNPRM*). The EDP Rule addresses multiple non-attributable interests that, if combined, could allow the holders to exert significant influence over licensees. *Id*. at 5932, para. 19; *see also* 47 CFR 73.3555, Note 2(i)(1)-(2).

[327] *See Diversity Order*, 23 FCC Rcd at 5936, para. 30.

[328] *Id*. at 5936-37, paras. 30-34.

[329] *See supra* para. 108 (discussing the public interest benefits associated with television JSAs).

the analysis cannot end there.[330]  The Commission must ensure that its attribution decisions do not harm the very markets that the attribution rules are designed to protect by preventing the accrual of significant public interest benefits.  As discussed herein, the tangible benefits of television JSAs far outweigh the benefits that may accrue from a rote application of the attribution criteria in these circumstances.

112.    We also find that our decision to eliminate the Television JSA Attribution Rule is appropriate, even in light of our decision to relax the Local Television Ownership Rule.  As discussed above, we find that the Commission failed to establish that television JSAs confer significant influence warranting treating JSAs as attributable ownership interests, so the existence of television JSAs in the marketplace does not have an impact on our public interest analysis in the Local Television Ownership Rule context.  Indeed, television JSAs have been utilized by many broadcasters with increasing prevalence for well over a decade.  The record in this proceeding lacks any evidence of public interest harm, and there is evidence that these agreements have produced and can produce meaningful public interest benefits.  As such, we do not believe that the Local Television Ownership Rule should be made more restrictive due to the presence of television JSAs.

113.    And while there may be fewer television JSAs executed moving forward because of our relaxation of the Local Television Ownership Rule, that does not diminish the public interest benefits associated with these agreements in the television context.  The television ownership limits are still much more restrictive than the radio ownership limits, so there may be a continuing need for JSAs to help create economies of scale and improve program offerings, particularly for small or independent station owners.[331]  By preserving the ability to enter into a JSA, some station owners may be able to maintain independent operations instead of exiting the marketplace, and these agreements will continue to be available to help new entrants and small businesses acquire and operate new stations.[332]

## V.    SHARED SERVICE AGREEMENTS

### A.    Introduction

114.    We uphold the Commission's decision in the *Second Report and Order* to adopt a comprehensive definition of SSAs and a requirement that commercial television stations disclose SSAs by placing them in their online public inspection files.[333]  We find that the SSA definition is appropriately tailored to reflect relevant station-related services and that the Commission adequately justified the disclosure requirement adopted in the *Second Report and Order*.

### B.    Background

115.    SSAs allow stations in a local market to combine certain operations, personnel, and/or facilities, with one station effectively performing functions for multiple, independently owned stations.[334]  Evidence in the record suggests that these agreements create efficiencies that enable broadcasters, particularly in small and mid-sized markets, to improve service to their local communities, including

---

[330] *See Second Report and Order*, 31 FCC Rcd at 9888-89, para. 62 (discussing the rationale for attributing television JSAs).

[331] *See, e.g.*, Sinclair FNPRM Comments at 12-13 (asserting that the Commission should relax the Local Television Ownership Rule, eliminate the Television JSA Attribution Rule, and decline to regulate SSAs to help preserve the ability of lower-rated stations to serve their local markets).

[332] Thus, we are not persuaded that repeal of the eight-voices requirement and the Television JSA Attribution Rule will deter new entry based on consolidation of advertising sales.  *See* MMTC/NABOB Nov. 9, 2017 *Ex Parte*, Fact Sheet at 2.

[333] *Second Report and Order*, 31 FCC Rcd at 10008, para. 338.

[334] *Id.* at 10008, para. 337.

enhanced local news offerings.[335] The Commission considered the regulatory treatment of these agreements in multiple proceedings and developed an extensive record prior to taking action in this proceeding.[336] The *Second Report and Order* contains a detailed background of this issue, which we incorporate herein.[337] In relevant part, the *FNPRM* proposed a comprehensive definition of SSAs and sought comment on the scope of the definition, including any potential refinements to the definition to help ensure that it was not overbroad.[338] While certain commenters expressed concerns with the scope of the definition, none provided an alternative definition or suggested any specific changes to the definition proposed in the *FNPRM*.[339] The *FNPRM* also sought comment on potential disclosure options for these agreements.[340] In the *Second Report and Order*, the Commission adopted a definition of SSAs substantially similar to the definition proposed in the *FNPRM* and a requirement that commercial television stations disclose SSAs by placing them in their online public inspection files.[341]

116. In its Petition for Reconsideration, NAB asks the Commission either to eliminate the SSA disclosure requirement or "rationally define" the SSAs subject to it,[342] asserting that the SSA disclosure requirement is overbroad and unnecessary.[343]

## C. Discussion

117. We decline to reconsider the SSA definition and disclosure requirements adopted in the *Second Report and Order*. We find that both the definition and the disclosure requirement were supported by the record and that NAB has failed to provide sufficient reasons to reconsider the Commission's decision at this time; therefore, we deny the NAB Petition in this regard.

---

[335] *See, e.g.*, *FNPRM*, 29 FCC Rcd at 4520-21, para. 324.

[336] *See Standardized and Enhanced Disclosure Requirements for Television and Broadcast Licensee Public Interest Obligations*, Order on Reconsideration and Further Notice of Proposed Rulemaking, 26 FCC Rcd 15788, 15805-06, para. 35 (2011) (seeking comment on whether the disclosure of sharing agreements that are not already defined and subject to disclosure requirements under Commission rules would serve the public interest and whether to require disclosure of such sharing agreements in stations' public files); *Standardized and Enhanced Disclosure Requirements for Television and Broadcast Licensee Public Interest Obligations*, Second Report and Order, 27 FCC Rcd 4535, 4575, para. 84 (2012) (declining to adopt any disclosure requirements for sharing agreements, but indicated that it would continue to monitor the issue and would revisit disclosure requirements); *NPRM*, 26 FCC Rcd at 17564-70, paras. 194-208 (seeking comment on the potential impact of sharing agreements involving commercial television stations on the Commission's ownership rules and policy goals, on how to define such agreements, and on whether such agreements should be attributed or disclosed).

[337] *Second Report and Order*, 31 FCC Rcd at 10008, paras. 339-40.

[338] *FNPRM*, 29 FCC Rcd at 4522-24, paras. 329-34.

[339] *See, e.g.*, NAB FNPRM Comments at 95-98; Smaller Market Coalition FNPRM Comments at 17.

[340] *FNPRM*, 29 FCC Rcd at 4524-26, paras. 335-39.

[341] *See Second Report and Order*, 31 FCC Rcd at 10009-22, paras. 341-75. The *Second Report and Order* defined SSAs as "any agreement or series of agreements, whether written or oral, in which (1) a station provides any station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to a station that is not directly or indirectly under common *de jure* control permitted under the Commission's regulations; or (2) stations that are not directly or indirectly under common *de jure* control permitted under the Commission's regulations collaborate to provide or enable the provision of station-related services, including, but not limited to, administrative, technical, sales, and/or programming support, to one or more of the collaborating stations." *Id.* at 10012, para. 349.

[342] NAB Petition at 14.

[343] *Id.* at 13 (citing NAB FNPRM Comments at 95-99, 101-03).

118.     Contrary to NAB's claim,[344] the *Second Report and Order* rationally defines SSAs.[345]  In the *Second Report and Order*, the Commission adopted a clear definition of SSAs and addressed commenters' concerns regarding the types of agreements covered by the definition.[346]  As the Commission discussed, the definition of SSAs is appropriately limited in scope, applying only to those agreements that involve station-related services.  Moreover, the Commission sufficiently illustrated this scope by providing guidance in the definition of SSAs with non-exhaustive examples.[347]  The *Second Report and Order* also addressed specific concerns in the record, clarifying that certain agreements, such as ad hoc or "on-the-fly" arrangements during breaking news coverage, fall outside the SSA definition.[348]  Ultimately, the definition is appropriately tailored to include only those agreements that involve station operations relevant to the public.[349]  In light of the Commission's analysis and the lack of any alternative definitions or specific refinements proposed in the record, including on reconsideration, we find no reason to reconsider the definition of SSAs adopted in the *Second Report and Order*.

119.     We also find that the *Second Report and Order* provided a sufficient justification for requiring the disclosure of SSAs.  The Commission is not required to first determine the regulatory status of SSAs before requiring disclosure.[350]  The *Second Report and Order* addressed the various objections in the record and effectively demonstrated that the Commission has the authority to require disclosure of SSAs in order help the Commission obtain information relevant to its statutory responsibilities.[351]  The *Second Report and Order* set forth a sufficient justification for requiring disclosure in these circumstances,[352] and NAB's brief argument to the contrary in its request for reconsideration gives us no cause to disturb the underlying decision at this time.

---

[344] *See id.* at 14.

[345] *See Second Report and Order*, 31 FCC Rcd at 10011-12, paras. 345-49.

[346] *See id.* at 10012, paras. 346-47.

[347] *See id.* at 10011, para. 346; *see also* UCC et al. Opposition at 9-10.

[348] *Second Report and Order*, 31 FCC Rcd at 10011, para. 347.

[349] *See id.* at 10018, para. 362.  NAB expresses concern that the SSA definition would apply to agreements "encompass[ing] everything from janitorial to catering to maintenance to security services."  NAB Petition at 13.  An agreement to share facilities and station personnel meeting the definition of an SSA may include provisions allocating costs or responsibilities related to the operation and upkeep of the shared facilities.  Consistent with the *Second Report and Order*, however, agreements that relate only to such incidental services, even those involving shared facilities, are not encompassed by the SSA definition and are not, therefore, subject to disclosure.  *See* 31 FCC Rcd at 10011, para. 347 ("Indeed, it is not our goal to adopt a definition of SSAs that encompasses station interactions that do not relate to station operations or that are incidental in nature.").  Accordingly, we find NAB's concerns to be misplaced and sufficiently addressed in the *Second Report and Order*.

[350] *Second Report and Order*, 31 FCC Rcd at 10015, para. 356 ("[T]he Commission could hardly fulfill its obligation to ensure that station operations are consistent with Commission rules and policies if it were required to determine the regulatory status of certain agreements before obtaining the information necessary to evaluate the agreements."); *see also* 47 U.S.C. § 403; *Stahlman v. FCC*, 126 F.2d 124, 126-27 (D.C. Cir. 1942) (holding that the Commission's authority to institute any inquiry concerning questions arising under the Communications Act, or relating to its enforcement, includes authority to obtain the information necessary to discharge the Commission's proper functions).

[351] *See id.* at 10014-18, paras. 354-62; *see also* UCC et al. Opposition at 9-10.

[352] *Second Report and Order*, 31 FCC Rcd at 10017, para. 360.  Any efforts to ascertain the potential impact of these agreements on the Commission's policy goals should not be read to imply only a negative impact.  SSAs may help facilitate improved service in local communities, and disclosure of these agreements may provide greater insight into such potential benefits.

120. While we are upholding the decision in the *Second Report and Order* to require disclosure, we emphasize that our action today is not a pretext for future regulation of SSAs. As the Third Circuit recognized, the Commission acted appropriately in declining to attribute these agreements in this proceeding,[353] as some commenters had requested.[354] Among other things, the Commission has admitted that it lacks an understanding of the potential impact of SSAs on a station's core operating functions, and evidence in the record suggests that these agreements help produce significant public interest benefits. Accordingly, any consideration of the regulatory status of these agreements by a future Commission must reflect significant study and understanding of the impact of these agreements on station operations and a complete account of the public interest benefits these agreements help facilitate. Furthermore, while the record compiled in this proceeding does not demonstrate that the disclosure requirement will unduly burden commercial television broadcasters,[355] the Commission retains the authority to revisit this disclosure requirement should evidence of such burdens arise after the disclosure requirement is implemented or experience demonstrate that the benefits of this requirement are outweighed by its costs.

## VI. DIVERSITY/INCUBATOR PROGRAM

### A. Introduction

121. We grant in part and deny in part NAB's request for reconsideration regarding the Commission's decision in the *Second Report and Order* not to adopt an incubator program on the current record.[356] We agree that the Commission should adopt such a program and decide today that we will do so. However, we also find that the underlying record fails to provide sufficient guidance on how best to structure such a program. Accordingly, we adopt today a Notice of Proposed Rulemaking seeking comment on how we should structure the incubator program.

### B. Background

122. As explained in greater detail in the accompanying Notice of Proposed Rulemaking, an incubator program would provide an ownership rule waiver or similar benefits to a company that establishes a program to help facilitate station ownership for a certain class of new owners. The concept of an incubator program has been discussed since at least the early 1990s.[357] Yet, despite general support for the concept, the Commission has never undertaken the creation of a comprehensive incubator program.[358] Most recently, the Commission sought comment in the *NPRM* and *FNPRM* on whether to

---

[353] *Prometheus III*, 824 F.3d at 60, n.18 (rejecting claim that the Commission acted arbitrarily and capriciously by not attributing SSAs in the *Report and Order*).

[354] *See, e.g.*, UCC et al. NPRM Comments at 19-20 (proposing a multifactor attribution test for various agreements that are not individually attributable under the Commission's rules); *see also* CWA FNPRM Comments at 7-20; Free Press FNPRM Comments at 25-27; Free Press FNPRM Reply at 18-19; SAG-AFTRA FNPRM Comments at 2-3; UCC et al. FNPRM Comments at 1-2.

[355] *See Second Report and Order*, 31 FCC Rcd at 10015-16, para. 357.

[356] NAB Petition at 25; *see also Second Report and Order*, 31 FCC Rcd at 10002, para. 321.

[357] *See, e.g.*, *Revision of Radio Rules and Policies*, Memorandum Opinion & Order and Further Notice of Proposed Rulemaking, 7 FCC Rcd 6387, 6391, 6391-92, paras. 22, 24-25 (1992).

[358] The Commission has adopted a limited program that provides a duopoly preference to parties that agree to incubate or finance an eligible entity. *See Second Report and Order*, 31 FCC Rcd at 9982-83, para. 285 (reinstating the program following the reinstatement of the revenue-based eligible entity standard); *see also Diversity Order*, 23 FCC Rcd at 5943, para. 56 (originally adopting the duopoly preference). In adopting this general policy preference, however, the Commission did not provide details regarding the structure and operation of the incubation activities. As such, we do not believe that this limited policy preference serves as an effective basis upon which to design a comprehensive incubator program.

adopt an incubator program and, if so, how to structure such a program.[359]  In the *FNPRM*, in particular, the Commission highlighted administrative concerns and structural issues that needed to be addressed before such a program could be adopted.[360]  While there was general support for an incubator program, and some suggestions on how to structure certain aspects of such a program, the Commission found in the *Second Report and Order* that the record failed to address the specific concerns detailed in the *FNPRM*; accordingly, the Commission declined to adopt an incubator program.[361]

123.     NAB sought reconsideration of the Commission's rejection of NAB's recommendation for an incubator program.[362]  According to NAB, the Commission could create an incubator program based on the overcoming disadvantages preference (ODP) standard, which the Commission rejected in the *Second Report and Order*, or the "new entrant" criteria in the broadcast services' auction rules.[363]  The petition otherwise fails to address the many other issues of concern highlighted by the Commission in this proceeding.  Bonneville/Scranton supports NAB's petition for reconsideration.[364]  In opposition, UCC et al. restate their concerns that an incubator program would create a loophole in the Commission's ownership limits and highlight the unresolved administrative and structural issues identified in this proceeding.[365]

### C.     Discussion

124.     On reconsideration, we agree with NAB that the Commission should adopt an incubator program and decide here that we will do so.  Despite UCC et al.'s objections noted above, there is support for an incubator program from many industry participants and advocacy groups.  And we agree with these supporters that adopting an incubator program would promote new entry and ownership diversity in the broadcast industry by helping address barriers to station ownership, such as lack of access to capital and the need for technical/operational experience.[366]  In this proceeding, however, the Commission has identified various, specific concerns regarding how to structure and monitor such a program.[367]  We find that the comments and recommendations in the record—including those made by NAB and Bonneville/Scranton—fail to adequately address all of these issues.  While certain suggestions may have merit in regards to specific aspects of the program, we are not yet at the point where we can finalize the overall structure and method for implementation of the program.  Therefore, we require additional comment on how to structure the incubator program.

125.     We are initiating a new proceeding in the accompanying Notice of Proposed Rulemaking that will seek additional comment on how best to implement the Commission's incubator program.  Initiating a dedicated proceeding will allow the Commission to focus its efforts on getting this program

---

[359] *See FNPRM*, 29 FCC Rcd at 4514-16, paras. 312-14; *NPRM*, 26 FCC Rcd at 17554-56, para. 169.

[360] *FNPRM*, 29 FCC Rcd at 4515-16, paras. 313-14.

[361] *Second Report and Order*, 31 FCC Rcd at 10001-02, paras. 319-21; *see also* NAB FNPRM Comments at 92-93; NMA FNPRM Comments at 15; Alliance for Women in Media FNPRM Reply Comments at 2; Bonneville/Scranton FNPRM Reply at 9.  *But see* UCC et al. FNPRM Reply at 25 (opposing the incubator program).

[362] NAB Petition at 25.

[363] *Id.*

[364] Bonneville/Scranton Reconsideration Reply Comments at 8.

[365] UCC et al. Opposition at 10-11.

[366] *See, e.g.*, Bonneville/Scranton Reconsideration Reply Comments at 8; MMTC Comments, MB Docket Nos. 14-50, 09-182, 07-294, and 04-256 at 6-9 (Apr. 17, 2017) (MMTC Apr. 17, 2017 Comments); NAB Petition at 25; NABOB Feb. 24, 2017 *Ex Parte* Letter at 3-4.

[367] *See FNPRM*, 29 FCC Rcd at 4515-16, paras. 313-14.

up and running, and we anticipate that our consideration of this issue will be assisted by the newly established Advisory Committee on Diversity and Digital Empowerment.[368]

## VII. NOTICE OF PROPOSED RULEMAKING

### A. Introduction

126. With this NPRM, we seek comment on how to design and implement our incubator program to support the entry of new and diverse voices in the broadcast industry. Specifically, we seek comment on the structure, review, and oversight of a comprehensive incubator program that will help create new sources of financial, technical, operational, and managerial support for eligible broadcasters. We believe that such a program can create ownership opportunities for new entrants and small businesses, thus promoting competition and new voices in the broadcast industry.

### B. Background

127. The Commission has long considered whether to adopt an incubator program to help provide new sources of capital and support to entities that may otherwise lack operational experience or access to financing. Generally, an incubator program would provide an ownership rule waiver or similar benefits to a company that establishes a program to help facilitate station ownership for a certain class of prospective or existing station owners. For example, in exchange for a defined benefit, such as waiver of a broadcast ownership rule, an established company could assist a new owner by providing "management or technical assistance, loan guarantees, direct financial assistance through loans or equity investments, training, or business planning assistance."[369] Over the years, a number of parties have proposed or supported recommendations for some type of an incubator program, but the Commission has never developed a comprehensive incubator program.[370]

128. The history of this issue dates back at least to the early 1990s,[371] but our goal is to build on the Commission's most recent efforts. Notably, in 2010 the Commission's Advisory Committee on

---

[368] *See* The Advisory Committee on Diversity and Digital Empowerment was officially chartered on July 5, 2017, after Chairman Pai initially indicated his intention to establish the committee on April 24, 2017. Press Release, FCC, Chairman Pai Announces Plan to Form Advisory Committee on Diversity (Apr. 24, 2017), https://www.fcc.gov/document/chairman-pai-announces-plan-form-advisory-committee-diversity. The Commission sought nominations for committee chairperson and membership on June 7, 2017. *FCC Seeks Nominations for Membership on Advisory Committee on Diversity and Digital Empowerment*, Public Notice, 32 FCC Rcd 4761 (MB 2017) (establishing the committee for a period of two years). The committee held its initial meeting on September 25, 2017. *FCC Announces the Membership, First Meeting, and Docket Number of the Advisory Committee on Diversity and Digital Empowerment*, Public Notice, DA 17-857 (MB Sept. 8, 2017).

[369] Advisory Committee on Diversity for Communications in the Digital Age, Recommendation on Incentive-Based Regulations at 5 (June 14, 2004) (2004 Diversity Committee Incentive-Based Recommendations), https://www.fcc.gov/diversity-committee-adopted-recommendations (select "Incentive-Based Regulations").

[370] As discussed above, the Commission has adopted a limited program that provides a duopoly preference to parties that agree to incubate or finance an eligible entity, but we do not believe that this limited policy preference serves as an effective basis upon which to design a comprehensive incubator program. *See supra* note 358.

[371] *See, e.g.*, *Revision of Radio Rules and Policies*, Memorandum Opinion & Order and Further Notice of Proposed Rulemaking, 7 FCC Rcd 6387, 6391, 6391-92, paras. 22, 24-25 (1992); *see also* Advisory Committee on Diversity for Communications in the Digital Age, Media Issues Subcommittee, Structural Rule Waivers for Creating an Incubator Program at 1-6 (Dec. 2, 2010) (2010 Diversity Committee Incubator Program Recommendation), https://www.fcc.gov/diversity-committee-adopted-recommendations (select "Media Issues Subcommittee Recommendation on Structural Rule Waivers for Creating an Incubator Program"); *Diversity Third FNPRM*, 23 FCC Rcd at 5955-56, para. 97 (seeking comment on a two-year "Trial Incubation Plan" that would allow entities that create and maintain an incubator program for [socially and economically disadvantaged businesses] to receive a waiver of the local radio ownership rule); *Policies and Rules Regarding Minority and Female Ownership of Mass*

(continued....)

Diversity for Communications in the Digital Age recommended that the Commission commence a rulemaking to pursue an incubator program in order to help promote ownership diversity.[372] The committee provided various recommendations on how to structure such a program.[373] Subsequently, the Commission sought comment in the *NPRM* and *FNPRM* in the 2010/2014 Quadrennial Review proceeding on whether to adopt an incubator program and, if so, how to structure such a program.[374] In the *FNPRM*, in particular, the Commission highlighted administrative concerns and structural issues that needed to be addressed before such a program could be adopted.[375] The record built in response to the *NPRM* and *FNPRM* contained continued support for the concept of an incubator program and some suggestions on how to structure certain aspects of such a program.[376] Some commenters, however, expressed concern that an incubator program would create a loophole in the Commission's ownership limits that could potentially harm small and independent station owners.[377] In the *Second Report and Order*, the Commission found that the record failed to address specific concerns detailed in the *FNPRM* and declined to adopt an incubator program.[378] Following the release of the *Second Report and Order*, NABOB and MMTC each urged the Commission to continue its consideration of an incubator program. They suggest that additional public comment could help resolve the remaining administrative and structural issues. In the accompanying Order on Reconsideration above, the Commission has decided to adopt an incubator program and committed to initiating this proceeding to resolve issues regarding the design and implementation of that program.[379]

129.　　　In addition, on July 5, 2017, we commissioned the Advisory Committee on Diversity and Digital Empowerment, which held its first meeting on September 25, 2017.[380] We anticipate that the committee's work will help inform our efforts to create an incubator program.

## C.　　Discussion

130.　　　As discussed above, the Commission has decided to adopt an incubator program to help address the lack of access to capital and technical expertise faced by potential new entrants and small businesses.[381] But while there is general support for an incubator program to help address these issues,

---

(Continued from previous page) ————————————

*Media Facilities*, Notice of Proposed Rulemaking, 10 FCC Rcd 2788, 2788, para. 1 n.2 (1995) (incorporating the 1992 rulemaking).

[372] *See generally* 2010 Diversity Committee Incubator Program Recommendation; *see also* Letter from Henry Rivera, Chairman, FCC Advisory Committee on Diversity for Communications in the Digital Age, to Julius Genachowski, Chairman, FCC (Dec. 14, 2010) (regarding full Committee adoption of an incubator recommendation), https://transition.fcc.gov/DiversityFAC/120210/letter-to-genachowski-121410.pdf.

[373] 2010 Diversity Committee Incubator Program Recommendation at 2.

[374] *See FNPRM*, 29 FCC Rcd at 4514-16, paras. 312-14; *NPRM*, 26 FCC Rcd at 17554-56, para. 169.

[375] *FNPRM*, 29 FCC Rcd at 4515-16, paras. 313-14.

[376] *See, e.g.*, NAB FNPRM Comments at 92-93; NMA FNPRM Comments at 15; Alliance for Women in Media FNPRM Reply Comments at 2; Bonneville/Scranton FNPRM Reply at 9, Attach. at 2-3; Comments of the Diversity and Competition Supporters (DCS), MB Docket 09-182, at 22-25 (filed July 12, 2010) (DCS July 12, 2010 Comments).

[377] *See, e.g.*, Free Press NPRM Reply at 51-53; Mt. Wilson NPRM Reply at 9; UCC et al. FNPRM Reply at 25.

[378] *Second Report and Order*, 31 FCC Rcd at 10001-02, paras. 319-21.

[379] *See supra* Section VI.

[380] *See supra* note 368.

[381] *See supra* Section VI; *see also* Bonneville/Scranton Reconsideration Reply Comments at 8; MMTC Apr. 17, 2017 Comments at 6-9; NAB Petition at 25; NABOB Feb. 24, 2017 *Ex Parte* Letter at 3-4.

there is little consensus regarding the structure or details of such a program. We anticipate that this NPRM, devoted exclusively to an incubator program, can help generate solutions to these technical and administrative issues. Accordingly, as detailed below, we seek comment on eligibility criteria for the incubated entity; appropriate incubating activities; benefits to the incubating entity; how such a program would be reviewed, monitored, and enforced; and the attendant costs and benefits. We anticipate that the record will reveal innovative strategies for partnerships between established broadcasters and new entrants.

### 1. Defining Entities Eligible for Participation

131. We seek comment on how to determine eligibility for participation in the incubator program. Options include:

- New Entrants. NAB suggests the Commission create a standard similar to the new entrant bidding credit eligibility definition applicable in the broadcast auction context.[382] Under the auction rules, an auction participant is eligible for bidding credits if it has attributable interests in few or no other "media of mass communication."[383]

- Revenue-Based Eligible Entity. In the *Second Report and Order*, the Commission re-adopted a revenue-based eligible entity standard to identify those qualified to take advantage of certain preferential regulatory policies.[384] An eligible entity under this definition is any commercial or non-commercial entity that qualifies as a small business consistent with Small Business Administration (SBA) revenue grouping according to industry.[385]

- Socially and Economically Disadvantaged Businesses (SDB). The SDB standard is based on the definition employed by the Small Business Administration (SBA). Pursuant to the SBA's program, persons of certain racial or ethnic backgrounds are presumed to be disadvantaged; all other individuals may qualify for the program if they can show by a preponderance of the evidence that they are disadvantaged.[386]

---

[382] NAB Petition at 25.

[383] 47 CFR § 73.5007(a); *see also id*. § 73.5008(b) (defining media of mass communication as "a daily newspaper; a cable television system; or a license or construction permit for a television broadcast station, an AM or FM broadcast station, or a direct broadcast satellite transponder"). A 35 percent bidding credit is awarded to a qualifying new entrant who has no attributable interest in any other media of mass communication, while a 25 percent bidding credit is awarded to a qualifying new entrant who holds an attributable interest in no more than three mass media facilities. *Id.* § 73.5007(a).

[384] *Second Report and Order*, 31 FCC Rcd at 9983, para. 286.

[385] *Id*. Additionally, the Commission requires a small business eligible entity to hold: (1) 30 percent or more of the stock/partnership shares and more than 50 percent voting power of the corporation or partnership that will hold the broadcast license; (2) 15 percent or more of the stock/partnership shares and more than 50 percent voting power of the corporation or partnership that will hold the broadcast license, providing that no other person or entity owns or controls more than 25 percent of the outstanding stock or partnership interest; or (3) more than 50 percent of the voting power of the corporation if the corporation that holds the licenses is a publicly traded corporation. *Id.* at 9983-84, para. 286.

[386] 13 CFR §§ 124.103(b)-(c), 124.104(a). To qualify for this program, a small business must be at least 51 percent owned and controlled by a socially and economically disadvantaged individual or individuals. *See id*. § 124.105; *see also* U.S. Small Business Administration, Small Disadvantaged Businesses, https://www.sba.gov/contracting/ government-contracting-programs/small-disadvantaged-businesses (visited Oct. 11, 2017). The SDB standard is explicitly race-conscious and, therefore, subject to heightened constitutional review. In the *Second Report and Order*, the Commission determined that evidence in the record was not sufficient to satisfy the constitutional standards to adopt the SDB standard or any other race- or gender-conscious measures. *Second Report and Order*, 31 FCC Rcd at 9987-88, 9999-10000, paras. 297, 315-16.

- Overcoming Disadvantages Preference (ODP). The ODP standard would employ various criteria to demonstrate that an individual or entity has overcome significant disadvantage.[387] The *Second Report and Order* declined to adopt an ODP standard, citing concerns with the approach.[388]

132.     We seek comment on these various standards, including any modifications that would be appropriate in the incubator context. In particular, are there any changes to these standards that would help address previous concerns expressed by the Commission? Which of these standards most closely aligns with our goal to help facilitate ownership opportunities for entities that lack access to capital and operational experience and thereby promote competition and viewpoint diversity in local markets? In addition, we seek comment on any other standards that would effectively promote our objectives. Any commenters proposing or supporting a race- and/or gender-specific standard should also provide analysis regarding how such a standard could withstand a constitutional challenge. We also seek comment on the relative advantages of the various standards. Certain standards are more difficult to define and administer and may raise constitutional concerns. What are the offsetting benefits of these approaches relative to standards that are easier to apply and/or do not raise constitutional concerns?

## 2.     Defining Qualifying Incubation Activities

133.     We also seek comment on the activities that would qualify as incubation. Such activities would need to provide the incubated entity with support that it otherwise lacks and that is essential to its operation and ability to serve its community. As traditionally conceived, a comprehensive program could include management or technical assistance, loan guarantees, direct financial assistance through loans or equity investment, and training and business planning assistance.[389] Should we consider other activities, such as donating stations to certain organizations or arrangements whereby the new entrant gains operational experience without first acquiring a station, such as programming a station and selling advertising time under an LMA?[390]

134.     What combination of activities (financial and operational) should be required to qualify as an incubation relationship? Should there be any conditions on the financial aspects of the relationship? For example, should there be any limitations on the incubating entity holding an option to acquire the incubated station? Should we adopt time limitations on technical assistance? For example, should we impose a minimum amount of time to ensure that the incubated station acquires sufficient technical expertise to operate the station independently of the established broadcaster? Should we impose a maximum amount of time to ensure that the incubated station actually does become independent? What role should sharing agreements (e.g., LMAs, JSAs, and SSAs) play, if any, in the incubation relationship? We seek comment on these issues.

135.     How can the Commission ensure that use of the incubation program is necessary to promote new entry? For example, should the proposed incubated station certify that it lacks the access to capital and technical expertise necessary to acquire and operate the station? Should participation in an incubator program be limited to new station acquisitions? Alternatively, should participation extend to existing station owners that are struggling and may need financing or other support to continue operation? Are there any justifications for limiting participation differently based on the eligibility standard selected?

---

[387] *Second Report and Order*, 31 FCC Rcd at 9993-94, para. 306.

[388] *See id.* (discussing concerns with ODP standard). NAB and MMTC, however, continue to support the ODP standard. *See* MMTC Apr. 17, 2017 Comments at 6-7; NAB Petition at 25.

[389] DCS July 12, 2010 Comments at 22.

[390] *See, e.g., id.* at 22-24.

136.    While the Commission's rules already prohibit unauthorized transfers of control, including *de facto* transfers of control, should we adopt any additional safeguards as part of an incubation program to ensure that the incubated station licensee retains control of its station?

### 3.    Benefit to Incubating Station

137.    In order to encourage an established broadcaster to engage in incubating activities, the incubation program must provide a meaningful benefit to the incubating entity.  In general, the potential benefit suggested has been a waiver of the Commission's local broadcast ownership rules.  How should the Commission structure the waiver program?  For example, should the waiver be limited to the market in which the incubating activity is occurring?  Alternatively, should waiver be permissible in any similarly sized market?  How would the Commission determine which markets are similar in size?  Should the Commission review these waivers in the future to determine whether they continue to be justified?  On what grounds would the Commission evaluate the waivers?  Should the waiver be tied to the success of the incubation relationship?  Should the waiver continue even if the incubator program ends and, if so, for how long?  What should be considered a successful relationship?  Should the waiver be transferrable if the incubating entity sells a cluster of stations that does not comply with the ownership limits at the time?

138.    Instead of a waiver to acquire a different station in the market (or a similarly sized market), should we allow the incubating entity to obtain an otherwise impermissible non-controlling, attributable interest in the incubated station?  This would allow the incubating entity to obtain financial benefits that accrue from successful operation of the incubated station and would limit the impact on competition, both by ensuring that the incubated entity retains control of the station and by tying the ownership waiver to the period of time the incubated entity owns the station.  Would such an approach dilute the contributions of the incubated station as an independent market participant?

139.    Should we limit any incubator program to radio, as the proposal was initially conceived, or should the program apply to both radio and television?  Should we adopt a phased approach, whereby we institute the program on a trial basis in radio and then evaluate its success and operation before expanding to television, and if so, how long should such a trial period last?  What steps should the Commission take to evaluate the trial period and whether to expand the program?

### 4.    Review of Incubation Proposals

140.    We seek comment on the review process for incubation proposals.  We expect that most incubation proposals will accompany an assignment or transfer of control application.  These applications would be subject to petitions to deny and informal comments under the Commission's rules.  Does this provide the public with sufficient opportunity to comment on the proposal?  What public concerns should the Commission consider in its evaluation?  Are there other situations beyond an assignment or transfer of control application in which an incubator proposal could be applied, and if so, how should the review process work in such circumstances?

141.    We asked above whether to extend incubation opportunities to existing station owners that are facing financial and/or technical difficulties.[391]  If the program is so extended, how should the parties submit the proposal to the Commission for review and approval?  For example, should we require electronic filing of such requests in the Commission's Electronic Comment Filing System?  Should these filings then be subject to the same public comment requirements as those filed as part of an assignment or transfer of control application?

---

[391] *Supra* para. 135 ("Should participation in an incubator program be limited to new station acquisitions? Alternatively, should participation extend to existing station owners that are struggling and may need financing or other support to continue operation?").

142.     We note that so long as the arrangement is permissible under existing Commission rules, parties do not need prior approval to enter into agreements regarding finances or station operations. However, for the arrangement to count as incubation, such that the incubating entity is entitled to the benefits of the program (e.g., an ownership waiver), the Commission would need to find that the relationship satisfies the incubation criteria.  In such circumstances, should we require Commission approval prior to the initiation of the incubation relationship or should we permit the parties to request recognition of a previous or ongoing incubation relationship, perhaps as part of an application from the incubating entity requesting an ownership waiver for the acquisition of another station?  Should there be a time limit on such subsequent requests for approval?

### 5.      Compliance Assessment

143.     As evidenced by the foregoing, an incubation relationship may involve complex agreements between the parties regarding financing, programming, and operations.  How should the Commission monitor compliance with the terms of incubation?  Should the Commission require periodic reports to be filed by one or both parties or placed in their online public files?  If so, how frequently should the reports be filed?  Should these reports be available to the public?  What information should the reports contain?  Should the Commission instead conduct its own periodic review of the incubation activities and compliance with the relevant agreements?  What other compliance measures should we consider?

144.     If compliance lapses, for any reason, what are the consequences?  Should the incubating party be required to divest itself of the benefits it received for engaging in incubation activities?  For example, if the incubating party was granted a waiver of a local broadcast ownership rule, should it be forced to come into compliance with the relevant ownership limit if it does not fulfill the terms of the incubation program?  Should we allow the incubating party to seek to be relieved of its obligations and retain the benefits (e.g., ownership waiver) if the incubated station fails to comply with the terms of the agreement?  Are there other appropriate enforcement responses, such as fines?  Should we establish a time limit on the benefits granted under the incubation program based on the premise that the purpose of the program is to enable incubated entities to operate independently after some period of assistance?

### 6.      Costs and Benefits

145.     We seek comment on the costs and benefits associated with the proposals in this NPRM.  In particular, we encourage broadcasters and other industry participants to submit any relevant data regarding the potential costs associated with the various application, recordkeeping, and compliance requirements proposed herein.  Are there ways to structure the program to reduce costs, particularly for small businesses?  How do we define and quantify the expected benefits of an incubator program?

## VIII.   PROCEDURAL MATTERS

### A.      *Ex Parte* Rules

146.     The proceeding for the Notice of Proposed Rulemaking shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[392]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the

---

[392] 47 CFR §§ 1.1200 *et seq.*

proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with Section 1.1206(b).  In proceedings governed by Section 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

### B.     Filing Requirements

147.     Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Commenting parties may file comments in response to this Notice in MB Docket No. 17-289; interested parties are not required to file duplicate copies in the additional dockets listed in the caption of this notice.

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://apps.fcc.gov/ecfs/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

  - All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, D.C. 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of <u>before</u> entering the building.

  - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

  - U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington, D.C. 20554.

148.     People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

### C.     Regulatory Flexibility Analysis

149.     As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[393] the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) and a Supplemental Final Regulatory Flexibility Analysis (Supplemental FRFA) of the possible significant economic impact on small entities of the policies and rules addressed in the Report and Order and Notice of Proposed

---

[393] *See* 5 U.S.C. § 603.

Rulemaking.  The Supplemental FRFA is set forth in Appendix B.  The IRFA is set forth in Appendix C.  We request written public comment on the IRFA.  Comments must be filed in accordance with the same deadlines as comments filed in response to the Notice of Proposed Rulemaking as set forth on the first page of this document, and have a separate and distinct heading designating them as responses to the IRFA.  The Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, will send a copy of this Order on Reconsideration and Notice of Proposed Rulemaking, including the Supplemental FRFA and IRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  In addition, the Order on Reconsideration and Notice of Proposed Rulemaking and IRFA (or summaries thereof) will be published in the *Federal Register*.

###### D.     **Paperwork Reduction Act Analysis**

150.     This Order on Reconsideration contains information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  The requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies will be invited to comment on the information collection requirements contained in this proceeding.  The Commission will publish a separate document in the *Federal Register* at a later date seeking these comments.  In addition, we note that, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), the Commission previously sought specific comment on how it might further reduce the information collection burden for small business concerns with fewer than 25 employees.

151.     The Notice of Proposed Rulemaking contains proposed new information collection requirements.  The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and OMB to comment on the information collection requirements contained in this document, as required by PRA.  In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4), the Commission seeks specific comment on how it might "further reduce the information collection burden for small business concerns with fewer than 25 employees."[394]

###### E.     **Congressional Review Act**

152.     The Commission will send a copy of this Order on Reconsideration and Notice of Proposed Rulemaking to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

## IX.     ORDERING CLAUSES

153.     Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 257, 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 257, 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996, this Order on Reconsideration and Notice of Proposed Rulemaking **IS ADOPTED**.

154.     **IT IS FURTHER ORDERED** that, pursuant to Section 405 of the Communications Act of 1934, as amended, 47 U.S.C. § 405, and Section 1.429 of the Commission's rules, 47 CFR § 1.429, that the petitions for reconsideration filed by (1) Connoisseur Media, LLC **IS GRANTED, IN PART, AND OTHERWISE DENIED** as set forth herein; (2) the National Association of Broadcasters **IS GRANTED, IN PART, AND OTHERWISE DENIED** as set forth herein; and (3) Nexstar Broadcasting, Inc. **IS GRANTED, IN PART, AND OTHERWISE DENIED** as set forth herein.

155.     **IT IS FURTHER ORDERED** that UCC et al.'s Motion to Strike and Dismiss **IS DENIED** as set forth herein.

---

[394] 44 U.S.C. § 3506(c)(4).

156.    **IT IS FURTHER ORDERED** that the Order on Reconsideration and the rule modifications attached hereto as Appendix A **SHALL BE EFFECTIVE** thirty (30) days after publication of the text or a summary thereof in the *Federal Register*, except for those rules and requirements involving Paperwork Reduction Act burdens, which shall become effective on the effective date announced in the *Federal Register* notice announcing OMB approval.

157.    **IT IS FURTHER ORDERED** that, pursuant to applicable procedures set forth in Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on the Notice of Proposed Rulemaking in MB Docket No. 17-289 on or before sixty (60) days after publication in the *Federal Register* and reply comments on or before ninety (90) days after publication in the *Federal Register*.

158.    **IT IS FURTHER ORDERED**, that the proceedings MB Docket No. 04-256, MB Docket No. 09-182, and MB Docket No. 14-50 **ARE TERMINATED**.

159.    **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Order on Reconsideration and Notice of Proposed Rulemaking, including the Supplemental Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

160.    **IT IS FURTHER ORDERED** that, pursuant to Section 801(a)(1)(A) of the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A), the Commission SHALL SEND a copy of the Order on Reconsideration and Notice of Proposed Rulemaking to Congress and to the Government Accountability Office.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## Appendix A

## Final Rule Changes

Part 73 of Title 47 of the Code of Federal Regulations is amended as follows:

PART 73—RADIO BROADCAST SERVICES

1.    The authority citation for Part 73 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 303, 334, 336 and 339.

2.    Amend § 73.3555 by revising paragraph (b); removing and reserving paragraphs (c) and (d); revising Note 2, Note 4, Note 5, Note 6, Note 7, and Note 9; and removing Note 12:

### § 73.3555 Multiple ownership.

* * * * *

(b) *Local television multiple ownership rule.*  (1) An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) if:

(i) The digital noise limited service contours of the stations (computed in accordance with § 73.622(e)) do not overlap; or

(ii) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.

(b)(2) Paragraph (b)(1)(ii) (Top-Four Prohibition) of this section shall not apply in cases where, at the request of the applicant, the Commission makes a finding that permitting an entity to directly or indirectly own, operate, or control two television stations licensed in the same DMA would serve the public interest, convenience, and necessity.  The Commission will consider showings that the Top-Four Prohibition should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.

(c) [Reserved]

(d) [Reserved]

* * * * *

### Note 2 to § 73.3555:

In applying the provisions of this section, ownership and other interests in broadcast licensees will be attributed to their holders and deemed cognizable pursuant to the following criteria:

a. Except as otherwise provided herein, partnership and direct ownership interests and any voting stock interest amounting to 5% or more of the outstanding voting stock of a corporate broadcast licensee will be cognizable;

b. Investment companies, as defined in 15 U.S.C. 80a-3, insurance companies and banks holding stock through their trust departments in trust accounts will be considered to have a cognizable interest only if they hold 20% or more of the outstanding voting stock of a corporate broadcast licensee, or if any of the officers or directors of the broadcast licensee are representatives of the investment company, insurance company or bank concerned. Holdings by a bank or insurance company will be aggregated if the bank or insurance company has any right to determine how the stock will be voted. Holdings by investment companies will be aggregated if under common management.

c. Attribution of ownership interests in a broadcast licensee that are held indirectly by any party through one or more intervening corporations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, except that wherever the ownership percentage for any link in the chain exceeds 50%, it shall not be included for purposes of this multiplication. For purposes of paragraph i. of this note, attribution of ownership interests in a broadcast licensee that are held indirectly by any party through one or more intervening organizations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, and the ownership percentage for any link in the chain that exceeds 50% shall be included for purposes of this multiplication. [For example, except for purposes of paragraph (i) of this note, if A owns 10% of company X, which owns 60% of company Y, which owns 25% of "Licensee," then X's interest in "Licensee" would be 25% (the same as Y's interest because X's interest in Y exceeds 50%), and A's interest in "Licensee" would be 2.5% (0.1 × 0.25). Under the 5% attribution benchmark, X's interest in "Licensee" would be cognizable, while A's interest would not be cognizable. For purposes of paragraph i. of this note, X's interest in "Licensee" would be 15% (0.6 × 0.25) and A's interest in "Licensee" would be 1.5% (0.1 × 0.6 × 0.25). Neither interest would be attributed under paragraph i. of this note.]

d. Voting stock interests held in trust shall be attributed to any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will. If the trustee has a familial, personal or extra-trust business relationship to the grantor or the beneficiary, the grantor or beneficiary, as appropriate, will be attributed with the stock interests held in trust. An otherwise qualified trust will be ineffective to insulate the grantor or beneficiary from attribution with the trust's assets unless all voting stock interests held by the grantor or beneficiary in the relevant broadcast licensee are subject to said trust.

* * *

g. Officers and directors of a broadcast licensee are considered to have a cognizable interest in the entity with which they are so associated. If any such entity engages in businesses in addition to its primary business of broadcasting, it may request the Commission to waive attribution for any officer or director whose duties and responsibilities are wholly unrelated to its primary business. The officers and directors of a parent company of a broadcast licensee, with an attributable interest in any such subsidiary entity, shall be deemed to have a cognizable interest in the subsidiary unless the duties and responsibilities of the officer or director involved are wholly unrelated to the broadcast licensee, and a statement properly documenting this fact is submitted to the Commission. [This statement may be included on the appropriate Ownership Report.] The officers and directors of a sister corporation of a broadcast licensee shall not be attributed with ownership of that licensee by virtue of such status.

h. Discrete ownership interests will be aggregated in determining whether or not an interest is cognizable under this section. An individual or entity will be deemed to have a cognizable investment if:

1. The sum of the interests held by or through "passive investors" is equal to or exceeds 20 percent; or

2. The sum of the interests other than those held by or through "passive investors" is equal to or exceeds 5 percent; or

3. The sum of the interests computed under paragraph h. 1. of this note plus the sum of the interests computed under paragraph h. 2. of this note is equal to or exceeds 20 percent.

i.1. Notwithstanding paragraphs e. and f. of this Note, the holder of an equity or debt interest or interests in a broadcast licensee subject to the broadcast multiple ownership rules ("interest holder") shall have that interest attributed if:

A. The equity (including all stockholdings, whether voting or nonvoting, common or preferred) and debt interest or interests, in the aggregate, exceed 33 percent of the total asset value, defined as the aggregate of all equity plus all debt, of that broadcast licensee; and

B.(i) The interest holder also holds an interest in a broadcast licensee in the same market that is subject to the broadcast multiple ownership rules and is attributable under paragraphs of this note other than this paragraph i.; or

(ii) The interest holder supplies over fifteen percent of the total weekly broadcast programming hours of the station in which the interest is held. For purposes of applying this paragraph, the term, "market," will be defined as it is defined under the specific multiple ownership rule that is being applied, except that for television stations, the term "market" will be defined by reference to the definition contained in the local television multiple ownership rule contained in paragraph (b) of this section.

2. Notwithstanding paragraph i.1. of this Note, the interest holder may exceed the 33 percent threshold therein without triggering attribution where holding such interest would enable an eligible entity to acquire a broadcast station, provided that:

i. The combined equity and debt of the interest holder in the eligible entity is less than 50 percent, or

ii. The total debt of the interest holder in the eligible entity does not exceed 80 percent of the asset value of the station being acquired by the eligible entity and the interest holder does not hold any equity interest, option, or promise to acquire an equity interest in the eligible entity or any related entity. For purposes of this paragraph i.2, an "eligible entity" shall include any entity that qualifies as a small business under the Small Business Administration's size standards for its industry grouping, as set forth in 13 CFR 121.201, at the time the transaction is approved by the FCC, and holds:

A. 30 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet; or

B. 15 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet, provided that no other person or entity owns or controls more than 25 percent of the outstanding stock or partnership interests; or

C. More than 50 percent of the voting power of the corporation that will own the media outlet if such corporation is a publicly traded company.

j. "Time brokerage" (also known as "local marketing") is the sale by a licensee of discrete blocks of time to a "broker" that supplies the programming to fill that time and sells the commercial spot announcements in it.

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraph (a) of this section. This limitation shall apply regardless of the source of the brokered programming supplied by the party to the brokered station.

2. Where two television stations are both located in the same market, as defined in the local television ownership rule contained in paragraph (b) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (b) and (e) of this section. This limitation shall apply regardless of the source of the brokered programming supplied by the party to the brokered station.

3. Every time brokerage agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the provisions of paragraph (b) of this section if the brokering station is a television station or with paragraph (a) of this section if the brokering station is a radio station.

k. "Joint Sales Agreement" is an agreement with a licensee of a "brokered station" that authorizes a "broker" to sell advertising time for the "brokered station."

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station sells more than 15 percent of the advertising time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraph (a) of this section.

2. Every joint sales agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities, including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the limitations set forth in paragraph (a) of this section if the brokering station is a radio station.

* * * * *

## Note 4 to § 73.3555:

Paragraphs (a) and (b) of this section will not be applied so as to require divestiture, by any licensee, of existing facilities, and will not apply to applications for assignment of license or transfer of control filed in accordance with §73.3540(f) or §73.3541(b), or to applications for assignment of license or transfer of control to heirs or legatees by will or intestacy, or to FM or AM broadcast minor modification applications for intra-market community of license changes, if no new or increased concentration of ownership would be created among commonly owned, operated or controlled broadcast stations. Paragraphs (a) and (b) of this section will apply to all applications for new stations, to all other applications for assignment or transfer, to all applications for major changes to existing stations, and to all other applications for minor changes to existing stations that seek a change in an FM or AM radio station's community of license or create new or increased concentration of ownership among commonly

owned, operated or controlled broadcast stations. Commonly owned, operated or controlled broadcast stations that do not comply with paragraphs (a) and (b) of this section may not be assigned or transferred to a single person, group or entity, except as provided in this Note, the Report and Order in Docket No. 02-277, released July 2, 2003 (FCC 02-127), or the Second Report and Order in MB Docket No. 14-50, FCC 16-107 (released August 25, 2016).

* * * * *

**Note 5 to § 73.3555:**

Paragraphs (b) and (e) of this section will not be applied to cases involving television stations that are "satellite" operations. Such cases will be considered in accordance with the analysis set forth in the Report and Order in MM Docket No. 87-8, FCC 91-182 (released July 8, 1991), in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest. An authorized and operating "satellite" television station, the digital noise limited service contour of which overlaps that of a commonly owned, operated, or controlled "non-satellite" parent television broadcast station may subsequently become a "non-satellite" station under the circumstances described in the aforementioned Report and Order in MM Docket No. 87-8. However, such commonly owned, operated, or controlled "non-satellite" television stations may not be transferred or assigned to a single person, group, or entity except as provided in Note 4 of this section.

**Note 6 to § 73.3555:**

Requests submitted pursuant to paragraph (b)(2) will be considered in accordance with the analysis set forth in the Order on Reconsideration in MB Docket Nos. 14-50, et al. (FCC 17-156).

**Note 7 to § 73.3555:**

The Commission will entertain applications to waive the restrictions in paragraph (b) of this section (the local television ownership rule) on a case-by-case basis. In each case, we will require a showing that the in-market buyer is the only entity ready, willing, and able to operate the station, that sale to an out-of-market applicant would result in an artificially depressed price, and that the waiver applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA. One way to satisfy these criteria would be to provide an affidavit from an independent broker affirming that active and serious efforts have been made to sell the permit, and that no reasonable offer from an entity outside the market has been received.

We will entertain waiver requests as follows:

1. If one of the broadcast stations involved is a "failed" station that has not been in operation due to financial distress for at least four consecutive months immediately prior to the application, or is a debtor in an involuntary bankruptcy or insolvency proceeding at the time of the application.

2. If one of the television stations involved is a "failing" station that has an all-day audience share of no more than four per cent; the station has had negative cash flow for three consecutive years immediately prior to the application; and consolidation of the two stations would result in tangible and verifiable public interest benefits that outweigh any harm to competition and diversity.

3. If the combination will result in the construction of an unbuilt station. The permittee of the unbuilt station must demonstrate that it has made reasonable efforts to construct but has been unable to do so.

* * * * *

**Note 9 to § 73.3555**

Paragraph (a)(1) of this section will not apply to an application for an AM station license in the 1605-1705 kHz band where grant of such application will result in the overlap of the 5 mV/m groundwave contours of the proposed station and that of another AM station in the 535-1605 kHz band that is commonly owned, operated or controlled.

* * * * *

3.          Amend § 73.3613 by revising paragraphs (d)(2) to read as follows:

**§ 73.3613 Filing of contracts.**

* * * * *

(d) * * *

(2) *Joint sales agreements*:  Joint sales agreements involving radio stations where the licensee (including all parties under common control) is the brokering entity, the brokering and brokered stations are both in the same market as defined in the local radio multiple ownership rule contained in § 73.3555(a), and more than 15 percent of the advertising time of the brokered station on a weekly basis is brokered by that licensee.  Confidential or proprietary information may be redacted where appropriate but such information shall be made available for inspection upon request by the FCC.

* * * * *

**APPENDIX B**

**Supplemental Final Regulatory Flexibility Analysis**

1.      In compliance with the Regulatory Flexibility Act (RFA),[1] this Supplemental Final Regulatory Flexibility Analysis (Supplemental FRFA) supplements the Final Regulatory Flexibility Analysis (FRFA) included in the *Second Report and Order*,[2] to the extent that changes adopted on reconsideration require changes to the information included and conclusions reached in the FRFA.  As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[3] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *NPRM* that initiated this proceeding.[4]  The Commission sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  The Commission also incorporated a Supplemental Initial Regulatory Flexibility Analysis (Supplemental IRFA) in the *FNPRM* in this proceeding.[5]  The Commission sought written public comment on the proposals in the *FNPRM*, including comment on the Supplemental IRFA.  The Commission received no comments in response to the IRFA or the Supplemental IRFA.  This present Supplemental FRFA conforms to the RFA.[6]

A.      **Need for, and Objectives of, the *Order on Reconsideration***

2.      This *Order on Reconsideration* modifies the *Second Report and Order*, which concluded the 2010 and 2014 Quadrennial Reviews of the broadcast ownership rules initiated pursuant to Section 202(h) of the Telecommunications Act of 1996 (1996 Act).[7]  The Commission is required by statute to review its media ownership rules every four years to determine whether they "are necessary in the public interest as the result of competition"[8] and to "repeal or modify any regulation it determines to be no longer in the public interest."[9]  The media ownership rules that are subject to this quadrennial review are the Local Television Ownership Rule, the Local Radio Ownership Rule, the Newspaper/Broadcast Cross-Ownership (NBCO) Rule, the Radio/Television Cross-Ownership Rule, and the Dual Network Rule.[10]

3.      In this *Order on Reconsideration*, the Commission eliminates the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule in their entirety.  The Commission revises the Local Television Ownership Rule to eliminate the Eight-Voices Test and to modify the Top-Four Prohibition to better reflect the competitive conditions in local markets.  The Commission also eliminates the attribution rule for television joint sales agreements (JSAs).  No other changes are made to the rules adopted in the *Second Report and Order*.[11]

4.      *Newspaper/Broadcast Cross-Ownership Rule.*  In the *Order on Reconsideration*, the Commission finds that the Newspaper/Broadcast Cross-Ownership (NBCO) Rule no longer serves the public interest.  The Commission accordingly repeals the rule in its entirety.  The *Second Report and*

---

[1] *See* 5 U.S.C. § 604.

[2] *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Second Report and Order, 31 FCC Rcd 9864, 10029-42, App. B (2016) (*Second Report and Order*).

[3] 5 U.S.C. § 603.  The RFA, *id.* §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[4] *See 2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Notice of Proposed Rulemaking, 26 FCC Rcd 17489, Appx. C (2011) (*NPRM*).

[5] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, Appx. D (2014) (*FNPRM*).

[6] *See* 5 U.S.C. § 604.

*Order* retained the NBCO Rule, which prohibits common ownership of a daily newspaper and a full-power broadcast station (AM, FM, or TV) within the same local market, with only modest modifications in order to promote viewpoint diversity.  On reconsideration, the Commission finds that the NBCO Rule no longer meets the public interest standard required under Section 202(h).  The Commission finds that the NBCO Rule is no longer necessary to promote viewpoint diversity (and confirms that the rule is not necessary to promote competition or localism) because of the multiplicity of sources of news and information in the current media marketplace and the diminished voice of daily print newspapers.  The Commission also finds that the rule may, in fact, be limiting opportunities for broadcasters and newspapers to retain their strength as voices in local markets.  In addition, the Commission finds that eliminating the rule will benefit localism by allowing both broadcasters and newspapers to seek out new sources of investment and operational expertise, thereby potentially increasing the quantity and quality of local news programming they provide in their local markets.  On balance, therefore, the Commission finds that retaining the rule does not serve the public interest.  The Commission therefore concludes that retaining the rule is not in the public interest and that the public interest is best served by repealing the NBCO Rule.  Accordingly, a newspaper will be allowed to combine with television and radio stations within the same local market, subject to the remaining broadcast ownership rules.

5.     *Radio/Television Cross-Ownership Rule.*  In the *Order on Reconsideration*, the Commission finds that the Radio/Television Cross-Ownership Rule no longer serves the public interest.  Accordingly, the Commission eliminates the rule in its entirety.  The Commission concludes that it can no longer justify retention of the rule in light of broadcast radio's diminished contributions to viewpoint diversity and the variety of other media outlets that contribute to viewpoint diversity in local markets.  In addition, given that the Radio/Television Cross-Ownership Rule retained in the *Second Report and Order* already permits a significant degree of common ownership, the Commission concludes that the rule's elimination will have a negligible effect in most markets, particularly as ownership will continue to be limited by the Local Television and Local Radio Ownership Rules.  Accordingly, television stations and radio stations in the same market may be commonly owned provided that such ownership arrangements otherwise comply with the Local Television and Local Radio Ownership Rules.

6.     *Local Television Ownership Rule.*  In the *Order on Reconsideration*, the Commission finds that the Local Television Ownership Rule adopted in the *Second Report and Order* is not supported

(Continued from previous page) ———————————————
[7] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act) (codified as amended at 47 U.S.C. § 303 note); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act).

[8] 1996 Act § 202(h).  In *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) (*Prometheus I*), the Third Circuit concluded that "necessary in the public interest" is a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable.'"  *Id.* at 394.  The court stated that "the first instruction [of Section 202(h)] requires the Commission to take a fresh look at its regulations periodically in order to ensure that they remain 'necessary in the public interest.'"  *Id.* at 391.  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629.

[9] 47 U.S.C. § 303 note (Section 202(h) of the 1996 Act as amended).

[10] These rules are found, respectively, at 47 CFR Sections 73.3555(b), (a), (d), (c), and 73.658(g).

[11] The Commission declines to modify the market definitions relied on for the Local Radio Ownership Rule—though the *Order on Reconsideration* does adopt a presumptive waiver standard for certain embedded market transactions—and retains the disclosure requirement for shared service agreements (SSAs) involving commercial television stations, as requested by certain parties in petitions for reconsideration.  Accordingly, no supplemental FRFA is warranted for the Local Radio Ownership Rule or the SSA disclosure requirement, as the FRFA adopted in the *Second Report and Order* will continue to apply to those provisions.  In addition, in the *Order on Reconsideration* the Commission decides to adopt an incubator program and initiates a new proceeding to seek comment on the structure and administration of such a program.  That program is addressed in an IRFA attached to the *Order on Reconsideration* at Appendix C.

by the record and must be modified.  Specifically, the Commission eliminates the Eight-Voices Test, which required that at least eight independently owned television stations must remain in the market after combining ownership of two stations in a market.  The Commission modifies the Top-Four Prohibition, a prohibition against common ownership of two top-four ranked stations in all markets, adopting a case-by-case approach to account for circumstances in which application of the prohibition is not in the public interest.

7.      The Commission finds that the decision in the *Second Report and Order* to retain ownership rules focused on promoting competition among broadcast television stations in local television viewing markets was appropriate because broadcast television stations still play a unique and important role in their local communities.  However, the importance of broadcast television stations also compels the Commission to ensure that its rules do not restrict unnecessarily the ability of broadcast television stations to serve their local markets when facing pressure from ever-growing video programming options.

8.      On reconsideration, the Commission finds no record support or reasoned analysis to justify retention of the Eight-Voices Test.  In the *Second Report and Order*, the Commission failed to explain adequately why the number of independent television stations must be equal to the number of top-performing stations in a market (i.e., the top-four rated stations).  The *Second Report and Order* also failed to provide precedent, record evidence, or economic theory to support the underlying premise that the number of independent television stations must be equal to the number of top-performing stations in a market to promote competition.  The Commission also ignored evidence in the record demonstrating that the Eight-Voices Test lacks any economic support, is inconsistent with the realities of the television marketplace, and prevents combinations that would likely produce significant public interest benefits.  In the *Order on Reconsideration*, the Commission found that elimination of the Eight-Voices Test will enable broadcasters to realize potential public interest benefits of common ownership, potentially allowing local broadcast stations to invest more resources in news or other public interest programming that meets the needs of their local communities.  Accordingly, the Commission modifies the Local Television Ownership Rule as adopted in the *Second Report and Order* to eliminate the Eight-Voices Test.

9.      In contrast to the Eight-Voices Test, the Commission finds that its decision in the *Second Report and Order* to treat combinations involving two top-four rated stations differently than other combinations was generally supported by the record.  However, evidence in the record demonstrated that the concerns for which the Top-Four Prohibition is intended to address may not be present in some markets.  Accordingly, the Commission modifies the Top-Four Prohibition to include an option for case-by-case examination, which will lead to a more tailored application of the Local Television Ownership Rule.

10.     *Television JSA Attribution Rule*.  On reconsideration, the Commission finds that the *Second Report and Order* failed to demonstrate that television JSAs should be attributable and finds significant evidence that television JSAs help promote the public interest, particularly in small and mid-sized markets.  Attributing JSAs discourages stations from achieving these benefits to the detriment of the public interest.  Therefore, even if the *Second Report and Order* had correctly determined television JSAs should be attributable, the Commission finds that the public interest is best served by refraining from attributing such agreements.  Accordingly, based on a full consideration of the record, the Commission eliminates the Television JSA Attribution Rule.

**B.      Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

11.     The Commission received no comments in response to the IRFA, or the Supplemental IRFA.

**C.      Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

12.     Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the

Small Business Administration (SBA) and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[12]

13.    The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D.    Description and Estimate of the Number of Small Entities to Which Rules Will Apply

14.    The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted.[13]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[14]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[15]  A "small business concern" is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[16]  The final rules adopted herein affect small television and radio broadcast stations and small entities that operate daily newspapers.  A description of these small entities, as well as an estimate of the number of such small entities, is provided below.

15.    *Television Broadcasting*.  This Economic Census category "comprises establishments primarily engaged in broadcasting images together with sound."[17]  These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public.[18]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources.[19] The SBA has created the following small business size standard for such businesses: those having \$38.5 million or less in annual receipts.[20]  The 2012 Economic Census data reports that 751 such firms in this category operated in that year.  Of that number, 656 had annual receipts of \$25,000,000 or less, 25 had annual receipts between \$25,000,000 and \$49,999,999 and 70 had annual receipts of \$50,000,000 or more.[21]  Based on this data, we therefore estimate that the majority of commercial television broadcasters are small entities under the applicable SBA size standard.

16.    The Commission has estimated the number of licensed commercial television stations to be 1,382.[22]  Of this total, 1,262 stations (or about 91 percent) had revenues of \$38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on May 9, 2017, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission has estimated the number of licensed noncommercial educational television stations to be 393.[23]  Notwithstanding, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

17.    We note, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[24] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, another element of the definition of "small business" is that the entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific television broadcast station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which rules may apply do not exclude any television broadcast station from the definition of a small business on this basis and are therefore possibly over-inclusive.[25]  Also, as noted above, an additional element of the definition of "small business" is that the entity must be independently owned

---

[12] 5 U.S.C. § 604(a)(3).

and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and its estimates of small businesses to which they apply may be over-inclusive to this extent.

18. *Radio Stations*. This Economic Census category "comprises establishments primarily engaged in broadcasting aural programs by radio to the public. Programming may originate in their own studio, from an affiliated network, or from external sources."[26] The SBA has established a small business size standard for this category as firms having $38.5 million or less in annual receipts.[27] Economic Census data for 2012 shows that 2,849 radio station firms operated during that year.[28] Of that number,

---

(Continued from previous page) ————————————————

[13] *Id.*

[14] *Id.* § 601(6).

[15] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[16] 15 U.S.C. § 632.

[17] U.S. Census Bureau, 2017 NAICS Definitions, "515120 Television Broadcasting," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515120&search=2017+NAICS+Search&search=2017.

[18] *Id.*

[19] U.S. Census Bureau, North American Industry Classification System at 420 (2017) (Television Broadcasting NAICS Code 515120) (NAICS Codes 2017), https://www.census.gov/eos/www/naics/2017NAICS/2017_NAICS_Manual.pdf. Separate census categories pertain to businesses primarily engaged in producing programming. *See* Motion Picture and Video Production, NAICS Code 512110; Motion Picture and Video Distribution, NAICS Code 512120; Teleproduction and Other Post-Production Services, NAICS Code 512191; and Other Motion Picture and Video Industries, NAICS Code 512199.

[20] 13 CFR § 121.201 (NAICS code 515120).

[21] U.S. Census Bureau, Table No. EC1251SSSZ4, Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012 (515120 Television Broadcasting). https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table.

[22] Broadcast Station Totals as of June 30, 2017, Press Release (MB July 11, 2017) (June 30, 2017 Broadcast Station Totals), https://apps.fcc.gov/edocs_public/attachmatch/DOC-345720A1.pdf.

[23] *Id.*

[24] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both." 13 CFR § 121.103(a)(1).

[25] There are also 2,385 LPTV stations, including Class A stations, and 3,776 TV translator stations. June 30, 2017 Broadcast Station Totals. Given the nature of these services, we will presume that all of these entities qualify as small entities under the above SBA small business size standard.

[26] U.S. Census Bureau, 2017 NAICS Definitions, "515112 Radio Stations," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515112&search=2017+NAICS+Search&search=2017.

[27] 13 CFR § 121.201 (NAICS code 515112).

[28] U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515112 Radio Stations) https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table (visited Oct. 11, 2017).

2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more.[29] Therefore, based on the SBA's size standard the majority of such entities are small entities.

19.     According to Commission staff review of the BIA/Kelsey, LLC's Media Access Pro Radio Database on May 9, 2017, about 11,392 (or about 99.9 percent) of 11,401 of commercial radio stations had revenues of $38.5 million or less and thus qualify as small entities under the SBA definition.[30]  The Commission has estimated the number of licensed commercial radio stations to be 11,401.[31]  We note the Commission has also estimated the number of licensed noncommercial radio stations to be 4,111.[32]  Nevertheless, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

20.     We also note, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[33] must be included.  The Commission's estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation.[34]  We further note, that it is difficult at times to assess these criteria in the context of media entities, and the estimate of small businesses to which these rules may apply does not exclude any radio station from the definition of a small business on these basis, thus our estimate of small businesses may therefore be over-inclusive.  Also, as noted above, an additional element of the definition of "small business" is that the entity must be independently owned and operated.  The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

21.     *Daily Newspapers.*  The SBA has developed a small business size standard for the census category of Newspaper Publishers; that size standard is 1,000 or fewer employees.[35]  Business concerns included in this category are those that "carry out operations necessary for producing and distributing newspapers, including gathering news; writing news columns, feature stories, and editorials; and selling and preparing advertisements."[36]  Census Bureau data for 2012 show that there were 4,168 firms in this category that operated for the entire year.[37]  Of this total, 4,107 firms had employment of 499 or fewer employees, and an additional 22 firms had employment of 500 to 999 employees.[38]  Therefore, the

---

[29] *Id.*

[30] June 30, 2017 Broadcast Station Totals.

[31] *Id.*

[32] *Id.*

[33] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both."  13 CFR § 121.103(a)(1).

[34] 13 CFR § 121.102(b).

[35] *Id.* § 121.201 (NAICS Code 511110).

[36] NAICS Codes 2017 at 411 (Newspaper Publishers NAICS Code 511110).  These establishments may publish newspapers in print or electronic form.  *Id.*

[37] *See* U.S. Census Bureau, Table No. EC1251SSSZ5, Information:  Subject Series - Estab & Firm Size: Employment Size of Firms for the U.S.:  2012 Economic Census of the United States (NAICS code 511110), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prod%20Type=table (visited Oct. 11, 2017).

[38] *Id.*

Commission estimates that the majority of Newspaper Publishers are small entities that might be affected by its action.

E.      **Description of Reporting, Record Keeping, and other Compliance Requirements for Small Entities**

22.      The *Order on Reconsideration* eliminates the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule, modifies the Local Television Ownership Rule and, and eliminates the Television JSA Attribution Rule. The *Order on Reconsideration* does not adopt any new reporting, recordkeeping, or compliance requirements for small entities. The *Order on Reconsideration* thus will not impose additional obligations or expenditure of resources on small businesses. In addition, to conform to the elimination of the Television JSA Attribution Rule, parties to JSAs that were attributable under the previous rule will no longer be required to file the agreements with the Commission pursuant to Section 73.3613 of the Commission's rules.[39]

F.      **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

23.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities.[40]

24.      In conducting the quadrennial review, the Commission has three chief alternatives available for each of the Commission's media ownership rules—eliminate the rule, modify it, or, if the Commission determines that the rule is "necessary in the public interest," retain it. The Commission finds that the modification and elimination of the rules in the *Order on Reconsideration*, which are intended to achieve the policy goals of competition, localism, and viewpoint diversity, will continue to benefit small entities by fostering a media marketplace in which they are better able to compete and by promoting additional broadcast ownership opportunities, as described below, among a diverse group of owners, including small entities. The Commission discusses below several ways in which the rules may benefit small entities as well as steps taken, and significant alternatives considered, to minimize any potential burdens on small entities.

25.      *Newspaper/Broadcast Cross-Ownership (NBCO) Rule (Paragraphs 8-48).* In the *Order on Reconsideration*, the Commission considered whether to retain, modify, or eliminate the NBCO Rule. The Commission determined that the NBCO Rule is no longer in the public interest and should be repealed. As an alternative to the action taken, the Commission considered whether to adopt a modified NBCO Rule, but rejected that approach as unsupported by the record. As a result, newspapers will be able to combine with television and radio stations within the same local market, subject only to the Local Television and Local Radio Ownership Rules. Repeal of the NBCO Rule in its entirety eliminates the economic burden of compliance with the rule on small entities. Furthermore, repeal of the rule will allow broadcasters and local newspapers to seek out new sources of investment and operational expertise, potentially increasing the quantity and quality of local news and information they provide to consumers. Small broadcasters may find that merging with a newspaper could boost their ability to serve their local markets. The *Order on Reconsideration* finds that the NBCO Rule created considerable harm in small markets where the benefits of cross-ownership could have helped to sustain the local news outlets, many of which are likely to be small entities. Elimination of the rule will help promote additional investment

---

[39] 47 CFR § 73.3613.

[40] 5 U.S.C. § 603(c)(1)-(4).

opportunities for small entities in many local markets.  The *Order on Reconsideration* also concludes that repeal of the NBCO Rule is unlikely to have a material effect on minority and female ownership of newspapers and broadcast stations.

26.　　　*Radio/Television Cross-Ownership Rule (Paragraphs 49-65)*.  In the *Order on Reconsideration*, the Commission considers whether to retain, modify, or eliminate the Radio/Television Cross-Ownership Rule.  The Commission finds that the Radio/Television Cross-Ownership Rule no longer serves the public interest and should be repealed.  The Commission considers whether to adopt a modified rule, but rejects that approach as unsupported by the record.  Eliminating the rule allows television stations and radio stations in the same market to be commonly owned provided that such ownership arrangements otherwise comply with the Local Television and Local Radio Ownership Rules.  As with the NBCO Rule, repeal of the Radio/Television Cross-Ownership Rule in its entirety eliminates the economic impact of the rule on small entities.  Small entities in particular may benefit from the aforementioned efficiencies and benefits of common ownership enabled by the rule's repeal.  The Commission also finds that repeal of the Radio/Television Cross-Ownership rule is unlikely to have an effect on minority and female ownership of broadcast television and radio stations.

27.　　　*Local Television Ownership Rule (Paragraphs 66-85)*.  In the *Order on Reconsideration*, the Commission finds that the existing Local Television Ownership Rule is no longer necessary in the public interest but should be modified further to enable television stations to compete more effectively.  Accordingly, the Commission repeals the Eight-Voices Test that had required at least eight independently owned television stations to remain in a market after combining ownership of two stations in the market.  The Commission considers whether to adopt a different voice test, but rejects that approach as unsupported by the record.  In addition, the Commission considers whether to retain, modify, or eliminate the Top-Four Prohibition, a prohibition against common ownership of two top-four ranked stations in all markets.  The Commission finds that the record generally supported the Commission's decision in the *Second Report and Order* to treat combinations involving two top-four rated stations differently than other combinations, but on reconsideration the Commission modifies the rule to include a case-by-case approach to account for circumstances in which strict application of the prohibition is not in the public interest.  Under the new modified television ownership rule an entity may own two television stations in the same DMA if (1) the digital noise limited service contours (NLSCs) of the stations (as determined by Section 73.622(e)) do not overlap; or (2) at least one of the stations is not ranked among the top four stations in the market.  The Commission will consider combinations otherwise barred by the Top-Four Prohibition on a case-by-case basis.

28.　　　The modifications to the Local Television Ownership Rule are not expected to create additional burdens for small entities.  Conversely, the economic impact of the rule modification may benefit small entities by enabling them to achieve operational efficiencies through common ownership.  The *Order on Reconsideration* also concludes that the modifications to the Local Television Ownership Rule are unlikely to have an effect on minority and female ownership of broadcast television stations.

29.　　　*Television JSA Attribution Rule (Paragraphs 96-113)*.  On reconsideration, the Commission considers whether to retain or eliminate the Television JSA Attribution Rule.  The Commission finds that the rule was unsupported by the record and does not serve the public interest and therefore should be repealed.  The repeal of the Television JSA Attribution Rule eliminates the economic burden of the rule on small entities.  In the rapidly changing video marketplace, television JSAs help reduce costs and attract vital revenue at a time of increasing competition for advertising and viewership.  Efficiencies provided by JSAs also enable broadcasters to improve or increase services for local communities, thus fostering significant public interest benefits.  Local television broadcasters—particularly in small- and medium-sized markets—stand to benefit from these efficiencies that television JSAs create.  The repeal of the attribution rule will remove a regulatory disincentive for stations to enter into JSAs and enable these stations to better serve their communities.  In addition, because of the elimination of the Television JSA Attribution Rule, parties to JSAs that were attributable under the previous rule will no longer be required to file the agreements with the Commission, thus eliminating that economic burden.

**Report to Congress:** The Commission will send a copy of the *Order on Reconsideration*, including this Supplemental FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[41] In addition, the commission will send a copy of the *Order on Reconsideration*, including this Supplemental FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Order on Reconsideration* and Supplemental FRFA (or summaries thereof) will also be published in the *Federal Register*.[42]

---

[41] *See id*. § 801(a)(1)(A).

[42] *See id.* § 604(b).

**APPENDIX C**

**Initial Regulatory Flexibility Act Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this present Initial Regulatory Flexibility Act Analysis (IRFA) of the possible significant economic impact on small entities by the policies and rules proposed in this Notice of Proposed Rulemaking (*NPRM*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments provided on the first page of the *NPRM*.  The Commission will send a copy of the *NPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *NPRM* and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.        Need for, and Objectives of, the Proposed Rules

2.        In the *NPRM*, the Commission seeks comment on the structure and implementation of an incubator program.  Broadly speaking, an incubator program would provide an ownership rule waiver or similar benefits to a company that establishes a program to help facilitate station ownership for a certain class of new owners.  Under such a program, an established company could assist a new owner by providing "management or technical assistance, loan guarantees, direct financial assistance through loans or equity investments, training, or business planning assistance."[4]  The primary purpose of such a program would be to help provide new sources of capital and support to entities that may otherwise lack operational experience or access to financing and thereby promote diversity.  Over the years, a number of parties have proposed or supported recommendations for some type of an incubator program; however, substantive and administrative issues need to be resolved before an incubator program can be adopted. This *NPRM* seeks comment on these issues.

### B.        Legal Basis

3.        The proposed action is authorized pursuant to Sections 1, 2(a), 4(i), 257, 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 257, 303, 307, 309, 310, and 403.

### C.        Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.        The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[5]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]  A small business

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] 5 U.S.C. § 603(a).

[3] *Id.*

[4] Advisory Committee on Diversity for Communications in the Digital Age, Recommendation on Incentive-Based Regulations at 5 (June 14, 2004) (2004 Diversity Committee Incentive-Based Recommendations), https://www.fcc.gov/diversity-committee-adopted-recommendations (select "Incentive-Based Regulations").

[5] 5 U.S.C. § 603(b)(3).

[6] *Id.* § 601(6).

[7] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with

(continued….)

concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8] Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

5.  *Television Broadcasting*.  This Economic Census category "comprises establishments primarily engaged in broadcasting images together with sound."[9] These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public.[10] These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.[11]  The SBA has created the following small business size standard for such businesses: those having $38.5 million or less in annual receipts.[12]  The 2012 Economic Census data reports that 751 such firms in this category operated in that year.  Of that number, 656 had annual receipts of $25,000,000 or less, 25 had annual receipts between $25,000,000 and $49,999,999 and 70 had annual receipts of $50,000,000 or more.[13] Based on this data we therefore estimate that the majority of commercial television broadcasters are small entities under the applicable SBA size standard.

6.  The Commission has estimated the number of licensed commercial television stations to be 1,382.[14]  Of this total, 1,262 stations (or about 91 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on May 9, 2017, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission has estimated the number of licensed noncommercial educational television stations to be 393.[15]  Notwithstanding, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

---

(Continued from previous page) ————————————

the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[8] 15 U.S.C. § 632.

[9] U.S. Census Bureau, 2017 NAICS Definitions, "515120 Television Broadcasting," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515120&search=2017+NAICS+Search&search=2017.

[10] *Id.*

[11] U.S. Census Bureau, North American Industry Classification System at 420 (2017) (Television Broadcasting NAICS Code 515120) (NAICS Codes 2017), https://www.census.gov/eos/www/naics/2017NAICS/2017_NAICS_Manual.pdf.  Separate census categories pertain to businesses primarily engaged in producing programming. *See* Motion Picture and Video Production, NAICS Code 512110; Motion Picture and Video Distribution, NAICS Code 512120; Teleproduction and Other Post-Production Services, NAICS Code 512191; and Other Motion Picture and Video Industries, NAICS Code 512199.

[12] 13 CFR § 121.201 (NAICS code 515120).

[13] U.S. Census Bureau, Table No. EC1251SSSZ4, Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012 (515120 Television Broadcasting), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table (visited Oct. 11, 2017).

[14] Broadcast Station Totals as of June 30, 2017, Press Release (MB July 11, 2017) (June 30, 2017 Broadcast Station Totals), https://apps.fcc.gov/edocs_public/attachmatch/DOC-345720A1.pdf.

[15] *Id.*

7.     We note, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[16] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, another element of the definition of "small business" is that the entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific television broadcast station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which rules may apply do not exclude any television broadcast station from the definition of a small business on this basis and are therefore possibly over-inclusive.[17]  Also, as noted above, an additional element of the definition of "small business" is that the entity must be independently owned and operated.  The Commission notes that it is difficult at times to assess these criteria in the context of media entities and its estimates of small businesses to which they apply may be over-inclusive to this extent.

8.     *Radio Stations*.  This Economic Census category "comprises establishments primarily engaged in broadcasting aural programs by radio to the public.  Programming may originate in their own studio, from an affiliated network, or from external sources."[18]  The SBA has established a small business size standard for this category as firms having $38.5 million or less in annual receipts.[19]  Economic Census data for 2012 shows that 2,849 radio station firms operated during that year.[20]  Of that number, 2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more.[21]  Therefore, based on the SBA's size standard the majority of such entities are small entities.

9.     According to Commission staff review of the BIA/Kelsey, LLC's Media Access Pro Radio Database on May 9, 2017, about 11,392 (or about 99.9 percent) of 11,401 of commercial radio stations had revenues of $38.5 million or less and thus qualify as small entities under the SBA definition.[22]  The Commission has estimated the number of licensed commercial radio stations to be 11,401.[23]  We note the Commission has also estimated the number of licensed noncommercial radio stations to be 4,111.[24]  Nevertheless, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

---

[16] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both."  13 CFR § 121.103(a)(1).

[17] There are also 2,385 LPTV stations, including Class A stations, and 3,776 TV translator stations.  June 30, 2017 Broadcast Station Totals.  Given the nature of these services, we will presume that all of these entities qualify as small entities under the above SBA small business size standard.

[18] U.S. Census Bureau, 2017 NAICS Definitions, "515112 Radio Stations," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515112&search=2017+NAICS+Search&search=2017.

[19] 13 CFR § 121.201 (NAICS code 515112).

[20] U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515112 Radio Stations) https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table.

[21] *Id.*

[22] June 30, 2017 Broadcast Station Totals.

[23] *Id.*

[24] *Id.*

10.     We also note, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[25] must be included.  The Commission's estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation.[26]  We further note, that it is difficult at times to assess these criteria in the context of media entities, and the estimate of small businesses to which these rules may apply does not exclude any radio station from the definition of a small business on these basis, thus our estimate of small businesses may therefore be over-inclusive.  Also, as noted above, an additional element of the definition of "small business" is that the entity must be independently owned and operated.  The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

### D.     Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

11.     Certain options, if adopted, may result in new reporting, recordkeeping, and compliance obligations for those broadcasters that participate in an incubator program.  For example, parties could be required to submit the incubation proposal to the Commission for approval, file periodic compliance reports with the Commission or place the reports in their online public files, or submit requests for relief if the terms of the incubator proposal are not adhered to.  In order to evaluate any new or modified reporting, recordkeeping or other compliance requirements that may result from the actions proposed in this *NPRM*, the Commission has sought input from the parties on various matters.  The *NPRM* seeks comment on how to structure an incubation program, including a requirement that the parties file the incubation proposal with the Commission for the purpose of seeking the Commission's approval of the arrangement.  The Commission seeks comment on the method for filing the agreement in circumstances in which the parties seek Commission approval of the incubation relationship, such as whether it should be filed as part of an application for assignment or transfer of control of a broadcast license or, in the absence of such an application, via the Commission's Electronic Comment Filing System.  The *NPRM* also seeks comment on how to structure reporting, recordkeeping, and compliance requirements, which could also result in increased requirements for parties to an incubation arrangement.  For example, the *NPRM* seeks comment on whether to require periodic certifications that the parties remain in compliance with the incubation proposal approved by the Commission.

### E.     Steps Taken to Minimize Significant Economic Impact on Small Entities and Significant Alternatives Considered

12.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standard; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[27]

13.     To evaluate options and alternatives should there be a significant economic impact on small entities as a result of actions that have been proposed in this *NPRM,* the Commission has sought comment from the parties.  The *NPRM* seeks comment on the costs and benefits associated with various

---

[25] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has to power to control both."  13 CFR § 121.103(a)(1).

[26] 13 CFR § 121.102(b).

[27] 5 U.S.C. § 603(c)(1)–(4).

proposals and alternatives such as how to structure the administration and oversight of an incubator program and specifically seeks comment on ways to reduce the burdens on small entities.  Overall, however, the Commission believes that small entities will benefit from their participation in an incubator arrangement by getting access to capital and/or operational assistance that they may otherwise lack, which may minimize any economic impact that may be incurred by small entities.

     **F.**       **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

     14.      None.

## STATEMENT OF
## CHAIRMAN AJIT PAI

Re:　*2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 14-50; *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182; *Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294; *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, MB Docket No. 04-256; *Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket No. 17-289.

It's a simple proposition: the media ownership regulations of 2017 should match the media marketplace of 2017.

That's the proposition the FCC vindicates today—nothing more, nothing less. And it's about time. For few of the FCC's rules are staler than our broadcast ownership regulations. Notwithstanding the congressional command that we review and update these rules every four years, they have remained stuck in the past. After too many years of cold shoulders and hot air, this agency finally drags its broadcast ownership rules into the digital age.

Our decision is based on the law, the facts in the record, and sound economics. Some say we've gone too far. Others say we haven't gone far enough. I think we've gotten it just right.

The *Order* ably sets forth the rationale for our decisions. So I don't need to read a lengthy statement, a welcome change of pace for those who had to endure my long dissenting statements regarding the prior Commission's 2014 and 2016 media ownership orders. But I would like to briefly highlight four important points.

*First*, we eliminate the newspaper-broadcast cross-ownership rule that was adopted in 1975. As President Clinton's first FCC Chairman said back in 2013, this rule is "perverse." With the newspaper industry in crisis, it makes no sense to place regulatory roadblocks in the way of those who want to purchase newspapers. The media landscape has changed dramatically in the last 42 years, and the idea that a company could dominate a media market by owning a radio station and a newspaper is utter nonsense.

This is a rule that, among other things, predates cable news and a little thing called the Internet. It reflects a world in which people would come home from work, put on their slippers, read the evening paper, and watch the 11:00 news. It doesn't reflect a world in which we get news and analysis throughout the day from countless national and local websites, podcasts, and social media outlets. Indeed, one *Wall Street Journal* article recently dubbed Facebook "the most powerful distributor of news and information on Earth." And I know for a fact from my Twitter feed that many are following news of today's Commission meeting through that outlet.

To be sure, repealing the newspaper-broadcast cross-ownership rule won't end the newspaper industry's struggles. But it will open the door to pro-competitive combinations that can strengthen local voices and enable both newspapers and broadcast stations to better serve their communities.

*Second*, we reform the local television ownership rule to eliminate the eight-voices test. That test says that no company is allowed to own two television stations in a market unless there are at least eight independently-owned television stations in that market. We haven't been able to find any other industry in which the government preemptively decrees that there must be at least eight competitors for a market to be competitive. Nor have we found any economic literature justifying this proposition. And little wonder, for the eight-voices test has as strong a factual basis as does the health myth that you should

drink eight glasses of water per day.[1]  By ending this entirely arbitrary test, we allow efficient combinations that can help television stations thrive.  This is particularly true in small- and mid-sized markets where there may not be sufficient advertising revenue to support eight vibrant competitors.

*Third*, we reverse the prior FCC's mistaken crackdown on television joint sales agreements (JSAs).  Whenever I think about JSAs, I remember my 2015 visit to television station WLOO in Jackson, Mississippi.  WLOO is owned by Tougaloo College, a historically black college.  The station produces its own content, broadcasts in HD and carries programming created by and for African-Americans.  It also offers student-interns the opportunity to get hands-on training, nurturing the next generation of minority broadcasters.

During my visit, I toured the station with general manager Pervis Parker.  Pervis told me that WLOO's joint sales agreement with another Jackson station, WDBD, has been crucial to the station's success.  Without it, he told me the station wouldn't have survived given its limited financial resources.  In fact, I had first met Pervis the year before when he came to the FCC to express his opposition to the prior Commission's misguided crackdown on JSAs.

And this story is not unique.  I've visited two stations in Wichita that participate in a joint sales agreement that has allowed for the broadcast of the only Spanish-language television news in Kansas.  The staff working at those stations directly told me that these Spanish-language newscasts would not have been possible without the JSA.  And then there's the JSA in Joplin, Missouri that permitted KSNF and KODE to upgrade their Doppler radar system, which proved critical when a disaster tornado tore through the city on May 22, 2011.  These examples, and countless others, provide overwhelming evidence that JSAs improve local television stations' ability to serve their viewers' needs.  I'm pleased that at long last, we reject the prior misguided policy, which essentially made it impossible for stations to enter into JSAs in most markets.

And *fourth*, we adopt an incubator program to expand ownership diversity.  We heard a lot of talk during the prior Administration about the need to take action to promote ownership diversity.  But after eight years, what was there to show for it?  Nothing.  Zero.  It was all just a talking point, as underscored by the prior majority's specific rejection of my call for an incubator program a few years ago.  But this FCC is taking concrete action.  Today, we decide to establish an incubator program and seek public input on how it should be designed.  In addition, I've tasked the new Advisory Committee on Diversity and Digital Empowerment to study this issue and provide recommendations.  With wise counsel from the public and the committee, I'm confident that we'll craft a program that will help bring diverse voices into the broadcast industry.

Finally, I would like to thank the dedicated staff who worked on this *Order*: Ben Arden, Michelle Carey, Chad Guo, Brendan Holland, Tom Horan, Jamila-Bess Johnson, Kim Matthews, Mary Beth Murphy, and Julie Salovaara from the Media Bureau; and Susan Aaron, David Gossett, Dave Konczal, Jake Lewis, Bill Richardson, and Royce Sherlock from the Office of General Counsel.  The good news for you is that today marks the end of the 2010 and 2014 quadrennial reviews; the bad news is that next year, many of you will be starting work on the 2018 review.

---

[1] *See* "You don't really need to drink eight glasses of water each day," *The Verge* (May 10, 2017), *available at* https://www.theverge.com/2017/5/10/15619544/how-much-water-a-day-8-glasses-myth; "No, You Do Not Have to Drink 8 Glasses of Water a Day," *The New York Times* (Aug. 25, 2015), *available at* https://www.nytimes.com/.../no-you-do-not-have-to-drink-8-glasses-of-water-a-day.html.

## DISSENTING STATEMENT OF
## COMMISSIONER MIGNON L. CLYBURN

Re:     *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules
        and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, 2010
        Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and
        Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Promoting
        Diversification of Ownership in the Broadcasting Services, Rules and Policies Concerning
        Attribution of Joint Sales Agreements in Local Television Markets, Rules and Policies to Promote
        New Entry and Ownership Diversity in the Broadcasting Services,* MB Docket Nos. 14-50, 09-
        182, 07-294, 04-256, 17-289, Order on Reconsideration and Notice of Proposed Rulemaking

The problems with this Order on Reconsideration are so glaring – both on process and substance,
it is truly hard to decide just where to begin.

Do I start by describing why the wholesale elimination of key media ownership rules will harm
localism, diversity, and competition? Do I focus on the number of loopholes this Commission blesses
through this Order? Or do I highlight how the FCC majority has chosen to take some of the same facts
used by this Commission just over a year ago to reach the exact opposite conclusions? After I address
each of these failures in greater detail, allow me to explain the alternative proposal I put forward to my
colleagues.

Let me begin by establishing this: that despite what you have been told about the genesis of this
Order, it is not really about helping small, struggling broadcasters or newspapers. While the jury is still
out on whether it could actually achieve that goal, this is really about helping large media companies
grow even larger which is actually in stark contrast to what the President said just last week in discussing
the importance of having as "many news outlets as you can."[1] Because if our aim were to provide help for
the smallest entities in the tiniest of media markets, we would have adopted a narrowly tailored proposal
focused expressly on these financially challenged stations. Instead, today's action, coupled with recent
FCC actions, including the reinstatement of the UHF discount and the elimination of the Main Studio
Rule, we have paved the way for a new crop of broadcast media empires that will be light years removed
from the very local communities they are supposed to serve.

These media titans will have degrees of power far beyond the imagination of our local
communities. Our local outlets that inform us of what is happening in our community; our outlets
investigate allegations of improprieties within government; they inform us of whether we need an
umbrella or an overcoat; and they are there on the ground before, during, and after a major natural or
man-made disaster. Our local stations clearly play a unique role in our communities and unlike those 24-
hour cable news networks, our local outlets deliver their broadcast signal using the public airwaves and
with that comes, the responsibility to serve the public interest.

Now if you were to stop someone randomly on the street and ask them who owns their local
television or radio station, how many people would be able to answer? Would they know if two out of the
top four television stations in their community had the same owner and a third station was affiliated with
the stations through a sharing agreement? Would they know that their local news anchor is reporting a
story using the same script as dozens of other stations around the country, or even another station in their
own community? While these may not be top of mind questions for most Americans, the answers matter
and viewers or listeners have a right to know those answers. They should also be aware that these

---

[1] The Hill, *Trump says US needs 'many news outlets' amid rumored CNN sale* (November 11, 2017).

practices are already happening today and when this Order is adopted, the floodgates to more consolidation will come without transparency or accountability.

To be clear, the media landscape has changed a lot over the past thirty years and when it comes to coverage of national and international events, there is no question that Americans have more choice today than they did in 1975. But if we are going to play that game of making comparisons between the legacy platforms and newer entrants, including cable news and online sources, we need a neutral umpire to keep the score: these platforms are not created equal and the reality is, that they are not substitutes when it comes to local news and event coverage. As one news publication aptly put it last week, "Consolidating ownership won't put more reporters on the ground—but it will certainly amplify the influence of a small number of corporations."[2] I could not have said it better.

Citing to "simple fairness,"[3] the Chairman is fond of making a comparison between local broadcasters and tech companies like Google, Twitter and Facebook. Yet the last time I checked, none of these companies are in the newsgathering business nor to my knowledge are they engaged in local news production. A recent visit to Google's News page unscored this very point. Under the 'local' news tab for the District of Columbia, nine out of the first 10 search results linked to stories produced by guess what? A traditional local newspaper or a broadcast television or radio outlet. These are the simple facts that we cannot ignore when evaluating the current media landscape.

While I am not here to vilify financial success, the horror stories depicted in ex parte filings or cited in this Order by the largest of broadcasters as reason for eliminating the rules, do not match the realities of what is being presented on Wall Street. One major broadcast group, in fact, reported that their revenues are up 15% this year, a new record.  Another's revenues are up 17%, and yet another broadcaster saw its stock price reach a record high earlier this year.[4] As even further evidence of facts not matching filings, retransmission consent fees: they are up year-over-year by as much as 162%.[5] If these are the financial realities on the ground, why then are we in such a rush to eliminate protections that may prevent consolidation, but have untold benefits on localism and viewpoint diversity?

What may be less obvious to the casual observer, are the loopholes in our media ownership rules that this Order blesses. Take the use of Joint Sales Agreements (JSAs) for example. As I have shared in past statements, there have been cases in which these agreements have been shown to be in the public interest, albeit rare. But I have also described arrangements that amounted to the full-scale control of the brokered station, including the same programming, the same talent, the same management, and the same studio. Such an agreement coupled with the dismantling of other key media ownership rules substantially distorts the reality of how much control a broadcast station owner has in any given local market.

This Order also fails to acknowledge the past benefits from unwinding these JSAs. In a December 2014 blog, then Chairman Wheeler and I described how by enforcing the Local Television Ownership Rule, ten new minority and women-owned stations were established.[6] Similarly, absent from the

---

[2] Slate.com, *Only Sinclair Can Save You* (November 9, 2017).

[3] Op-Ed of FCC Chairman Ajit Pai, *Media Ownership Rules Must Adjust to the Digital Era*, The New York Times (November 9, 2017).

[4] *See, e.g.*, Broadcasting & Cable, *Meredith Revenue Hits Record $630M in Fiscal 2017* (July 27, 2017); TVNewsCheck, *Gray 1Q Revenue Hits Record $203.5M* (May 4, 2017); *Reuters, Exclusive: Sinclair approaches Tribune Media about possible deal – sources* (March 1, 2017).

[5] Communications Daily*, Media Notes* at 19 (November 15, 2017).

[6] Blog Post of FCC Chairman Wheeler and Commissioner Clyburn, *Making Good on the Promise of Independent Minority Ownership of Television Stations* (December 4, 2014).

Commission's analysis is the harms to minority ownership by eliminating ownership attribution of these agreements. As MMTC and NABOB pointed out in a recent joint filing, non-attribution of JSAs coupled with the repeal of the eight voices test could enable a single company to "completely dominat[e] [a] market's television advertising sales and mak[es] new entry impossible."[7] Once again, the Order fails to properly consider this very tangible reality.

Turning now to process, where we reverse course not much more than one year after the Commission completed its last Quadrennial Review. Certainly, something must have changed in those last 15 months to warrant such a drastic change in direction, right? Yet the facts are the facts and while my colleagues in the majority may not have agreed with the policy adopted by the previous Administration, it was based on a record that has not changed. If they disagree with policy – and that is their right to hold such a belief – then what they should have done was open a new proceeding and build a case for that position. The courts have admonished this agency in the past for changing our rules without a supporting record and today's Order on Reconsideration ignores the courts' instructions.

Continuing with the topic of process, take a look at how the Order incorrectly invokes Section 202(h) to suit its policy goals. Three times the courts have told us that if we want to make meaningful changes to our rules to promote minority and female ownership, then we must get comprehensive, reliable data. In *Prometheus II* for example, the court stated that, "[a]t a minimum, in adopting or modifying its rules, the FCC must 'examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"[8] Here, the Commission flips those instructions on its head by concluding without the benefit of any new data that "we cannot continue to subject broadcast television licensees to aspects of the Local Television Ownership Rule that can no longer be justified based on the unsubstantiated hope that these restrictions will promote minority and female ownership."

Now some supporters of this Order, may point to the Commission's newly commissioned Advisory Committee on Diversity and Digital Empowerment as evidence that we are on a path towards obtaining better data. The problem with such a notion is that we are adopting today's Order, less than two months after the Committee held its first meeting. What is the point of establishing a Committee, if the FCC majority has already reached the conclusion that our core media ownership rules are no longer necessary to support our goal of increasing diversity? The 31 members of this committee have agreed to step away from their busy schedules to do what the Chairman describes as "tak[ing] important steps towards increasing diversity throughout the communications industry and bringing digital opportunity to all Americans."[9] So, why not let them get to work and make recommendations to the full Commission and rely on data, instead of reversing the actions of the previous Administration simply because you feel differently.

News flash: There was in fact a path forward that could have garnered my support but regrettably the proposal I put forth was rejected. All petitions for reconsideration should have been denied on the basis of Section 1.429 of the Commission's rules. Specifically, this section of our rules outlines a narrow set of criteria by which the Commission will consider a petition that introduces new facts or arguments which have not previously been presented. Yet here, neither the facts nor arguments have changed in the year since the Commission completed the last Quadrennial Review. This majority has routinely rejected petitions for reconsideration that failed to meet these requirements, but here it ignores these rules

---

[7] Letter from Multicultural Media, Telecom and Internet Council (MMTC) & National Association of Black Owned Broadcasters (NABOB) to Marlene H. Dortch, Secretary, FCC (filed November 9, 2017).

[8] *Prometheus Radio Project v. FCC*, 652 F.3d at 469 (3d Cir. 2011) (Prometheus II).

[9] Remarks of FCC Chairman Ajit Pai before the Advisory Committee on Diversity and Digital Empowerment (September 25, 2017).

to satisfy its own self-serving interests.

Second, I proposed opening a new proceeding to explore the adoption of an incubator program. Such a concept has been debated for many years with bipartisan support, but is largely untested. I believe the questions posed in the accompanying Notice of Proposed Rulemaking (NPRM) are the right ones to be asking, but we are undertaking this process in the wrong order.

Third, I urged my colleagues to initiate a proceeding that would build a comprehensive set of data examining the impact of ownership diversity on the broadcast marketplace. The proceeding should also examine how further media consolidation would impact localism and competition. I proposed that this data collection be undertaken expeditiously and completed prior to the start of the 2018 Quadrennial Review.

And lastly, I proposed that any changes to the Commission's media ownership rules be considered as part of the 2018 Quadrennial Review, once the appropriate data is collected and an assessment can be made of the impact that an established incubator program has had in creating opportunities for new entrants and small businesses.

These asks, in my opinion, were not unreasonable. They are consistent with Commission rules, the instructions of the Third Circuit, and our commitment as an agency to be data-driven. Now my colleagues in the majority and other proponents of eliminating these rules might suggest that my aim was to further delay the inevitable. This could not be further from the truth. The reality is that the rule changes made in this Order are all interrelated. By looking independently at each change, rather than assessing the collective impact of the changes on the media landscape, we are left with a deeply flawed Order with no data to support its conclusions.

So, welcome my friends back to "Industry Consolidation Month" at the Federal Communications Commission where it seems my colleagues in the majority are more intent on granting the industry's wish list rather than looking out for the public interest. Mark my words, today will go down in history as the day when the FCC abdicated its responsibility to uphold the core values of localism, competition and diversity in broadcasting.

I vociferously dissent and look forward to the day when the court issues a decision to right this sad wrong.

# STATEMENT OF
# COMMISSIONER MICHAEL O'RIELLY

Re:    *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 14-50; *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 09-182; *Promoting Diversification of Ownership in the Broadcasting Services*, MB Docket No. 07-294; *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, MB Docket No. 04-256; *Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket No. 17-289.

Let me start my statement with a quote: "Today, the modern media marketplace includes literally thousands of radio and broadcast television stations, hundreds of national, regional, and local non-broadcast television networks delivering a vast range of content over cable and direct broadcast satellite systems, and perhaps most significantly, the Internet and a host of digital technology-enabled interactive services."[1]  This statement is from Chief Judge Scirica of the Third Circuit.  In 2004.

As the court has reminded this Commission, "Section 202(h) of the Telecommunications Act of 1996 uses unmistakably mandatory language in describing the Commission's obligations."[2]  Despite what some of my colleagues would have you believe, our action today is not part of a larger master plan to favorably set the landscape for a future merger.  Implying that is simply untrue and minimizes the repeated dereliction of duty by the Commission.  Instead, today's item – in 2017 – concludes the Commission's 2010/2014 Quadrennial Review.

First, the Commission eliminates the Newspaper/Broadcast Cross-Ownership ("NBCO") rule.  As the item carefully explains, in today's environment, the rule no longer makes sense.  This is not a new idea. In fact, the Commission, in one form or another, has been unable to justify this rule for more than *15 years*.

The Commission concluded as part of its 2002 review that a complete ban of newspaper and broadcaster cross-ownership was no longer in the public interest.  Upon review, the Third Circuit agreed with this conclusion, but found the FCC's alternative proposal to be arbitrary and capricious.  As a result, the 1975 rule remained.  Up next came the 2006 review.  Once again, the FCC no longer believed it could justify the ban and modified its rules accordingly.  But, once again, the court found process fouls and remanded the item.  As a result, the 1975 rule remained.

The wounds are still fresh from the 2010/2014 Quadrennial Review.  Prior to Commission action, the Third Circuit admonished the FCC for its delay[3] and specifically highlighted the NBCO rule, stating that "the 1975 ban remains in effect to this day even though the FCC determined more than a decade ago that it is no longer in the public interest."[4]  Perhaps determined to continue the process fouls of the past,

---

[1] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 436 (3d Cir. 2004) (*Prometheus I*) (Scirica, Chief Judge, dissenting in part).

[2] *Prometheus Radio Project v. FCC*, 824 F.3d 33, 50 (3d Cir. 2016) (*Prometheus III*) ("It provides that the Commission 'shall' review its rules on broadcast ownership every four years, 'shall determine whether any of such rules are necessary in the public interest as the result of competition,' and 'shall repeal or modify any regulation it determines to be no longer in the public interest.'").

[3] *Id.* at 51 ("The Commission's delay keeps five broadcast ownership rules in limbo: the local television ownership rule, the local radio ownership rule, the newspaper/broadcast cross-ownership ("NBCO") rule, the radio/television cross-ownership rule, and the dual network rule.").

[4] *Id.*

when the Commission finally did act on this proceeding it examined the full media landscape then did nothing to adjust our rules in response to that landscape.  In fact, despite having the votes to eliminate the cross-ownership rules, the Commission ignored precedent, consensus, and the record before it and in an about-face, decided to maintain the NBCO rule.  Again, the 1975 rule remained.

Today, we fix the shoddy effort of the previous Commission.  We also establish a thorough record and analysis justifying why the NBCO rule is no longer necessary.  I have no doubt that this item will wind up back on the desk of the Third Circuit.  However, the court will be hard pressed to find that the FCC failed to justify its reasoning.  More than a decade ago the court found that the FCC "reasonably concluded" that the NBCO rule was not necessary to promote competition or localism[5] and today's item fully addresses why it is also not needed to ensure viewpoint diversity.  According to Pew, "Americans turn to a wide range of platforms to get local news and information."[6]  The Third Circuit recognized this multiplicity of voices, including cable and Internet, in 2004.  It simply disagreed with the Commission on the degree to which these services competed with local newspapers.  But, something else happened in 2004: a social media platform known as Facebook launched, followed by Twitter in 2006.  These social media platforms, along with Google, became go-to sites that many consumers visit to first learn about breaking national or local news.  More than a decade later, it is hard to overstate the impact of social media platforms and online outlets on viewpoint diversity.

Also since 2002, the Commission has explored ways to modify the Local Television Ownership Rule, otherwise known as the duopoly rule.[7]  In 2004, the Third Circuit largely upheld the Commission's decision to relax the "eight voices test" but remanded the new numerical limits the FCC imposed.[8]  Once again, this had the effect of freezing the old rules in place.

I have long called for a reexamination of the duopoly rule.  In many markets, duopolies or triopolies could strengthen the overall state of broadcasters and allow stations to concentrate more resources on bringing more and higher quality local content to their viewers.  At the very least, requirements like the "eight voices test" makes even less sense now than it did in 2002 when the Commission first sought to eliminate it.  I am pleased that this Commission agrees.  As to the top-four restriction, I would prefer that we were adopting bright-line rules rather than relying on a staff-driven case-by-case assessment.  I also question how likely, and quickly, these decisions will be reached.  I trust that as we re-examine this issue as part of the 2018 Quadrennial Review we will give serious weight to a full elimination of the duopoly rule.

I also hope in the 2018 quadrennial that we can more honestly define the media market as it exists today.  While the item acknowledges that the video marketplace has substantially evolved, based on the current record the Commission declines to expand its market definition beyond local broadcast television stations.  I believe there is ample evidence that cable operators, over-the-top providers, Internet sites, and social media platforms compete with local broadcasters.  Fortunately, the item at least recognizes that its

---

[5] *Prometheus I,* 373 F.3d at 400–01.

[6] Pew Research Center and Knight Foundation, How People Learn About Their Local Community 1 (Sept. 26, 2011) (How People Learn About Their Local Community), http://www.pewinternet.org/2011/09/26/how-people-learn-about-their-local-community (cited in NAB FNPRM Comments at 25 & n.83 (cited in NAB Petition at ii & n.4) and Morris FNPRM Reply at 5).

[7] *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620 (2003) (2002 Biennial Review Order).

[8] *Prometheus I,* 373 F.3d at 412–21.

market definition could change in a future proceeding with a different record. While it may be a missed opportunity today, I will be watching closely for this in our next review of our rules.

We also eliminate the attribution rule for television joint sales agreements, which never should have been adopted in the first place. Further, we agree to set up an incubator program in this item, while exploring how to best structure it.

Turning to radio, I appreciate the Chairman's willingness to work with me and Commissioner Carr to address the issue of embedded markets. Originally, this item denied the relevant reconsideration petition. Admittingly, this is a narrow issue as only two markets have multiple embedded markets—DC and New York. I believe the Commission should have granted the petition in full and altered the Commission's methodology for determining compliance with the Local Radio Ownership Rule in markets containing embedded markets. As both Nielsen and BIA make clear, the listing of embedded markets in the parent market "is a reflection of geography, not an analysis of competition."[9] However, it appears the Commission wants to gather more information in the record before going this far. For these reasons, I understand that the Commission will consider this further in its 2018 Quadrennial Review.

Until then, Connoisseur presents convincing evidence that even under the most extreme circumstance in which one party were to own the maximum number of stations in each embedded market *and* each of these stations reached their highest ratings of the last 13 months, the owner would only rank third in the New York market with an 11.2 percent market share.[10] In Washington, DC, under the most extreme example, a station would rank sixth.[11] For these reasons, I support providing a presumptive waiver that the Commission will evaluate proposed transactions of radio stations located in the current markets with multiple embedded markets by looking to the transaction's compliance with the ownership limits in the embedded markets. Not only does the record support this, but this will bring more certainty to the marketplace until we can more fully examine this rule. These are important changes from the draft item.

Beyond the issue of embedded markets, I am disappointed that this item did very little to unburden the radio industry. While I was pleased to see the elimination of the Radio/Television Cross-ownership rule, I wish the Commission would have gone further in addressing our Local Radio Ownership Rules. For starters, it's time to review the Commission's AM/FM subcaps. However, I recognize that the Commission was confined to the petitions for reconsideration before us and that there will be an opportunity to re-examine our rules once again during the 2018 Quadrennial Review.

Finally, I am disappointed that the Commission declines to reverse course from the previous Commission's ill-advised decision to impose disclosure requirements for shared services agreements (SSAs) for commercial television stations. Despite assurances from this Commission, make no mistake: disclosure requirements are generally used as precursors for regulations. Maybe not today. Maybe not tomorrow. But regulations will likely come. It is also counterintuitive that in one item we consider today we question whether the costs of Form 325 data collections exceed the benefits of the information but in this item we retain illogical disclosure requirements. This is the wrong approach. We should treat this part of the proceeding in the same way that we have treated items within our media modernization initiative: with deep skepticism. I look forward to its elimination in the very near future.

---

[9] Connoisseur Oct. 30, 2017 *Ex Parte* Letter ("If embedded market stations really competed in the parent market, there would be no need to have embedded markets.").

[10] Connoisseur Nov. 9, 2017 *Ex Parte* Letter.

[11] Connoisseur Oct. 30, 2017 *Ex Parte* Letter.

In 2004, Judge Scirica got it right. He dissented from the court stay, suggesting it would be better to allow the quadrennial review process to run its course in order to allow both the Commission and Congress the ability to measure the media marketplace.[12] He cautiously warned, "[v]acating and remanding the proposed rules to the Commission will preserve the existing rules in place for months or even years, and the resulting delay will likely leave the public worse off than if these rules were allowed to take effect."[13] If only. These rules have been frozen in place for over a decade. Remands result in inertia. Inertia in our media ownership rules upend Congressional intent and prohibit a functioning media marketplace, to the detriment of the American consumer. If only the rest of the Third Circuit understood this as well.

In *Prometheus III* the court reminded us, "[r]arely does a trilogy benefit from a sequel."[14] I do not disagree. Alas, it is coming. I can only hope that this time there is a twist at the end: the court finally allows the Commission to do its job and update our rules to accurately reflect today's media landscape. If not, I trust we have the wherewithal to challenge any decision to a higher court.

---

[12] *Prometheus I,* 373 F.3d at 435–36.

[13] *Id.* At 438.

[14] *Prometheus III*, 824 F.3d at 60.

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:     *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules
and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB
Docket No. 14-50; *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast
Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act
of 1996*, MB Docket No. 09-182; *Promoting Diversification of Ownership in the Broadcasting
Services*, MB Docket No. 07-294; *Rules and Policies Concerning Attribution of Joint Sales
Agreements in Local Television Markets*, MB Docket No. 04-256; *Rules and Policies to Promote
New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket No. 17-289.

Congress recognized that the FCC's media ownership rules could outlive their usefulness. That's
why it directed the Commission to examine those rules every four years and determine whether they're
still "necessary in the public interest as the result of competition." Unfortunately, the Commission has
taken an ostrich-like approach to this requirement in nearly every one of its quadrennial reviews. And
when it finally completed the 2010 and 2014 reviews in August 2016, the Commission ignored the
realities of the modern media marketplace and the many ways that Americans now consume news and
information. This failure does not serve anyone's interest, as a broad range of stakeholders have made
clear.

Fortunately, the agency has a longstanding process that enables us to correct these types of errors.
Under our rules, any interested party can petition the FCC to reconsider a final decision in a notice-and-
comment rulemaking, and a number of parties did so. In response, the Commission provided public
notice and afforded all stakeholders an opportunity to comment.

As a result of this process, we now reconsider several decisions made in the Commission's
August 2016 order. In doing so, we finally acknowledge the reality that many of our current media
ownership rules are outdated and counterproductive.

Take the newspaper/broadcast cross-ownership ban. The FCC adopted it in 1975 to promote a
diversity of viewpoints. At the time, the Commission found that prohibiting one entity from owning both
a daily print newspaper and a broadcast station within the same local market would preserve independent
voices in a marketplace then characterized by relatively few such voices. But the extensive record
compiled in this proceeding shows that the newspaper/broadcast cross-ownership ban is now doing far
more harm than good. The record is replete with evidence of a newspaper industry in decline, with
massive drops in ad revenues in the Internet era and the shuttering of hundreds of newsrooms around the
country as a result. If we want to reverse this tide, if we want to incentivize greater investment in
journalism and additional resources for local reporting, then we should eliminate regulations that are
preventing that investment. Our decision today does just that.

And the benefits of our decision are not just theoretical. The record contains numerous examples
of grandfathered combinations where the FCC has allowed newspaper/broadcast cross-ownership. Those
combined operations are producing more local news than other enterprises. This should come as no
surprise, as the Commission recognized over a decade ago that the cross-ownership ban likely hinders the
Commission's localism goals. So I support today's long overdue decision to repeal the
newspaper/broadcast cross-ownership rule.

For similar reasons, I support the decisions to eliminate the outdated radio/television cross-
ownership rule and to make commonsense modifications to the local television ownership rule. In light
of the modern media landscape, our ownership rules should give broadcasters flexibility to attract
investment that will enable them to better serve their local markets. Additionally, I support our decision

to repeal the attribution rule for television joint sales agreements or JSAs.  The record makes clear that these JSAs enable broadcasters to attract critical revenue in a marketplace characterized by increased competition for advertising and viewers, and in turn, invest in service improvements for local communities.  And I am glad that we are seeking comment on an incubator program to promote more diversity and new entry into broadcast markets.

Likewise, I am pleased that today's Order provides some relief to local radio broadcasters that operate in so-called "embedded markets," which are smaller communities located outside of major cities.  Our current policy prevents certain combinations of radio stations in multiple embedded markets even where doing so could enable broadcasters to improve their coverage of local news and events and better compete for local listeners.  On reconsideration, we grant some relief by adopting a presumptive waiver approach for these types of embedded market scenarios.  I appreciate my colleagues' willingness to work with me on changes to this portion of the Order.

Finally, I thank the Media Bureau staff for all of their hard work on this item.  It has my full support.

# STATEMENT OF
# COMMISSIONER JESSICA ROSENWORCEL,
# DISSENTING

Re:     *2014 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*; *2010 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*; *Promoting Diversification of Ownership in the Broadcasting Services*; *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*; *Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket Nos. 14-50, 09-182, 07-294, 04-256, 17-289, Order on Reconsideration and Notice of Proposed Rulemaking (November 16, 2017)

There was a time when we waited in the morning for the news to hit the front stoop in print and on paper.  Then we waited at night, huddled around the glow of a single television screen, for the evening news.  Those days are long gone.  The world has changed.  Not one of us expects our news and information to be available in such a limited way.  Every one of us now looks for content at any time, in any place, and on any screen handy.

This is exciting.  But let's be honest, it's also challenging.  The economic models that sustained traditional newsgathering have been forever changed by digitization—and while new platforms are multiplying, what is viral is not always verifiable.

If you need an object lesson in why this is true, look at how fast false information spread following last month's deadly attack in Las Vegas.  The same happened following the recent shooting in Texas.  Inaccurate information during Hurricane Season increased the peril for those who were stranded in rough winds and high waters.  Untangling what is really happening with tax policy, health care policy, or anything else is a tough task.  Knowing what sources to trust, what facts to rely on, and which authorities to credit are things we need to do as citizens.  It's a big job—with real consequences.  Consider that we are only starting to tally the scope of the falsehoods peddled during election season and still struggling to understand the ramifications.

This is a challenge.  When frothy stuff takes hold online and inaccurately informs our actions we have a problem.  When disinformation has greater velocity than real information, we have a problem.  When filter bubbles emerge that never force us to consider what might be happening on the outside we have an issue.

These are not easy matters because they involve complicated questions.  How do we advance journalism when algorithms are ascendant?  How do we advance trust in real facts instead of dismissing them as fake news?  This is hard.  There are no simple answers.  But I do know this: the solution doesn't lie in the FCC scrapping from top to bottom its policies to prevent media concentration.

For decades, at the direction of Congress, the FCC maintained limits on the number of broadcast stations that a single company can own.  The agency curbed the ability to own broadcast stations and newspapers in the same market.  The agency prevented a single entity from owning multiple television stations and radio stations in the same market.  These policies were designed to sustain media diversity, localism, and competition.  Those values may not be especially trendy, but I think they are solid.  I think they support journalism and jobs.  I think they play a critical role in advancing the mix of facts we all need to make decisions about our lives, our communities, and our country.

Today the FCC dismantles those values. Instead of engaging in thoughtful reform—which we should do—this agency sets its most basic values on fire. They are gone. As a result of this decision, wherever you live the FCC is giving the green light for a single company to own the newspaper and multiple television and radio stations in your community. I am hard pressed to see any commitment to diversity, localism, or competition in that result.

We should be troubled. Because we are not going to remedy what ails our media today with this rush of new consolidation. We are not going to fix our ability to ferret fact from fiction by doubling down on just a handful of companies controlling our public airwaves. We are not going to be able to remedy the way the highest level in government is now comfortable stirring up angry sentiment, denouncing news as false facts, and bestowing favors on outlets with narratives that flatter those in power rather than offer the hard-hitting assessments we need as citizens. Instead we clear the way for more mergers of greater magnitude—like the one presently before us—which will benefit heartily from the destruction of these policies today.

Finally, a note on diversity. Media ownership matters because what we see on our screens says so much about who we are as a individuals, as communities, and as a nation. Study a bit of history and you can only come to one conclusion: consolidation will make our stations look less and less like the communities they serve. Women and minorities have struggled for too long to take the reins at media outlets. A modest rulemaking on an incubator isn't going to get us where we need to go. It's a high price to pay for the damage this order does and that is an exchange I am unwilling to make.

I dissent.